**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 16-10236-MSH |
| BLAST FITNESS GROUP, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| GARY W. CRUICKSHANK, | ) | |
| CHAPTER 7 TRUSTEE OF THE | ) | |
| ESTATE OF BLAST FITNESS | ) | |
| GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 18-01011 |
| v. | ) | |
| | ) | |
| HAROLD R. DIXON *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF DECISION ON MOTIONS TO DISMISS OF GOODWIN
PROCTER LLP, JOHN R. LECLAIRE AND JEREMIAH J. SULLIVAN AND MOTION
FOR PARTIAL SUMMARY JUDGMENT OF GOODWIN PROCTER LLP AND
JOHN R. LECLAIRE**

**I. Introduction**

In a thirty-count complaint,[1] Gary W. Cruickshank, the chapter 7 trustee of the

bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief

against forty-seven named[2] and dozens of unnamed John Doe defendants for allegedly depriving

BFG of or diverting from it valuable assets and profit opportunities, ultimately leading to BFG's

---

[1] As amended by a First Amended Complaint (ECF #130).
[2] Since the filing of the complaint, four of the original named defendants have been dismissed
from this proceeding by stipulation with the trustee.

filing of a petition under chapter 7 of the United States Bankruptcy Code on January 26, 2016.[3]

This adversary proceeding was commenced two years after the petition date on January 26,

2018.

Several of the defendants, including the law firm of Goodwin Procter LLP ("Goodwin"),

John R. LeClaire, a Goodwin partner, and Jeremiah J. Sullivan, a former Goodwin attorney

(collectively, the "Goodwin Defendants") have filed motions to dismiss with Goodwin and Mr.

LeClaire also filing a joint motion for partial summary judgment.[4]  Specifically, Goodwin and

Mr. LeClaire jointly moved to dismiss count I (fraudulent transfer under Bankruptcy Code §

548(a)(1)(B)),[5] count XII (legal malpractice), count XIII (breach of professional fiduciary duty),

count XIV (violation of Mass. Gen. Laws. ch. 93A, §§ 2 and 11), count XXII (breach of contract

pursuant to Bankruptcy Code §§ 544 and 550) and the correlative portions of count VII

(turnover pursuant to Bankruptcy Code § 550), count VIII (unjust enrichment), count XXIX

(attorneys' fees) and count XXX (costs). They moved for partial summary judgment with respect

to count III (fraudulent transfer under Massachusetts Fraudulent Transfer Act ("MFTA") §

5(a)(2)), count IV (fraudulent transfer under MFTA § 6(a)),[6] count VIII (unjust enrichment)[7] and

the correlative portions of count VII (turnover pursuant to Bankruptcy Code § 550).  Mr.

Sullivan seeks dismissal of all of the counts asserted against him, namely count VIII (unjust

enrichment), count XII (legal malpractice), count XIII (breach of professional fiduciary duty),

count XIV (violation of Mass. Gen. Laws. ch. 93A, §§ 2 and 11), count XXII (breach of contract

---

[3] All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 *et seq.*
[4] ECF ## 175, 213, and 177, respectively.  These motions relate to the First Amended
Complaint (ECF #130).
[5] Goodwin is a named defendant in count I, and Mr. LeClaire is not.
[6] Goodwin is a named defendant in counts III and IV, and Mr. LeClaire is not.
[7] Goodwin and Mr. LeClaire seek both dismissal and summary judgment on counts VII and
VIII.

pursuant to Bankruptcy Code §§ 544 and 550) and the correlative portions of count XXIX (attorneys' fees) and count XXX (costs).

The causes of action asserted against the Goodwin Defendants fall into two categories: legal malpractice claims and unjust enrichment claims. The legal malpractice claims, including those styled as breaches of fiduciary duty, breach of contract and violation of Mass. Gen. Laws ch. 93A, arise from 2012 and 2013 corporate transactions involving BFG, defendant Harold R. Dixon, who controlled BFG, and others.  Fees paid to Goodwin in 2013 form the basis for the unjust enrichment claims. The legal malpractice claims are the subject of the Goodwin Defendants' motions to dismiss while the unjust enrichment claims are the subject of the joint motion for partial summary judgment filed by Goodwin and Mr. LeClaire.

At the outset, I note that Trustee Cruickshank concedes that his claim under count I (fraudulent transfer under Bankruptcy Code § 548(a)(1)(B)) against Goodwin is time-barred and should be dismissed. I will, therefore, enter an order granting Goodwin and Mr. LeClaire's motion to dismiss count I as well as count VII, which seeks to effectuate any judgment that the trustee might recover under count I.[8]  I will also enter an order allowing Mr. Sullivan's motion to dismiss count VIII (unjust enrichment) against him as the trustee failed to plead that Mr. Sullivan received any compensation from BFG or that he was in any way enriched.  In addressing the remaining dispositive motions, I begin with the motions to dismiss.

---

[8] Count VII for turnover under Bankruptcy Code § 550 is brought against the "Count I Defendants," among others. Count VII is thus applicable to Goodwin because of its status as a count I defendant. Hence, dismissal of count I against Goodwin necessitates the dismissal of count VII against it.  The trustee's other fraudulent transfer counts against Goodwin (counts III and IV) contain references to Bankruptcy Code §§ 544(b) and 550(a) and would enable the trustee, if successful on either of those counts, to recover fraudulently transferred property from Goodwin.

## II. <u>Motions to Dismiss</u>

*A.*    *Legal Standards*

In ruling on the motions to dismiss, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences in the trustee's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).  A claim cannot be dismissed if the trustee has demonstrated a "plausible entitlement to relief." *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).  Conclusory or speculative allegations, however, must be disregarded.  *Ocasio-Hernandez v. Fortuno-Burset,* 640 F.3d 1, 12 (1st Cir. 2011).

*B.*    *Trustee's Factual Allegations*[9]

*1. BFG*

In 2010, Mr. Dixon met Steven Borghi, and the two discussed going into business together. ¶ 72. Mr. Borghi operated various Work Out World ("WOW") health clubs with Tony Beninati and, when Mr. Beninati died, with his widow, Elizabeth Beninati. ¶ 71.  Mr. Borghi allowed Mr. Dixon to learn about the discount fitness center business by giving him access to the offices and proprietary information of WOW. ¶ 73.

On February 14, 2011, CapeCapital LLC, a Massachusetts limited liability company ("CapeCapital"), formed BFG.[10]  ¶¶ 3, 74. CapeCapital was the sole manager of BFG, and Mr. Dixon, in turn, was the sole manager of CapeCapital.  ¶ 3. At its peak, BFG owned and operated

---

[9] Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the first amended complaint.

[10] Although not specifically pleaded in the complaint, there is no dispute that BFG is a Massachusetts limited liability company.

over sixty fitness clubs bearing its name throughout the United States. (Intro., p. 2). At all

relevant times, BFG acted at the direction of CapeCapital and Mr. Dixon. ¶ 92.

### 2. Dispute with Elizabeth Beninati

In 2011, Mr. Dixon and Mr. Borghi began operating various health clubs in New England

using the WOW trade name, triggering a dispute with Ms. Beninati. ¶¶ 77, 79. Mr. Dixon, Mr.

Borghi and BFG hired Mr. Dixon's longtime personal lawyer, defendant Mr. LeClaire of

Goodwin, to represent them in negotiations with Ms. Beninati in April 2011. ¶ 80. Negotiations

failed, and Ms. Beninati commenced a Massachusetts state court lawsuit against Mr. Dixon, Mr.

Borghi and BFG on May 24, 2012, seeking millions of dollars in damages. ¶¶ 79, 376. Goodwin

represented Mr. Dixon, BFG and Mr. Borghi in that litigation. ¶¶ 107, 376. In July 2014, the

state court entered judgment against Messrs. Dixon and Borghi. ¶¶ 88, 315. Final judgment

against them in excess of $4.5 million entered on January 9, 2015. ¶¶ 90, 317.

### 3. The Bally Transaction

In addition to its work on the Beninati litigation, Goodwin attorneys did other legal work

for BFG starting in 2011, including in connection with BFG's acquisition and transfer of fitness

clubs, the formation of various limited liability companies (LLCs) ancillary to these acquisitions

and transfers and the drafting of corporate and transactional documents. ¶¶ 102-03, 105, 107. In

2012, while the Beninati dispute was going on, BFG was in negotiations with Bally Total Fitness

Inc. to purchase thirty-nine work-out clubs and certain real estate. ¶ 105. The Goodwin

Defendants acted as counsel to BFG and its wholly-owned subsidiary, Blast Fitness Acquisition,

LLC ("Blast Acquisition"), in that transaction, and in that capacity participated in drafting an

asset purchase agreement dated April 10, 2012. ¶¶ 106, 110, 113. Under the terms of the asset

purchase agreement, BFG was to receive three pieces of commercial real estate from Bally

located in Maryland Heights, Missouri, West Hartford, Connecticut and Irving, Texas which were to be "sold pursuant to the terms of a separate purchase agreement . . . for an aggregate purchase price of $1,000,000 to an entity identified by [BFG] prior to Closing." ¶ 62, 118. Three of the thirty-nine work-out clubs being purchased by BFG operated at these locations. ¶¶ 114, 118.

According to emails exchanged between defendant Mr. Sullivan of Goodwin and Bally's counsel on April 12, 2012, the Goodwin Defendants knew by that date that Mr. Dixon wanted to designate entities not owned by BFG to take title to the Bally real estate. ¶¶ 131-133. On April 25, 2012, Mr. Dixon formed CapeCapital Maryland Heights, LLC, a Missouri LLC, CapeCapital West Hartford, LLC, a Connecticut LLC, and CapeCapital Irving, LLC, a Texas LLC, all of which were managed by Mr. Dixon and effectively owned by him. ¶¶ 18, 20, 22, 62, 145, 152, 157, 164. None of these entities was owned by BFG. ¶¶ 62, 163-64.

To raise part of the cash needed to complete the Bally transaction, the members of BFG agreed to sell a preferred membership interest in BFG to the Dixon Family Limited Partnership (an affiliate of Dixon). ¶¶ 138-39. The Goodwin Defendants drafted and presented to BFG and its members a member consent dated April 27, 2012, which provided in part:

> WHEREAS, the Members and Managers [of BFG] are seeking to raise additional capital for the Company for purposes including, but not limited [sic], financing the growth of the Company's business through the acquisition, from Bally Total Fitness Corporation, a Delaware corporation ("Bally") and certain of ts [sic] affiliates, of operating assets ***and real property associated with additional health club facilities*** (the "Bally Acquisition") ***by a direct subsidiary of the Company.*** (Emphasis added).

*Id.* This consent was presented to BFG's members at a time when Mr. Dixon and the Goodwin Defendants were already planning to transfer the Bally real estate to entities not owned by BFG. ¶ 140. Members of BFG, including Mr. Borghi, relied on the member consent when they

approved the admission of the Dixon Family Limited Partnership as a member of BFG and allowed the Bally transaction to move forward. ¶ 142. They did so believing that BFG would receive the Bally real estate. *Id.*

The Bally transaction closed on April 30, 2012,[11] and on or by that date, Bally had sold the Bally real estate to Mr. Dixon's LLCs, CapeCapital Maryland Heights, LLC, CapeCapital West Hartford, LLC and CapeCapital Irving, LLC. ¶¶ 146, 153, 158. Mr. Dixon used BFG funds to subsidize his purchase of the Bally real estate. ¶¶ 63, 178. Following the closings, CapeCapital and Mr. Dixon directed BFG and/or its subsidiaries to make above-market lease payments for the BFG clubs operating at the three Dixon-controlled properties, enabling Mr. Dixon to receive rent payments from BFG at inflated rates. ¶¶ 63, 166, 181-83. By 2014, all three real estate properties had been sold to third parties for prices in excess of their purchase prices. ¶¶ 148, 154, 159.

### 4. The Lexfit and Newfit Transactions

In late 2012, while the Beninati litigation was pending, Mr. Dixon began transferring profitable BFG clubs to new entities in order to shield them from BFG's creditors such as Ms. Beninati. ¶¶ 82, 273, 309. Lexfit, LLC, a Massachusetts LLC, and Newfit, LLC, a Delaware LLC, both managed by CapeCapital and Mr. Dixon, were two of these entities. ¶¶ 9, 10, 103, 273. On December 6, 2012, Mr. Dixon, Cape Capital and another defendant transferred sixteen of BFG's more profitable fitness clubs to Lexfit for no or nominal consideration. ¶¶ 274, 276. Goodwin is not alleged to have been involved in this transfer. On January 30, 2013, Mr. Dixon, Cape Capital and another defendant transferred an additional eight of BFG's more profitable clubs to Newfit. ¶ 283. Goodwin drafted the asset transfer agreement for the Newfit transfers. ¶

---

[11] This fact was not pleaded by the trustee but is not disputed.

288. BFG did not receive full consideration for these transfers. ¶ 285.  Also on January 30,

2013, Lexfit transferred eight of the clubs received from BFG in the December 2012 transaction

to Newfit for less than full consideration.  ¶¶ 289, 291, 293.  Goodwin drafted the transfer

agreement even though BFG was not a party to the agreement.  ¶ 292.  Shortly after these

transactions, in March 2013, Mr. LeClaire gave Mr. Dixon advice on how to protect his personal

assets.  ¶ 301.  As late as December 2014, Goodwin had agreed to "move assets the right way out

of BFG." ¶ 203.

## C.    *Trustee's Claims Against the Goodwin Defendants*

### 1. *The Bally Transaction*

The trustee alleges that Goodwin had a material, undisclosed and unwaivable conflict of

interest in its dual representation of Mr. Dixon and BFG in connection with the Bally transaction

which benefitted Mr. Dixon and harmed BFG.  ¶¶ 65, 103, 137, 170-72. He also claims that the

Goodwin Defendants failed to advise BFG and its principals regarding the duties of loyalty, care

and candor. ¶¶ 123, 126, 129, 167. Specifically, the trustee alleges that the Goodwin Defendants

knew the Bally real estate was being diverted away from BFG for the benefit of Mr. Dixon, they

allowed the transfers to occur and they breached their duty to BFG when they failed to inform

BFG and its members of Mr. Dixon's plan, and in fact purposely concealed from them that plan.

¶¶ 65, 119, 130, 168-169.  According to the trustee, the Goodwin Defendants knowingly

presented BFG's members with a fraudulent and misleading member consent on April 27, 2012,

a date after they learned of Mr. Dixon's intention to divert the real estate.  ¶ 141.  The Goodwin

Defendants' conduct, the trustee maintains, caused BFG significant damage in the form of

inflated rent payments and lost cash used to subsidize Mr. Dixon's acquisition of the Bally real

estate and lost corporate opportunity as the properties were later sold for a significant profit by Mr. Dixon's LLCs.  ¶¶ 63, 143, 166, 178, 181-82.

The Goodwin Defendants argue that even assuming the allegations against them are true, the claims relating to the Bally transaction are time-barred by the three year statute of limitations governing malpractice actions under Mass. Gen. Laws ch. 260, § 4.[12]  As the Goodwin Defendants note, the statute of limitations begins to run as soon as "the plaintiff knows or reasonably should know that he or she has been harmed by the defendant's conduct." *Williams v. Ely*, 423 Mass. 467, 473 (1996). "The plaintiff need not know the extent of the injury or know that the defendant was negligent for the cause of action to accrue." *Id.* According to the Goodwin Defendants, BFG should have realized that it had not acquired the Bally real estate as of April 30, 2012, when the Bally transaction closed or, at the latest, when it began paying rent to the Dixon entities which had acquired the properties. In their view the statute had run by mid-2015, many months before BFG's bankruptcy filing.

The trustee asserts that the statute of limitations was tolled.  First he argues that under the doctrine of continuing representation, the statute of limitations did not begin to run until December 2014 when Goodwin, Mr. LeClaire, and presumably Mr. Sullivan, ended their representation of BFG. Thus, he argues, the statute of limitations under Mass. Gen. Laws ch. 260, § 4 had not run as of January 26, 2016, when BFG filed its bankruptcy petition, and was extended to January 26, 2018, by Bankruptcy Code § 108(a).[13]

---

[12] The statute provides: "Actions of contract or tort for malpractice, error or mistake against attorneys . . . shall be commenced only within three years next after the cause of action accrues."  Mass. Gen. Laws ch. 260, § 4. Actions under Chapter 93A are subject to a four year statute of limitations. *See* Mass. Gen. Laws ch. 260, § 5A.

[13] Code § 108(a), in part, provides: "(a) If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later

The continuing representation doctrine tolls the statute of limitations for professional malpractice claims until the professional has ceased its representation of the injured party. The Massachusetts Supreme Judicial Court summarized the doctrine in *Lyons v. Nutt*, 436 Mass. 244, 249–50 (2002).

> The continuing representation doctrine, which we adopted in *Murphy v. Smith,* 411 Mass. 133, 579 N.E.2d 165 (1991), recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered. . . . The doctrine has no application, however, where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct. If the client has such knowledge, then there is no innocent reliance which the continued representation doctrine seeks to protect.

*Id.* (internal citations and quotation marks omitted).

In order for the continuing representation doctrine to apply, however, the continuing representation must be with respect to the same matter. *Hodas v. Sherburne, Powers & Needham, P.C.*, 938 F. Supp. 58, 60 (D. Mass. 1996) (holding that client's complaint sufficiently invoked continuing representation doctrine where allegations of malpractice pertained to the "matters that form[ed] the basis of the allegations"); *see also Cambridge Biotech Corp. v. Deliotte & Touche*, Civ. A. No. 96-1480-A, 1997 WL 42516, at *2 (Mass. Super. Ct. Jan. 28, 1997) (quoting *F.D.I.C. v. Deloitte & Touche*, 834 F. Supp. 1129, 1148-1149 (E.D. Ark. 1992)) ("The continuous treatment we mean, however, is treatment for the same or related illnesses or injures, continuing after the alleged acts or malpractice, not mere continuity of a general physician-patient relationship."); *DeGiacomo v. Tobin & Assocs., P.C. (In re Inofin Inc.)*, No.

---

of--
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief." 11 U.S.C. § 108(a).

12-1091, 2012 WL 5457415, at *24 (Bankr. D. Mass. Nov. 8, 2012) (quoting *Cambridge Biotech*, 1997 WL 42516 at *2).  Here it was not.

While the trustee points to Goodwin and Mr. LeClaire's representation of BFG in the Lexfit and Newfit transactions and in the Beninati litigation which continued into 2014, these matters were separate and distinct from the Bally transaction, and they did not arise out of or relate in any way to the Bally transaction. The Goodwin Defendants' representation of BFG in the Bally transaction ended with the consummation of that transaction in April 2012. Thus, the continuing representation doctrine does not toll the statute of limitations here.

The trustee raises a second argument as to why the statute of limitations was tolled.  He asserts that knowledge of the alleged harm was fraudulently concealed from BFG thereby tolling the statute of limitations under Mass. Gen. Laws ch. 260, § 12.[14]  "When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G.L. c. 260, § 12, for the period prior to the plaintiff's discovery of the cause of action." *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 519 (1997). The trustee relies on the Goodwin Defendants' preparation of the member consent falsely stating that a direct subsidiary of BFG would be acquiring the Bally real estate.  The trustee alleges that the Goodwin Defendants knew prior to the preparation of the member consent that Mr. Dixon intended to designate non-BFG entities to acquire the Bally real estate and that they "purposefully concealed" that plan from the members of BFG.  ¶ 130-31.

---

[14] The statute provides: "If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." Mass. Gen. Laws ch. 260, § 12.

The Goodwin Defendants assert that BFG knew or should have known by April 30, 2012, when the Bally transaction closed, that BFG had not acquired the Bally real estate. They point to Mr. Dixon's knowledge of the real estate transfers, which they assert should be imputed to BFG, and to BFG's payment of rent to the Dixon-controlled owners of the properties.  Additionally, they blame the inaccurate members' consent on a "scrivener's error."  These defenses are insufficient to overcome the tolling provisions of Mass. Gen. Laws ch. 260, § 12.

"Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying [Mass. Gen. Laws ch. 260,] § 12." *Demoulas,* 424 Mass. at 519. The Goodwin Defendants drafted the member consent and presented it to the members for signature as BFG's attorneys.  A fiduciary relationship existed between BFG and the Goodwin Defendants. Scrivener's error or not, the Goodwin Defendants had a duty to inform the members of BFG other than Mr. Dixon that BFG was paying for but not acquiring the Bally real estate. That BFG paid rent for the three locations is irrelevant as the disinterested members of BFG, even if they were aware of the rental payments, would not have been required to make independent inquiry to determine that the landlords were not BFG-controlled entities.  *Demoulas*, 424 Mass. at 520. Without the disinterested BFG members having had actual knowledge, the fraudulent concealment continued.  *Id*. at 519.

With respect to the contention that Mr. Dixon's knowledge about the real estate transfer should be imputed to BFG, "an agent's knowledge of his own unauthorized acts is not imputed to the principal when the agent has acted fraudulently toward the principal and is engaged in an independent fraudulent act from which the principal does not benefit." *Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky &*

*Fitzgerald, P.C.*, 425 Mass. 63, 67, (1997) (citing *Tremont Trust Co. v. Noyes*, 246 Mass. 197, 207, 141 N.E. 93 (1923) and Restatement (Second) of Agency § 282 (Am. Law Inst. 1958) ("[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes . . . . "); *see also GTE Prods. Corp. v. Broadway Elec. Supply Co.*, 42 Mass. App. Ct. 293, 299–300 (1997) ("Indeed in cases like this where the agent and a third party have colluded to defraud the principal, the agent's knowledge generally is *not* imputed to the principal. . . . The rationale for imputing an agent's knowledge to his principal in order to do justice to an innocent third party is totally lacking here.") (emphasis in original).

In *Demoulas*, the Massachusetts Supreme Judicial Court recognized the "adverse domination" doctrine. "Under this doctrine, the statute of limitations is tolled while a corporate plaintiff continues under the domination of the wrongdoers." *Demoulas*, 424 Mass. at 523 (citing 3A William Meade Fletcher et al., Law of Private Corporations § 1306.20 (perm. ed. 1994 & Supp. 1996)). As noted in *Demoulas* there are several versions of the doctrine.

> The most common one is the "disinterested majority" test, under which the statute does not run until a majority of board members are disinterested and the board is therefore able to act on behalf of the corporation against the wrongdoers. . . . Other courts have proposed a stricter "complete domination" test, under which a plaintiff seeking to toll the statute of limitations must show that the culpable directors had full, complete, and exclusive control for the period at issue, so that there was no director or shareholder with knowledge who could have induced the corporation to bring an action.

*Id.* at 523-24 (internal citations omitted).

Although Mr. Dixon, the sole manager of CapeCapital, which, in turn, was the sole manager of BFG, knew BFG was not acquiring the Bally real estate, that knowledge is not

enough to prevent the tolling of the statute of limitations.  The Goodwin Defendants' motions to dismiss must be denied with respect to the counts in the complaint related to the Bally transaction.

### 2. The Lexfit and Newfit Transactions

The trustee alleges that Goodwin and Mr. LeClaire were in a conflict of interest position in violation of their duty of loyalty to BFG when they represented multiple parties in the Lexfit and Newfit transactions, which aided Mr. Dixon and harmed BFG.  ¶¶ 288, 292. He adds that the Lexfit and Newfit transactions furthered fraudulent transfers by BFG and breaches of duty by Dixon that were already taking place.  ¶ 292. The trustee alleges that this conduct gives rise to legal malpractice (count XII), breach of professional fiduciary duty (count XIII) and breach of contract (count XXII).

The parties dispute whether the complaint alleges sufficient facts to show that Goodwin's actions in the Lexfit and Newfit transactions breached a duty to BFG and, if there was a breach, whether the breach caused harm to BFG.[15]  Relying on Massachusetts Rule of Professional Conduct 1.2(a),[16] the Goodwin Defendants allege that there was no breach of duty in the Lexfit and Newfit transactions because Mr. Dixon, through Cape Capital, BFG's manager, directed the

---

[15] For a plaintiff to succeed on a legal malpractice claim, the plaintiff must show:

> "(1) an attorney-client relationship; (2) a duty to exercise a reasonable degree of care and skill in the performance of the attorney's legal duties; (3) a violation of this duty; and (4) reasonably foreseeable harm caused by the attorney's negligence."

*Alicea v. Commonwealth*, 466 Mass. 228, 234 n.9 (2013).

[16] The Rule provides in relevant part: "A lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law and these Rules."  Mass. R. Prof. C. 1.2(a).

transfers.  The Goodwin Defendants maintain that the firm was simply carrying out the lawful

instructions of its client, BFG.   Additionally, they argue that there was no conflict of interest in

representing both BFG and Mr. Dixon, asserting that it is not unlawful to represent a

Massachusetts LLC while simultaneously representing its controlling equity holder and that it is

common for law firms to represent organizations in transactions designed to favor an equity

holder.  The trustee, on the other hand, alleges that there are times when a lawyer must refuse to

carry out his client's instructions, and this was one of those times.  He relies on Mass. R. Prof. C.

1.2(d)[17] and alleges that Goodwin assisted Mr. Dixon in conduct it knew or should have known

was fraudulent. He also asserts that BFG's and Mr. Dixon's business interests and objectives

were in conflict— BFG desired to earn profit for its owners, while Mr. Dixon sought to enrich

himself by shielding assets from creditors, including Ms. Beninati.  This, he contends, was a

conflict of interest that should have prevented Goodwin from representing both parties.

Clearly Goodwin and Mr. LeClaire owed a duty of undivided loyalty to BFG, *see Bartle*

*v. Berry*, 80 Mass. App. Ct. 372, 378 (2011) ("There is no question that an attorney owes a duty

of undivided loyalty to his client."), and the conflict presented by their simultaneous

representations of other potentially adverse parties may have breached that duty. It is enough at

this stage of the proceeding that the complaint plausibly states such a claim.

Alternatively, the Goodwin Defendants argue that even if there was a breach of duty,

there was no causation, and accordingly the malpractice claim must fail.  For causation to exist in

a legal malpractice claim, the plaintiff must show that it would have been better off had the

attorney not breached his duty.  *See, e.g.*, *Shimer v. Foley, Hoag & Eliot LLP*, 795 N.E.2d 599,

---

[17] The Rule provides in relevant part: "A lawyer shall not counsel a client to engage, or assist a
client, in conduct that the lawyer knows is criminal or fraudulent . . . ." Mass. R. Prof. C. 1.2(d).

606 (Mass. App. Ct. 2003) (noting plaintiff must show that it suffered loss due to attorney's negligence); *McCann v. Davis, Malm & D'Agostine*, 423 Mass. 558, 560 (1996) (denying relief because the plaintiff was not harmed by the lawyer's negligence); *Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 515 N.E.2d 891, 895 (Mass. App. Ct. 1987) ("A client in a malpractice action based on an allegation of attorney negligence must show that, but for the attorney's failure, the client probably would have been successful in the prosecution of the litigation giving rise to the malpractice claim.").

The trustee alleges that there were two harms to BFG directly resulting from the Goodwin Defendants' malpractice. First, the trustee alleges that BFG was harmed by receiving less than fair market value for the clubs transferred in the Lexfit and Newfit transactions. ¶¶ 283-85, 306. Second, he alleges the transfers deprived BFG of the revenue from its most profitable clubs. ¶¶ 66, 283. Goodwin argues that despite these allegations, the complaint does not adequately plead causation because it does not allege what would have happened had it acted differently. The complaint, however, alleges that other unconflicted attorneys would not have let the transactions occur and without the transfers of its more profitable clubs, BFG would have been in a stronger financial position. ¶¶ 66, 68. Therefore, the trustee's amended complaint states a claim upon which relief can be granted, and the Goodwin Defendants' motions to dismiss must be denied with respect to the Lexfit and Newfit transactions as related to counts XII, XIII, and XXII.[18]

---

[18] The three counts are so "inextricably intertwined" that as goes one, so go the rest. *See Cholfin v. Gordon*, No. CA 943623C, 1996 WL 1185106, at *4 (Mass. Super. Ct. Jan. 2, 1996); *see also Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 397 n.7 (2003) ("There is little practical difference between the elements of proof in a tort action for negligence and a contract action for the negligent provision of legal services."); *Thomas v. Mass. Bay Transp. Auth.*, 389 Mass. 408, 409-410 (1983) (noting the overwhelming similarities between contract and negligent tort claims in personal injury suits).

### 3. Mass. Gen. Laws ch. 93A

To successfully state a claim under Mass. Gen. Laws ch. 93A, §11, a plaintiff must

establish:

> (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G.L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice.

*Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 469 Mass. 813, 820 (2014) (footnote omitted);

*see also 477 Harrison Ave., LLC v. Jace Boston, LLC*, 477 Mass. 162, 171-172 (2017) (quoting

*Auto Flat*).

Courts have discretion in determining what constitutes an unfair or deceptive act or

practice, but should consider: "1) whether the practice falls within the penumbra of common-

law, statutory, or other established concepts of unfairness; 2) whether it is immoral, unethical,

oppressive, or unscrupulous; and 3) whether it causes substantial injury to consumers,

competitors, or other businessmen." *Bridge Over Troubled Waters, Inc. v. Argo Tea, Inc.*, 220 F.

Supp. 3d 213, 220 (D. Mass. 2016) (quoting *Boyle v. Int'l Truck and Engine Corp.*, No. 01-

10039-DPW, 2002 WL 823810, at *6 (D. Mass. Apr. 23, 2002)).  Despite the court's discretion

in determining unfair or deceptive acts or practices, negligent legal representation alone does not

satisfy the requirements of ch. 93A.  *See Meyer v. Wagner*, 429 Mass. 410, 423-24 (1999).

Absent conduct involving dishonesty, fraud, deceit or misrepresentation, legal malpractice does

not constitute a ch. 93A violation.  *Poly v. Moylan*, 423 Mass. 141, 151 (1996); *Spenlinhauer v.*

*Kane*, No Civ. A. 9601ST-044887, 1998 WL 474170, at *2 (Mass. App. Ct. Aug. 4, 1998);

*O'Brien v. Kelly*, No. 05-P-1469, 2007 WL 121337, at *2 (Mass. App. Ct. Jan. 18, 2007).

The trustee alleges the Goodwin Defendants had a duty to act loyally to BFG due to their

attorney-client relationship.  He points to the Bally, Lexfit and Newfit transactions as evidence of

17

the breach of that loyalty, arguing that it is a fair inference that Goodwin and Mr. LeClaire

consistently remained loyal to Mr. Dixon to the detriment of BFG and its members and that they

intended to deceive BFG's members by failing to inform them of their loyalty to Mr. Dixon,

which was a violation of ch. 93A.   ¶¶ 68, 167, 169, 171, 288.  By Goodwin's representation of

both Mr. Dixon and BFG in transactions to the detriment of BFG, the trustee's complaint alleges

sufficient facts to plausibly support the conclusion that the Goodwin Defendants had a conflict of

interest that was unethical under Massachusetts law, *see* Mass. R. Prof. C. 1.7,[19] coupled with an

intent to deceive its client, BFG. The trustee's complaint therefore states a claim upon which

relief can be granted under ch. 93A, and the Goodwin Defendants' motions to dismiss will be

denied with respect to that count. *See generally Karasavas v. Gargano*, 31 Mass. L. Rptr. 624,

(Mass. Super. Ct. 2014), *aff'd*, 87 Mass. App. Ct. 1125 (Mass. App. Ct. 2015) (holding that

attorney's charging of excessive fee and handling of client funds in violation of ethical

---

[19] The Rule provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>> (1) the representation of one client will be directly adverse to another client; or
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>> (2) the representation is not prohibited by law;
>> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>> (4) each affected client gives informed consent, confirmed in writing.

Mass. R. Prof. C. 1.7.

requirements constituted unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A).

### 4. Unjust Enrichment Claim Against Mr. Sullivan

The trustee asserts a claim for unjust enrichment (count VIII) against all defendants. Although he specifically alleges that Goodwin and Mr. LeClaire received substantial payments from BFG to which they were not entitled, *see* ¶¶ 176, 369, he has not done so with respect to Mr. Sullivan and has identified him as a former Goodwin attorney, not a Goodwin partner.  In the absence of any allegation against Mr. Sullivan that he was unjustly enriched or received fees paid by or behalf of BFG, I will dismiss count VIII as against him.

### III. <u>Motion for Partial Summary Judgment</u>

#### A.    Legal Standards

Fed. R. Civ. P. 56 governs motions for summary judgment in bankruptcy proceedings, per Fed. R. Bank. P. 7056. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.*, *Inc.* 76 F.3d 413, 428 (1st Cir. 1996)). "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the nonmovant. *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995).

**B.**     ***Claims Against Goodwin and Mr. LeClaire***

It is undisputed that on January 25, 2013, BFG wired $175,000 to Goodwin, and on August 30, 2013, Blast Acquisition wired $375,000 to Goodwin.  The trustee seeks to avoid those payments as fraudulent transfers under sections 5 and 6 of the Massachusetts Fraudulent Transfer Act[20] ("MFTA") (counts III and IV) and to recover the payments under Bankruptcy Code § 550 (count VII).[21]  He also seeks to recover them on a claim of unjust enrichment from property of the estate (count VIII).

Goodwin and Mr. LeClaire seek partial summary judgment on these counts, asserting that BFG received reasonably equivalent value for both transfers in the form of legal services rendered by Goodwin and that the second transfer was not made by the debtor, BFG. They also seek summary judgment with respect to the unjust enrichment count, asserting that it is nothing more than a recycled avoidance claim which fails as a matter of law because the trustee is not entitled to a declaration of an interest in transfers when he cannot avoid those transfers.

---

[20] Section 5(a) of the MFTA provides, in part: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . ." Mass. Gen. Laws ch. 109A, § 5(a).

Section 6(a) of the MFTA provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Mass. Gen. Laws ch. 109A, § 6(a).

[21] As stated above, count VII (turnover under Bankruptcy Code § 550) has been dismissed against Goodwin due to the dismissal of count I against it.  Notwithstanding the dismissal of that count, the trustee would still be able to recover fraudulently transferred property from Goodwin under counts III and IV (fraudulent transfers under MFTA) should he ultimately prevail against it on either of those two counts as they contain references to Bankruptcy Code §§ 544(b) and 550(a).

The trustee counters that additional discovery will permit him to demonstrate a genuine dispute over whether BFG or Blast Acquisition paid the $375,000 to Goodwin and whether there was reasonably equivalent value given for both transfers.  *See* Fed. R. Civ. P. 56(d), made applicable to this proceeding by Fed. R. Bankr. P. 7056.  He maintains that he reasonably expects discovery to produce useful and material evidence on the claims in question, and that I should not permit Goodwin and Mr. LeClaire to parachute away from them before completion of discovery by using summary judgment to avoid claims they could not otherwise escape through a motion to dismiss.

Rule 56(d) provides:

d) **When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "[C]ourts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter." *Resolution Tr. Corp. v. N. Bridge Assocs., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994).

A litigant who desires to invoke Rule 56(f) must make a sufficient proffer. In all events, the proffer should be authoritative; it should be advanced in a timely manner; and it should explain why the party is unable currently to adduce the facts essential to opposing summary judgment. . . . When, as is often the case, the reason relates to incomplete discovery, the party's explanation must take a special form: it should show good cause for the failure to have discovered the facts sooner; it should set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist; and it should indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion.

*Id.* (internal citations omitted).[22]

The trustee's counsel submitted an affidavit setting forth his efforts to obtain discovery related to the two payments received by Goodwin as well as information as to the source of a third payment. The trustee points to Blast Acquisition's bank statement for August 2013 which reflects an incoming wire transfer of $375,000 on August 23, a week before the outgoing wire transfer to Goodwin, suggesting that Blast Acquisition was not the source of those funds. The trustee seeks Goodwin's invoices and detailed time records to determine the nature of the legal services and whether those services provided any benefit to BFG. The trustee also pointed in his affidavit to a payment of $800,000 made by Newfit to Goodwin.  The trustee seeks discovery to determine why and at whose direction that payment was made.

Goodwin and Mr. LeClaire point to the trustee's delay of almost two years after his appointment before bringing this adversary proceeding as undercutting the trustee's claim for additional discovery. The relevant issue, however, is not whether the trustee waited two years to bring this adversary proceeding but whether, upon the commencement of the proceeding, the trustee delayed in seeking discovery. He clearly did not.  The affidavit of the trustee's counsel establishes his diligent but as yet unsuccessful efforts to obtain documents responsive to his inquiry into whether BFG paid legal fees to Goodwin for services provided to others. Until the trustee has been provided with the necessary discovery, the motion for partial summary judgment is premature and will be denied without prejudice.

---

[22] *Resolution Tr. Corp*. discusses then-Rule 56(f), which is now Rule 56(d). Rule 56(d) "carrie[d] forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.

## IV. <u>Conclusion</u>

Based on the foregoing, an order shall enter granting the motion to dismiss of Goodwin and Mr. LeClaire with respect to counts I and VII of the complaint against Goodwin, and denying the Goodwin Defendants' motions to dismiss with respect to counts XII, XIII, XIV, XXII and the correlative portions of counts VIII, XXIX and XXX, except that an order shall enter allowing Mr. Sullivan's motion to dismiss count VIII against him. An order denying without prejudice the motion for partial summary judgment will also enter.


Dated: January 8, 2019                                By the Court,


                                                     Melvin. S. Hoffman
                                                     United States Bankruptcy Judge



          Counsel Appearing:    Ilyas J. Rona, Esq.
                                Milligan Rona Duran & King LLC
                                Boston, MA
                                       for the plaintiff, Gary W. Cruickshank,
                                       Trustee of the Estate of Blast Fitness
                                       Group, LLC

                                Peter Sabin Willett, Esq.
                                Morgan, Lewis & Bockius LLP
                                Boston, MA
                                       for defendants, Goodwin Procter LLP,
                                       John R. LeClaire and Jeremiah J. Sullivan