**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | | |
|---|---|---|
| _____ ) | | |
| In re: ) | | Chapter 7 |
| ) | | Case No. 16-10236-MSH |
| BLAST FITNESS GROUP, LLC, ) | | |
| ) | | |
| Debtor ) | | |
| _____ ) | | |
| ) | | |
| GARY W. CRUICKSHANK, ) | | |
| CHAPTER 7 TRUSTEE OF THE ) | | |
| ESTATE OF BLAST FITNESS ) | | |
| FITNESS GROUP, LLC, ) | | |
| ) | | |
| Plaintiff, ) | | Adversary Proceeding |
| ) | | Case No. 18-01011 |
| v. ) | | |
| ) | | |
| HAROLD R. DIXON *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| _____ ) | | |

**MEMORANDUM OF DECISION ON MOTION TO DISMISS OF
HAROLD R. DIXON**

**I. <u>Introduction</u>**

In a thirty-count complaint,[1] Gary W. Cruickshank, the plaintiff and chapter 7 trustee of

the bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief

against over forty named defendants including Harold R. Dixon, who controlled BFG, and

dozens of unnamed John Doe defendants.  The trustee has pleaded facts which, if true,

demonstrate the implementation of a plan by Mr. Dixon and other defendants he controlled to

---

[1] As amended by a first amended complaint (ECF #130).

deprive, divert, and transfer valuable assets and profit opportunities from BFG, ultimately

resulting in BFG's filing of a voluntary petition under Chapter 7 of the United States Bankruptcy

Code[2] on January 26, 2016, at which time its debts exceeded $16 million.  This adversary

proceeding was commenced two years after the petition date on January 26, 2018.

Mr. Dixon has filed a motion to dismiss 19 of the 23 counts against him for failure to

state a claim pursuant to Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b).[3]  Specifically,

Mr. Dixon seeks dismissal of count I (constructive fraudulent transfer under Bankruptcy Code §

548(a)(1)(B)), count II (actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A)), count

III (constructive fraudulent transfer under Massachusetts Fraudulent Transfer Act ("MFTA") §

5(a)(2)), count IV (constructive fraudulent transfer under MFTA § 6(a)), count V (actual

fraudulent transfer under MFTA § 5(a)(1)), count VI (turnover under Bankruptcy Code §

542(b)), count VII ("turnover" under Bankruptcy Code § 550),[4] count VIII (unjust enrichment),

count X (statutory reach and apply/Bankruptcy Code §§ 544 and 550 and Mass. Gen. Laws ch.

214, § 3(8)), count XI (establishment of a resulting/constructive trust),[5] count XVI (conspiracy),

count XVII (aiding and abetting), count XVIII (conversion and civil theft), count XIX (fraud),

XX (intentional interference with contractual advantage), count XXI (tortious interference with

contractual advantage), count XXIII (substantive consolidation), count XXV (alter ego/piercing

the corporate veil) and XXIX (attorneys' fees).   He does not seek dismissal of the remaining

counts against him for breach of fiduciary duty and theft of corporate opportunity (count XXVI),

corporate waste (count XXVII), breach of duty to preserve assets, deepening insolvency (count

---

[2] All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 *et seq.*
[3] ECF #179.  The motion relates to the first amended complaint (ECF #130).
[4] "Turnover" is a misnomer as the statute governs liability of transferees of avoided transfers.
[5] Mr. Dixon is not a named defendant in count XI, and I need not address that count herein.

XXVIII) and costs (XXX).  He does not address count XV (breach of fiduciary duty) in his

motion to dismiss, and I will not address that count here.

At the outset, I note that the trustee does not contest dismissal of counts VI, VIII, XVII,

XX, XXI, XXIII or XXIX.  I will, therefore, grant Mr. Dixon's motion to dismiss those counts.

## II. <u>Motion to Dismiss</u>

### A.  *Legal Standard*

In ruling on the motion to dismiss, I must accept all well-pleaded factual allegations in

the complaint as true, drawing all reasonable inferences in the trustee's favor.  *Langadinos v.

American Airlines, Inc*., 199 F.3d 68, 69 (1st Cir. 2000).  A claim cannot be dismissed if the

trustee has demonstrated a "plausible entitlement to relief." *Sanchez v. Pereira–Castillo*, 590

F.3d 31, 41 (1st Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's

obligation requires more than "labels and conclusions" and "a formulaic recitation of the

elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007).

Inquiry into plausibility is a two-step process.  "First, the court must sift through the

averments in the complaint, separating conclusory legal allegations (which may be disregarded)

from allegations of fact (which must be credited)." *Rodriguez-Reyes v. Molina-Rodriguez*, 711

F.3d 49, 53 (1st Cir. 2013) (citing *Morales–Cruz v. Univ. of P.R*., 676 F.3d 220, 224 (1st Cir.

2012)).  "Second, the court must consider whether the winnowed residue of factual allegations

gives rise to a plausible claim to relief." *Id*.  "Plausible, of course, means something more than

merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that

compels us 'to draw on' our 'judicial experience and common sense.'" *Schatz v. Republican

State Leadership Comm*., 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

'"Moreover, *each* defendant's role in the [adverse action] must be sufficiently alleged to make him or her a plausible defendant. After all, we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" *Rodriguez-Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40-41 (1st Cir. 2012) (quoting *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 16 (1st Cir. 2011) (emphasis in original). *See also Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant.").

## B. Trustee's Factual Allegations[6]

### 1. BFG

In 2010, prior to the formation of BFG, Mr. Dixon met Steven Borghi, and the two discussed going into business together. ¶ 72. Mr. Borghi operated various Work Out World ("WOW") health clubs with Tony Beninati and, when Mr. Beninati died, with his widow, Elizabeth Beninati. ¶ 71. Mr. Borghi allowed Mr. Dixon to learn about the discount fitness center business by giving him access to the offices and proprietary information of WOW. ¶ 73.

On February 14, 2011, CapeCapital LLC, a Massachusetts limited liability company ("CapeCapital"), formed BFG, acting through Mr. Dixon. ¶¶ 3, 74. BFG is also a Massachusetts limited liability company.[7] CapeCapital, a defendant in this adversary proceeding, was the sole manager of BFG, and Mr. Dixon, in turn, was the sole manager and a member of CapeCapital. ¶ 3. At its peak, BFG owned and operated over sixty fitness clubs bearing its name throughout the United States. (Intro., p. 2). At all relevant times, BFG acted at the direction of CapeCapital and

---

[6] Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the first amended complaint.

[7] Although not specifically pleaded in the complaint, there is no dispute that BFG is a Massachusetts limited liability company.

Mr. Dixon, who held himself out as CEO of BFG. ¶¶ 2, 92.  BFG owned, entirely or partially,

seventeen subsidiaries through which it operated its business.[8]  ¶ 53. Fitness clubs at different

locations were often operated through separate BFG subsidiaries, and those subsidiaries were

often the actual tenants under the applicable leases for the premises.  ¶¶ 251-52, 255-56.  At all

times relevant to the claims and causes of action alleged in the complaint, BFG was insolvent

and insufficiently capitalized. ¶¶ 310-12.

In 2011, Messrs. Dixon and Borghi were operating various health clubs in New England

using the WOW trade name, which triggered a dispute with Ms. Beninati. ¶¶ 76-77, 79. Mr.

Dixon, Mr. Borghi and BFG hired Mr. Dixon's longtime personal lawyer at the law firm of

Goodwin Procter LLP ("Goodwin"), a defendant in this action, to represent them in negotiations

with Ms. Beninati in April 2011. ¶ 80. Negotiations failed, and Ms. Beninati commenced a

Massachusetts state court lawsuit against Mr. Dixon, Mr. Borghi and BFG on May 24, 2012,

seeking millions of dollars in damages. ¶¶ 79, 376. Goodwin represented Mr. Dixon, BFG and

Mr. Borghi in that litigation. ¶¶ 107, 376. In July 2014, the state court entered judgment against

Messrs. Dixon and Borghi. ¶¶ 88, 315. Final judgment against them in excess of $4.5 million

entered on January 9, 2015. ¶¶ 90, 317.

### 2.  The Bally Transaction

In 2011, Goodwin performed additional legal work for BFG, including in connection

with BFG's acquisition and transfer of fitness clubs, the formation of various limited liability

companies (LLCs) ancillary to those acquisitions and transfers and the drafting of corporate and

---

[8] Each of the seventeen BFG subsidiaries is a defendant here.  The subsidiaries are named in
numerous counts of the complaint, including counts for fraudulent transfers, piercing the
corporate veil/alter ego and substantive consolidation.  None of the BFG subsidiaries has filed a
responsive pleading to the complaint.

transactional documents. ¶¶ 102-03, 105-07.  In 2012, at the time the Beninati dispute was active, BFG was engaged in negotiations with Bally Total Fitness Inc. to purchase from it thirty-nine work-out clubs and certain real estate. ¶ 105. Goodwin and two of its attorneys, who are also defendants (collectively the "Goodwin Defendants"), acted as counsel to BFG and its wholly-owned subsidiary, Blast Fitness Acquisition, LLC ("Blast Acquisition"),[9] in that transaction, and in that capacity participated in drafting an asset purchase agreement dated April 10, 2012. ¶¶ 106, 110, 113. Under the terms of the asset purchase agreement, BFG was to receive three pieces of commercial real estate from Bally located in Maryland Heights, Missouri, West Hartford, Connecticut and Irving, Texas which were to be "sold pursuant to the terms of a separate purchase agreement . . . for an aggregate purchase price of $1,000,000 to an entity identified by [BFG] prior to Closing." ¶¶ 62-63, 118. Three of the thirty-nine work-out clubs proposed to be purchased by BFG (through Blast Acquisition) operated at these locations. ¶¶ 114, 118.

On or prior to April 12, 2012, Mr. Dixon planned to designate entities not owned by BFG to take title to the Bally real estate. ¶¶ 131-133. On April 25, 2012, he formed CapeCapital Maryland Heights, LLC, a Missouri limited liability company, CapeCapital West Hartford, LLC, a Connecticut limited liability company, and CapeCapital Irving, LLC, a Texas limited liability company, all of which were managed by Mr. Dixon and effectively owned by him (collectively, the "Cape Real Estate Entities"). ¶¶ 18, 20, 22, 62, 145, 152, 157, 164. None of these entities was owned by BFG. ¶¶ 62, 163-64. The Cape Real Estate Entities are defendants in this adversary proceeding.

---

[9] Blast Acquisition, a defendant, is managed by Mr. Dixon. ¶ 32.

To raise part of the cash needed to complete the Bally transaction, the members of BFG agreed to sell a preferred membership interest in BFG to the Dixon Family Limited Partnership (an affiliate of Dixon and also a defendant in this action). ¶¶ 138-39. The Goodwin Defendants drafted and presented to BFG and its members a member consent dated April 27, 2012, which provided in part:

> WHEREAS, the Members and Managers [of BFG] are seeking to raise additional capital for the Company for purposes including, but not limited [sic], financing the growth of the Company's business through the acquisition, from Bally Total Fitness Corporation, a Delaware corporation ("Bally") and certain of ts [sic] affiliates, of operating assets **and real property associated with additional health club facilities (the "Bally Acquisition") by a direct subsidiary of the Company.** (Emphasis added).

*Id*. This consent was presented to BFG's members at a time when Mr. Dixon and the Goodwin Defendants were already planning to transfer the Bally real estate to entities not owned by BFG. ¶ 140.  Members of BFG, including Mr. Borghi, relied on the member consent when they approved the admission of the Dixon Family Limited Partnership as a member of BFG and allowed the Bally transaction to move forward. ¶ 142. They did so believing that BFG would receive the Bally real estate. *Id*.  According to emails exchanged between Goodwin attorneys and Bally's counsel on April 12, 2012, the Goodwin Defendants knew by that date that Mr. Dixon wanted to designate entities not owned by BFG to take title to the Bally real estate. ¶¶ 131-133.

The Bally transaction closed on April 30, 2012,[10] and on or by that date, Bally had sold the Bally real estate, worth over $4 million, to Mr. Dixon's LLCs, the Cape Real Estate Entities, for approximately $1 million. ¶¶ 62, 146, 153, 158. Mr. Dixon used BFG funds to subsidize his purchase of the Bally real estate. ¶¶ 63, 146, 153, 158, 178. Following the Cape Real Estate Entities' acquisition of the real estate, CapeCapital and Mr. Dixon directed BFG and/or its

---

[10] This fact was not pleaded by the trustee but is not disputed.

subsidiaries to enter into leases with the Cape Real Estate Entities and to make "potentially over-market" lease payments to them for the BFG clubs operating at the three Dixon-controlled properties at a time when BFG was insolvent, enabling Mr. Dixon to receive rent payments from BFG at inflated rates. ¶¶ 63, 166, 181-83.[11]  At the direction of Mr. Dixon, the Cape Real Estate Entities sold the properties to third parties in separate transactions on December 31, 2013, June 26, 2014 and December 31, 2014, ¶¶ 148, 151, 154, 156, 159, 161, for prices significantly in excess of their purchase prices, with the proceeds being distributed to Mr. Dixon or to unknown John Doe defendants. ¶¶ 148, 149, 154, 155, 159, 160. The Cape Real Estate Entities breached their lease agreements with BFG and/or its subsidiaries by terminating these leases prematurely to facilitate the sale of the Bally real estate, and Mr. Dixon and CapeCapital directed the closing of clubs at those locations for that purpose. ¶¶ 150, 156, 161, 184.

### 3. The Lexfit and Newfit Transactions

In late 2012, while the Beninati litigation was pending, Mr. Dixon began transferring profitable BFG clubs to new entities in order to shield them from BFG's creditors such as Ms. Beninati. ¶¶ 82, 273, 308-309. Lexfit, LLC, a Massachusetts limited liability company, and Newfit, LLC, a Delaware limited liability company, both managed by Mr. Dixon and/or CapeCapital, were two of these entities.  ¶¶ 9, 10, 103, 273.  Both are defendants in this action.

On December 6, 2012, Mr. Dixon, CapeCapital and another defendant transferred sixteen of BFG's more profitable fitness clubs to Lexfit for no or nominal consideration. ¶¶ 274, 276. On January 30, 2013, Mr. Dixon, CapeCapital and another defendant transferred an additional eight of BFG's more profitable clubs to Newfit, including a club located in Bridgeview, Illinois.

[11] The trustee did not allege any facts concerning the amount of rent charged, the amount of rent payments made by BFG (or its subsidiaries) or how the amounts paid compared to market rates at the time.

¶ 283-84. BFG did not receive full consideration for these transfers. ¶ 285.  Also on January 30,

2013, Lexfit transferred eight of the clubs received from BFG in the December 2012 transaction

to Newfit for less than full consideration. ¶¶ 289, 291, 293.  On a date not specified in the

complaint, Mr. Dixon and another defendant claimed they had provided a $1 million cash

infusion to BFG for the acquisition of the Bridgeview club in a separate transaction which they

later recharacterized as a loan.  ¶ 297.

### 4.  *Newfit to Eskandarian*

After acquiring valuable clubs through Newfit, Mr. Dixon and another defendant sold

twelve of those clubs to Ed Eskandarian for a substantial profit, and Mr. Dixon continues to

personally receive annual payments of $500,000 per year from Mr. Eskandarian. ¶ 331, 333, 334.

### 5.  *Executive Compensation*

Throughout the time he worked for BFG and its subsidiaries, Mr. Dixon received

unspecified executive compensation or fees and other valuable direct and indirect compensation

from BFG and its subsidiaries to which he was not entitled.[12]  ¶¶ 369, 373.

### 6.  *Dixon Family Conveyances*

In 2012, after Ms. Beninanti sued Mr. Dixon, he and his wife, defendant Juliet J. Dixon,

began to transfer and conceal their personal assets. ¶¶ 84, 335–39. On or about December 24,

2012, the Dixons conveyed, for no or nominal consideration, real property located at 25 Green

Lane, Weston, Massachusetts to Michael J. Craffey and Thomas Walsh, as trustees of the

following defendant trusts in equal shares: Harold R. Dixon IV GST Trust; George L. Dixon

GST Trust; William A. Dixon GST Trust; and John E. Dixon GST Trust. ¶ 336.  Mr. Walsh is

---

[12] The complaint contains no dates or amounts for the alleged payments and compensation.

also the trustee of 31 Green Lane Nominee Trust.[13] ¶ 339.  These trusts and Messrs. Walsh and

Craffey, as trustees, are also defendants in this adversary proceeding. On or around December

24, 2012, Mr. and Ms. Dixon conveyed real property located at 120 Point Isabella Road,

Barnstable, Massachusetts to Ms. Dixon, individually, for no or nominal consideration.  ¶ 337.

On May 12, 2015, Mr. and Ms. Dixon transferred real property located at 63 Cart Path Road,

Weston, Massachusetts to Mr. Craffey, as trustee of 63 Cart Path Road Nominee Trust, for no or

nominal consideration (the four above named "GST" trusts and the two nominee trusts shall be

collectively referred to as the "Dixon trusts").  ¶ 338.

### 7.  *Other Transactions and Third Parties*

BFG could not pay its debts as they arose and it implemented a strategy, through Mr.

Dixon and CapeCapital, of shifting assets from one fitness club to another.  ¶¶ 255, 312. At the

direction of Mr. Dixon and CapeCapital, BFG would shut down a profitable club, transfer the

club's assets—owned by a particular subsidiary of BFG—to one of its other wholly owned

subsidiaries and leave the now asset-less subsidiary with its liabilities. ¶¶ 247, 255, 262.  The

transferred assets included, membership lists, club equipment, cash, receivables in the form of

electronic funds transfers for scheduled membership payments, which were drawn from

members' accounts, and other assets.  ¶ 255.

A large number of BFG's creditors are landlords who leased space to wholly-owned

entities of BFG.   ¶ 248. The landlords relied on guaranties from BFG, third party guarantors, or

other obligors under the leases. ¶ 249.  BFG purchased workout clubs from sellers (such as

Bally), assumed the sellers' obligations under existing leases and often breached its obligations

---

[13] With respect to 31 Green Lane Nominee Trust, the trustee alleges no transfer of assets between it and Mr. Dixon and pleaded only that Mr. Dixon resigned as a trustee of that trust on May 12, 2015 and was replaced by Mr. Walsh. ¶ 339.

to remove the sellers as obligors under the leases.  ¶¶ 250, 359. When clubs were shut down, the subsidiary, which was the actual tenant under the lease, would stop making rent payments to the landlord. ¶ 256.  The landlord would sue the tenant, only to find that the assets of the tenant had been transferred to another subsidiary of BFG.  ¶ 257. Landlords, guarantors, and obligors, including Bally, then pursued fraudulent transfer, indemnification and other claims against BFG and others. ¶¶ 198, 232, 257, 359-60.  A large number of the claims in BFG's bankruptcy case arose in this manner.  ¶ 257.  With respect to one closed fitness center located in Irving Park, Illinois, Mr. Dixon and another defendant "just took the money from the equipment for themselves," leaving third party guarantors with no assets to satisfy the guaranties.[14] ¶ 363.

From 2014 to 2016, BFG was involved in numerous lawsuits commenced by landlords and others for unpaid rents and other lease defaults. ¶¶ 186, 198-199, 231-33, 261. BFG could not satisfy its debts to landlords due to its insolvency. ¶ 186.

### III. Procedural History

In addition to Mr. Dixon, other defendants have filed motions to dismiss, including CapeCapital, the Cape Real Estate Entities, Newfit, Ms. Dixon, Messrs. Craffey and Walsh, as trustees of the Dixon trusts. At a hearing held on these motions on June 14, 2018, the trustee agreed to the dismissal of his claim against Mr. Dixon for substantive consolidation (count XXIII), and, notwithstanding what he pleaded in the complaint, he stated at the hearing that he will not seek substantive consolidation (count XXIII) or veil piercing relief (count XXV) against the Dixon trusts.

The Goodwin Defendants also filed motions to dismiss which were allowed in part and denied in part by my memorandum and order dated January 8, 2019.  *See Cruickshank v. Dixon*

---

[14] The trustee alleged no dates or other supporting details for this allegation.

*(In re Blast Fitness Grp., LLC)*, No. 16-10236-MSH, 2019 WL 137109 (Bankr. D. Mass. Jan. 8,

2019) ("*Blast I*"). My legal findings on certain of the trustee's claims are set forth in *Blast I*,

which is incorporated herein by reference. I denied the Goodwin Defendants' motions to dismiss

counts against them for malpractice, breach of fiduciary duty, Mass. Gen. Laws ch. 93A, breach

of contract, and other correlative counts in the complaint in connection with the Bally real estate

transaction and the Lexfit and Newfit transactions.

There are a number of other defendants in this adversary proceeding which have not

answered or otherwise responded to the complaint, including certain BFG subsidiaries. These

defendants are the subject of, among other claims, the trustee's claim in count XXIII for

substantive consolidation with BFG.  Although those defendants have not yet been defaulted, I

will assume for purposes of this decision that BFG and the BFG subsidiaries (including Blast

Acquisition) are consolidated.

## IV. Trustee's Claims Against Mr. Dixon

### A. *Fraudulent Transfer Claims Generally*

In his complaint, the trustee alleges numerous fraudulent transfers involving multiple

defendants, including Mr. Dixon.  In counts I through V, he asserts claims against Mr. Dixon and

other defendants under Bankruptcy Code § 548(a)(1)(A) and (B) (counts II and I, respectively)

which permit a trustee to avoid actual and constructive fraudulent transfers, and under

Bankruptcy Code § 544(b) (counts III, IV and V) which permits a trustee to "avoid any transfer

of an interest of the debtor in property or any obligation incurred by the debtor that is voidable

under applicable law by a creditor holding [an allowed unsecured claim]. . . ." 11 U.S.C. §

544(b).  The "applicable law" here is the Massachusetts Uniform Fraudulent Transfer Act

("MUFTA"), Mass. Gen. Laws. ch. 109A.  Pursuant to MUFTA §§ 5(a)(2) and 6(a), the trustee

seeks avoidance of constructive fraudulent transfers (counts III and IV) and pursuant to MUFTA

§ 5(a)(1), he seeks avoidance of transfers committed with actual fraudulent intent (count V).[15]

The trustee fails to identify which transfers he seeks to avoid in the respective fraudulent transfer

counts.

Mr. Dixon asserts that counts I through V should be dismissed because the trustee has

failed to allege that BFG transferred any property to him.  The trustee responds that he has

sufficiently alleged that Mr. Dixon was a direct transferee of BFG's assets, a subsequent

transferee of other transfers, and that Mr. Dixon is also liable as a "transferor" of his personal

assets.

As stated above, the complaint does not set forth which of the numerous alleged

fraudulent transfers are applicable to specific counts in the complaint or to specific defendants.

The trustee's opposition to Mr. Dixon's motion to dismiss provides clarification.  The transfers

the trustee seeks to avoid, in which Mr. Dixon was involved, consist of 1) BFG's transfer of its

right to acquire the Bally real estate; 2) BFG's payment to Mr. Dixon of executive compensation;

3) BFG's transfer of gym equipment and proceeds to Mr. Dixon; and 4) transfers made (or

obligations incurred) by BFG resulting from Mr. Dixon's recharacterization of his investment in

BFG as a loan.  Additionally, the trustee seeks to hold Mr. Dixon liable as a subsequent

transferee of real estate sale proceeds he received from the Cape Real Estate Entities, above-

market rent payments made by BFG (or its subsidiaries) to those entities, and payments from Mr.

Eskandarian resulting from transfers of BFG's profitable clubs to Lexfit and Newfit.  Lastly, the

---

[15] In counts III-V, the trustee also references Bankruptcy Code § 550 and MUFTA § 8(a), which
is the remedy provision of the MUFTA.

13

trustee asserts fraudulent transfer claims against Mr. Dixon as a transferor of his personal assets

to his wife and the Dixon trusts.  I will address each in the context of counts I through V below.

## B.  Counts I and II-Bankruptcy Code § 548

### 1.  Applicable Law

Bankruptcy Code § 548 provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in
> property, or any obligation . . . incurred by the debtor, that was made or incurred
> on or within 2 years before the date of the filing of the petition, if the debtor
> voluntarily or involuntarily--
> (A) made such transfer or incurred such obligation with actual intent to hinder,
> delay, or defraud any entity to which the debtor was or became, on or after the
> date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such
> transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation
> was incurred, or became insolvent as a result of such transfer or obligation . . . .

11  U.S.C. § 548(a)(1)(A) and (B).

### 2.  Discussion

The alleged "direct" fraudulent transfers involving Mr. Dixon asserted by the trustee

consist of 1) BFG's transfer of its right to acquire the Bally real estate; 2) BFG's payment to Mr.

Dixon of executive compensation; 3) BFG's transfer of gym equipment and proceeds to Mr.

Dixon; and 4) transfers made (or obligations incurred) by BFG resulting from Mr. Dixon's

recharacterization of his investment in BFG as a loan.  With respect to the Bally real estate,

BFG's alleged transfer of its right to acquire the properties took place in 2012, well before the

two year "reach back" period under Bankruptcy Code § 548.  Although I will consider the

voidability of that transfer with reference to the MUFTA, it cannot form the basis of a fraudulent

transfer claim under Bankruptcy Code § 548 due to the temporal restrictions of the statute.  With

respect to the other alleged direct transfers, I find that the trustee has not pleaded sufficient facts

to support plausible avoidance claims under Bankruptcy Code § 548 or the MUFTA.  The trustee

has pleaded no facts concerning the dates or amounts of compensation allegedly received by Mr.

Dixon from BFG or its subsidiaries and has provided no dates or amounts of the alleged transfers

of gym equipment to Mr. Dixon.  Although he alleged facts about Mr. Dixon's involvement in

transferring assets among BFG subsidiaries, he alleged only conclusory statements that Mr.

Dixon directly received proceeds and gym equipment.  Likewise, the trustee has provided no

details or substance to support his allegations that, in connection with the Bridgeview club

acquisition, Mr. Dixon "recharacterized" a cash infusion in BFG as a loan.[16]  With respect to

each of the foregoing, he relies on vague and conclusory statements which are insufficient to

overcome a motion to dismiss.  Accordingly, I will not consider those claims in connection with

any fraudulent transfer count in the complaint.

The trustee's allegations concerning Mr. Dixon's receipt of real estate sale proceeds from

the Cape Real Estate Entities and his receipt of above-market rent payments made by BFG to

those entities emanate from the original 2012 transfer of BFG's rights in the Bally real estate

which took place outside the two year "reach back" period under Bankruptcy Code § 548.  I will

discuss below Mr. Dixon's status as a transferee of those transfers under the MUFTA, which has

a four year "reach back" period. *See* Mass. Gen. Laws ch. 109A, § 10.

With respect to the trustee's allegations that BFG transferred profitable clubs for little or

no consideration to Lexfit and Newfit, some of which were later sold to Mr. Eskandarian with

Mr. Dixon receiving annual payments of $500,000, the trustee relies in his opposition to the

motion to dismiss on the provisions of the MUFTA, not Code § 548. I will discuss those

---

[16] I am unable to discern whether the allegation is one of fraudulent transfer or fraudulent
obligation.

transfers below with respect to the MUFTA counts. Moreover, the trustee did not reference Code § 548 in his opposition to the motion to dismiss.   Accordingly, I will enter an order allowing Mr. Dixon's motion to dismiss counts I and II against him.[17]

## C.   Counts III and IV- MUFTA §§ 5(a)(2) and 6(a) and Bankruptcy Code §§ 544(b) and 550

The remaining alleged fraudulent transfers involving Mr. Dixon under counts III and IV under the MUFTA are: 1) BFG's transfer of its rights to acquire the Bally real estate and the subsequent distribution to Mr. Dixon by the Cape Real Estate Entities of the Bally real estate sale proceeds; 2) Mr. Dixon's receipt of above-market rent payments made by BFG (or its subsidiaries) to the Cape Real Estate Entities which he controlled; 3) Mr. Dixon's receipt of payments from Mr. Eskandarian resulting from the transfer of BFG's profitable clubs to Lexfit and Newfit; and 4) Mr. Dixon's transfers of his personal assets to his wife and the Dixon trusts.

### 1. Applicable Law

MUFTA §§ 5 and 6, in relevant part, provide:

Section 5. (a) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . :
        . . . (2) without receiving a reasonably equivalent value in exchange for the transfer . . , and the debtor:
                (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
                (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. . . .

Section 6. (a) A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

---

[17] The fraudulent transfer claims asserted against Mr. Dixon related to the transfers of his personal assets from 2012 through 2015 are dismissed for different reasons as discussed below.

16

Mass. Gen. Laws ch. 109A, §§ 5(a)(2) and 6(a).

There are numerous definitions in the MUFTA which are pertinent to any analysis here. A creditor is defined as "a person who has a claim." Mass. Gen. Laws ch. 109A, § 2.  A debtor is defined as a "person who is liable on a claim." *Id.* A claim is defined as "a right to payment . . . ." *Id.* An asset is defined as "property of a debtor. . . ." *Id.*  A transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. . . ." *Id.*  "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation[,]" and "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id.* at § 3(a) and (b).  "Value is given for a transfer . . . if, in exchange for the transfer . . . property is transferred or an antecedent debt is secured or satisfied . . . ." *Id.* at § 4(a).  Avoidance actions under MUFTA §§ 5(a) and 6(a) must be brought within four (4) years from the date of the transfers. *Id.* at § 10.[18]

Section § 8(a) of the MUFTA provides a range of remedies and types of recoveries available against either a fraudulent transferor or transferee to aid a creditor in collection. *See Bakwin v. Mardirosian,* 467 Mass. 631, 637 (2014).  Section 8(a) provides:

> Section 8. (a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in section nine, may obtain:

---

[18] That section provides:
"Section 10. A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought:
(a) under paragraph (1) of subsection (a) of section five, within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or could reasonably have been discovered by the claimant;
(b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six, within four years after the transfer was made . . . . "
Mass. Gen. Laws ch. 109A, § 10(a) and (b).

(1) avoidance of the transfer or obligation to the extent necessary
to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset
transferred or other property of the transferee in accordance with the
applicable procedure set forth in chapter two hundred and fourteen for
actions to reach and apply chapter two hundred and twenty-three for
attachments, and chapter two hundred and forty-six for trustee process and
in accordance with applicable rules of civil procedure;

(3) subject to applicable principles of equity and in accordance
with applicable rules of civil procedure,

(i) an injunction against further disposition by the debtor or a
transferee, or both, of the asset transferred or of other property;

(ii) appointment of a receiver to take charge of the asset
transferred or of other property of the transferee; or

(iii) any other relief the circumstances may require.

Mass. Gen. Laws ch. 109A, § 8(a).  "None of these remedies is mandatory, and the statute

commits the form of the judgment to the discretion of the trial judge." *Bakwin,* 467 Mass. at 637.

MUFTA § 9, in turn, provides, in part, that "to the extent a transfer is voidable in an action by a

creditor under [§ 8(a)(1)], the creditor may recover judgment for the value of the asset

transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less . . . ,"

Mass. Gen. Laws ch. 109A, § 9(b), and the judgment may be entered against either "(1) the first

transferee of the asset or the person for whose benefit the transfer was made; or (2) any

subsequent transferee other than a good-faith transferee . . . . who took for value or from any

subsequent transferee. . . ." *Id*. at § 9(b)(1) and (2).  Finally, MUFTA expressly provides that its

provisions are to be supplemented by the "principles of law and equity." *Id*. at § 11.

"Code § 550 provides a recovery action against certain transferees where the trustee or

estate representative has successfully avoided a transfer under one of the avoiding powers . . . ."

2 Joan N. Feeney et al., *Bankruptcy Law Manual* § 9:54 (5th ed. 2018).  If there are voidable

transfers under state or federal law, Code § 550 determines from whom the estate may recover

fraudulently transferred assets or their value and permits recovery from "(1) the initial transferee

of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or

mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1) and (2). *See also* 11 U.S.C.

§ 550(d) ("The trustee is entitled to only a single satisfaction under subsection (a) of this

section."). "The trustee 'may always recover from the initial transferee regardless of [that

transferee's] good faith, value, or lack of knowledge of the voidability of the transfer.'"

*Richardson v. United States (In re Anton Noll, Inc.)*, 277 B.R. 875, 878 (B.A.P. 1st Cir. 2002)

(quoting *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir. 1996)). "In contrast, a [sic] immediate or

mediate transferee will not be liable for the recovery of fraudulently transferred funds if 'the

subsequent transferee accepted the transfer for value, in good faith, and without knowledge of

the transfer's voidability.'" *Id.* (quoting § 550(b) and citing *Schafer v. Las Vegas Hilton Corp.

(In re Video Depot, Ltd.)* 127 F.3d 1195, 1198 (9th Cir. 1997));[19] *see also Crafts Plus+, Inc. v.

Foothill Capital Corp. (In re Crafts Plus+, Inc.)*, 220 B.R. 331, 338 (Bankr. W.D. Tex. 1998)

("Once it has been established that a qualified transfer has been made, § 550 provides for

recovery against either the initial transferee . . . or 'the entity for whose benefit such transfer was

made.'").

MUFTA §§ 5(a)(2) and 6(a) provide two similar bases upon which a transfer can be held

to be constructively fraudulent. Section 5(a) applies to a creditor whether its claim "arose before

or after the transfer was made," whereas § 6(a) applies only to a creditor "whose claim arose

before the transfer was made." In this case, the trustee has sufficiently alleged the existence of

creditors whose claims arose both before and after the alleged fraudulent transfers, including Ms.

---

[19] Mr. Dixon has not asserted that he was a good faith transferee, took for value or in the ordinary course of business or was without knowledge of the voidability of the transfers at issue or otherwise asserted any of the safe harbor provisions of MUFTA § 9(f) or Bankruptcy Code § 550(b).

Beninati and the landlords, guarantors, and other obligors of the fitness center leases to which

BFG and/or the BFG subsidiaries were a party.

"To establish a claim for constructive fraudulent transfer [under MUFTA § 5(a)(2)], the

trustee has the burden of proof on the following elements: (1) that the Debtor made a transfer, (2)

without receiving a reasonably equivalent value in exchange, and (3) the Debtor intended to

incur, or believed or reasonably should have believed that it would incur, debts beyond its ability

to pay as they became due." *Nickless v. Pappas (In re Prime Mortg. Fin., Inc.)*, No. Adv. P. No.

09-04047-MSH, 2011 WL 4572006, at *3 (B.A.P. 1st Cir. Feb. 14, 2011) (citing Mass. Gen.

Laws ch. 109A, § 5(a)(2)). The elements of a cause of action under § 6(a) of the MUFTA are

similar: "(1) a transfer was made by the Debtor; (2) the Debtor made the transfer without

receiving a reasonably equivalent value in exchange for the transferred property; and (3) the

Debtor either was insolvent at the time of the transfer or became insolvent as a result of the

transfer." *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 736 (Bankr. N.D. Ill. 2006),

*aff'd sub nom. Knippen v. Grochocinski*, Civ. A. No. 07C1697, 2007 WL 1498906 (N.D. Ill. May

18, 2007) (applying 740 Ill. Comp. Stat. 160/6(a), which is identical to MUFTA § 6(a)).

### 2. *The Bally Real Estate Transfer*

The Bally real estate was conveyed to the Cape Real Estate Entities by the end of April of

2012, within four years of BFG's bankruptcy filing on January 26, 2016.  Based upon the

language of the member consent and asset purchase agreement referenced in the complaint as

well as the allegations that BFG paid for the real estate but never acquired it, the trustee has

asserted a plausible claim that, in April of 2012, BFG had a contractual right to acquire the Bally

real estate through a wholly-owned subsidiary and that such right constituted an "asset" of BFG

as defined in MUFTA § 2.  Under the MUFTA's broad definition of "transfer," which includes

"direct or indirect, absolute or conditional, voluntary or involuntary" transfers of an asset or an

interest in an asset, the trustee has also sufficiently alleged that BFG transferred its right to

acquire the Bally real estate to the Cape Real Estate Entities, which were not owned by BFG, and

did so for the benefit of Mr. Dixon who controlled those entities.   The complaint also

sufficiently alleges that no consideration was received by BFG as a result of these transfers, that

the Bally real estate was worth $4 million at the time of the conveyances, and that BFG paid the

purchase price even though the Cape Real Estate Entities actually acquired the properties.

Accordingly, I find sufficient allegations that BFG did not receive reasonably equivalent value in

exchange for the transfers. Finally, the complaint further alleges that BFG was, at all times,

insolvent and insufficiently capitalized.  In particular, the transfer of BFG's rights in the Bally

real estate occurred during BFG's negotiations with Ms. Beninati and in the month prior to her

commencing litigation against BFG seeking millions of dollars in damages.  By the date of the

transfers, BFG plausibly should have believed that it would incur debts beyond its ability to pay

when due.

The complaint states a plausible claim for constructive fraudulent transfer under MUFTA

§5(a)(2) and 6(a) with respect to the transfer of BFG's rights in the Bally real estate to the Cape

Real Estate Entities.  As the trustee has also pleaded that Mr. Dixon controlled the Cape Real

Estate Entities, the trustee has also sufficiently pleaded that Mr. Dixon was the party "for whose

benefit [the] transfer was made" under MUFTA § 9(b)(1) and Bankruptcy Code § 550(a)(1).

"'The party who forces a debtor to make a transfer is almost always 'the entity for whose benefit

such transfer was made . . . .'" *Henry v. Off'l Comm. of Unsecured Creditors of Walldesign, Inc.*

*(In re Walldesign, Inc.)*, 872 F.3d 954, 965 (9th Cir. 2017)., *cert. denied sub nom. Henry v.*

*Weiss*, 138 S. Ct. 2575 (2018) (quoting *Gen. Elec. Capital Auto Lease, Inc. v. Broach (In re*

*Lucas Dallas, Inc.)*, 185 B.R. 801, 809-10 (B.A.P. 9th Cir. 1995)).  With respect to Mr. Dixon's

alleged receipt of the proceeds from the Cape Real Estate Entities' sale of the Bally real estate in

2013 and 2014, I find that the trustee has also sufficiently pleaded that Mr. Dixon is a subsequent

transferee of the proceeds of the Bally real estate; however, the trustee can achieve only one

recovery of the value for the Bally real estate.  *See* MUFTA § 9(b)(2); 11 U.S.C. § 550(a)(2), (d);

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 472 (Bankr. S.D.N.Y.

2015) ("To plead a subsequent transfer claim, the trustee must plead that the initial transfer is

avoidable, and that the defendant is a subsequent transferee of that initial transfer.").

### 3. *The Bally Real Estate Rent Payments*

The trustee alleges that Mr. Dixon received "potentially over-market" rent under leases

he and CapeCapital directed BFG and/or its subsidiaries to enter into with the Cape Real Estate

Entities, but he failed to allege any facts from which I am able to draw a reasonable inference

that BFG did not receive reasonably equivalent value in exchange for lease payments.  The

complaint contains no allegations concerning the rent amounts charged, the amounts or dates of

the rent payments made by BFG (or its subsidiaries), or why the leases should be considered

above-market. The allegations are conclusory and do not rise above the level of speculation for

purposes of a fraudulent transfer claim, although they may form the basis for other plausible

claims in the complaint against Mr. Dixon or other defendants.

### 4. *The Dixon Trusts, the Trustees, and Ms. Dixon*

With respect to transfers made by Mr. Dixon to his wife and the Dixon trusts, the trustee

maintains that they can be avoided because the claims against Mr. Dixon in this adversary

proceeding make him a "debtor" under the MUFTA.[20]  As a result, the trustee asserts, Mr. Dixon

---

[20] As stated above, a "debtor" under MUFTA § 2 is a "person who is liable on a claim."

is liable as a transferor under MUFTA § 8 which provides for a wide range of possible creditor remedies in a fraudulent transfer action.  There is no dispute that the assets transferred by Mr. Dixon to his wife and the Dixon trusts were owned by Mr. Dixon and his wife, not BFG. Nevertheless, the trustee contends that his claims against the Dixon trusts, their trustees and Ms. Dixon are derived from the fraudulent transfers of Mr. Dixon when he was "misappropriating money and property stolen from [BFG]."[21]

The trustee fails to state a claim against Mr. Dixon, the Dixon trusts, their trustees, or Ms. Dixon for avoidance of fraudulent transfer under the MUFTA with respect to the Weston and Barnstable real estate conveyances in 2012 and 2015.  In the context of bankruptcy, the purpose of fraudulent conveyance law is "to make available to creditors those assets of the *debtor* that are rightfully a part of the *bankruptcy* estate, even if they have been transferred away." *Buncher Co. v. Off'l Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 241-42 (3d Cir. 2000) (emphasis added) (a case involving the Pennsylvania Uniform Fraudulent Conveyance Act and Uniform Fraudulent Transfer Act).  The MUFTA, like its predecessor the Massachusetts Uniform Fraudulent Conveyance Act, "does not create new claims, nor does it contemplate placing the creditor in a more favorable position than would have existed without the fraudulent transfer." *Bakwin,* 467 Mass. at 637 (citing *Jorden v. Ball*, 357 Mass. 468, 470 (1970)).  The remedies of the MUFTA "assist a creditor in restoring the debtor's assets to their pretransfer status in order to enable the creditor to reach those assets that would have been available to satisfy the judgment but for the debtor's fraudulent transfer." *Id*.

---

[21] *See* trustee's brief in opposition to motion to dismiss of Mr. Craffey, as trustee, and the Dixon trusts. (ECF #224).

The MUFTA is to be "applied and construed to effectuate its general purpose to make

uniform the law . . . among states which [have] enact[ed] it." Mass. Gen Laws ch. 109A, § 12.

Sections 5 and 6 of the UFTA are analogous to 11 U.S.C. § 548(a). *Grochocinski v. Zeigler (In*

*re Zeigler)*, 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005) (citing *Scholes v. Lehmann*, 56 F.3d 750,

756 (7th Cir. 1995), *cert. denied sub nom. African Enter., Inc. v. Scholes*, 516 U.S. 1028 (1995);

*Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 443 (Bankr. N.D. Ill. 1995)

(applying the UFTA as adopted by Illinois[22]) (footnote omitted). "Considering the similarities in

purpose and language, many courts have concluded that the UFTA and section 548 are in pari

materia, and that the same analysis applies under both laws."  *Kaler v. Red River Commodities,*

*Inc. (In re Sun Valley Prod., Inc.)*, 328 B.R. 147, 155 (Bankr. D.N.D. 2005); *see also Walker v.*

*Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051 (11th Cir. 1983) ("The object of section 548 is

to prevent the debtor from depleting the resources available to creditors through gratuitous

transfers of the debtor's property.").

As Bankruptcy Code §§ 544(b) and 548(a) permit avoidance of certain transfers of "an

interest of the [bankruptcy] debtor in property,"[23] I conclude the MUFTA was intended to

effectuate the same purpose in the context of an adversary proceeding initiated by a bankruptcy

trustee.  *See generally, Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002)

(construing the text and policy of Bankruptcy Code § 548(a)(1), the court ruled that the

definition of "an interest of the debtor in property" requires proof of harm to the bankruptcy

estate); *Alford v. Thibault*, 83 Mass. App. Ct. 822, 828 (2013) (In a case involving MUFTA

---

[22] *See* 740 Ill. Comp. Stat. 160/5(a) and 160/6(a) which provisions are identical to Mass. Gen. Laws ch. 109A, § 5(a) and 6(a).

[23] A "debtor" is defined in the Bankruptcy Code as a "person or municipality concerning which a case under this title has been commenced."  11 U.S.C. § 101(13).

§5(a), the court held that "[a] transfer, even if made with intent to defraud, is not deemed fraudulent in fact unless there has been a resulting diminution of the assets available to the creditor.").

The trustee has not pleaded that BFG had an interest in the real estate Mr. Dixon conveyed to his wife and the Dixon trusts such that BFG's creditors, in whose shoes the trustee now stands, were harmed by the transfers. Although the trustee argues in his brief that the claims against the Dixon trusts are "derived from" the fraudulent transfers of Mr. Dixon when he was "misappropriating money and property stolen from [BFG]," the complaint's allegations do not support that contention. There are no allegations in the complaint that Mr. Dixon used any funds or property received directly or indirectly from BFG to acquire, gain equity in, or improve the Weston and Barnstable real estate he conveyed in 2012 and 2015. Moreover, the trustee failed to sufficiently plead that Mr. Dixon received compensation from BFG in any amount during the periods in question. The complaint fails to state a plausible claim that there was any diminution to BFG or that its creditors would have been in a more favorable position had Mr. Dixon not made transfers of his personal assets.

Although the trustee may prevail on claims against Mr. Dixon in this adversary proceeding, and then seek to reach his personal assets to satisfy a judgment, he has not alleged sufficient facts in the complaint to avoid transfers of the Dixons' personal assets, especially in light of the dismissal of the claim for substantive consolidation in count XXIII against him. Despite the range of remedies available under MUFTA "an action for relief under G.L. c. 109A, § 8, depends on the existence of an independently valid claim." *Kraft Power Corp. v. Merrill*, 464 Mass. 145, 153 (2013). To the extent the trustee relies on the broad definition of "debtor" in MUFTA § 2 as someone who is "liable on a claim," I interpret that term in the context of this

adversary proceeding to mean the debtor in bankruptcy, BFG.  The trustee does not yet have a

judgment against any defendant in this adversary proceeding and thus no defendant is yet

"liable" on the trustee's claims.  BFG, on the other hand, is currently liable for millions of dollars

of third party creditor claims.  To permit the trustee to seek avoidance of transfers made by

persons who *could* be liable on a claim because they are named defendants in an adversary

proceeding would constitute an expansion of the trustee's powers beyond that contemplated by

Bankruptcy Code §§ 544(b) and 548(a) (the trustee may avoid a transfer of "an interest of the

debtor in property") and 704(a)(1) (the trustee shall "collect and reduce to money the property of

the estate  . . . .").  For the foregoing reasons, the complaint fails to state a plausible entitlement

to relief against the Dixons, the Dixon trusts, or their trustees related to the alleged fraudulent

transfers of the Dixons' personal assets.[24]  *See Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592,

594 (1st Cir. 2011) ("[A]n adequate complaint must include not only a plausible claim but also a

plausible defendant.").

### 5.  *BFG Transfers to Lexfit and Newfit; Newfit Transfers to Eskandarian*

 The trustee has also alleged fraudulent transfers of certain BFG fitness clubs to Lexfit

and Newfit and eventually to Mr. Eskandarian, with Mr. Dixon receiving the proceeds from Mr.

Eskandarian through annual payments.  Any claim against Mr. Dixon as a beneficial or

subsequent transferee of such transfers will depend on the sufficiency of allegations concerning

the underlying initial transfers of BFG's assets to Lexfit and Newfit.  Both Lexfit and Newfit are

named defendants in this action and are the subject of claims asserted in counts III and IV.

Lexfit has not filed an answer and is subject to being defaulted.  Newfit has filed a motion to

---

[24] This ruling applies to all of the fraudulent transfer counts in the complaint (counts I through
V).

dismiss; however, it does not seek dismissal of any of the fraudulent transfer claims against it,

but rather, asserts that it will deal with those claims either through summary judgment or at trial.

Under these circumstances, I find that the trustee has asserted a plausible claim that Mr. Dixon is

a beneficial or a subsequent transferee with respect to these transfers under MUFTA § 9(b) and

Bankruptcy Code § 550(a).

### 6. *Conclusion as to Counts III and IV*

Based on the foregoing, I will enter an order denying Mr. Dixon's motion to dismiss

counts III and IV.

### D. *Count V- MUFTA § 5(a)(1) and Bankruptcy Code §§ 544(b) and 550*

In count V, the trustee asserts fraudulent transfer claims against Mr. Dixon under

MUFTA § 5(a)(1). That statute permits the avoidance of a transfer made with actual intent to

hinder, delay or defraud with respect to creditors whose claims arose before or after the transfer

was made. Bankruptcy Code § 544(b) arms the trustee with the powers of such creditors.

### 1. *Applicable Law*

MUFTA § 5(a)(1) provides:

> Section 5. (a) A transfer made . . . by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made . . . if the
> debtor made the transfer . . . :
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor. . . .

Mass. Gen. Laws ch. 109A, § 5(a)(1). MUFTA § 5(b) contains a non-exhaustive list of factors,

or "badges of fraud," courts may consider when determining actual intent of a debtor to hinder,

delay, or defraud a creditor. The list includes:

> whether (1) the transfer or obligation was to an insider; (2) the debtor retained
> possession or control of the property transferred after the transfer; (3) the transfer
> . . . was disclosed or concealed; (4) before the transfer was made . . . the debtor
> had been sued or threatened with suit; (5) the transfer was of substantially all the
> debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed

assets; (8) the value of the consideration received by the debtor was reasonably
equivalent to the value of the asset transferred . . . ; (9) the debtor was insolvent or
became insolvent shortly after the transfer was made. . . ; (10) the transfer
occurred shortly before or shortly after a substantial debt was incurred; and (11)
the debtor transferred the essential assets of the business to a lienor who
transferred the assets to an insider of the debtor.

Mass. Gen. Laws ch. 109A, § 5(b).

### 2. Discussion

The trustee has pleaded the existence of many of the badges of fraud in connection with

BFG's alleged transfer of its right to acquire the Bally real estate to the Cape Real Estate

Entities, including that: BFG relinquished its rights to acquire the Bally real estate so that Mr.

Dixon, an insider, could acquire the properties through his companies; the transfers were

concealed from BFG members by Mr. Dixon and the Goodwin Defendants, *see Blast I*; prior to

the transfer, BFG was under threat of suit by Ms. Beninati (who brought suit against it less than a

month after the transfers); BFG received no consideration for the transfers; and the transfers

were made at a time when BFG was insolvent.

Courts applying MUFTA § 5(a)(1) and analogous provisions of Bankruptcy Code §

548(a)(1)(A) permit a finding of intent to defraud where a transferee is in a position of

dominance or control over a debtor's disposition of property such that the transferee's intent to

hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer

fraudulent.  *See Baldiga v. Moog, Inc. (In re Comprehensive Power, Inc.),* 578 B.R. 14, 34

(Bankr. D. Mass. 2017) ("[T]he Trustee has alleged sufficient facts to state a plausible claim that

[secured creditor's] intent should be imputed to the Debtor through its 'control' and that the

Debtor was complicit in the transfer of its assets in relinquishing rights and facilitating a

purported secured party sale.") (citing *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984

(1st Cir. 1983) ("We may impute any fraudulent intent of Consove to the transferor [debtor]

because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property.")). Based upon Mr. Dixon's alleged domination and control over BFG through CapeCapital, its manager, and the benefit he allegedly received from the transfers to the Cape Real Estate Entities, the complaint contains sufficient allegations which, if true, would impute to BFG Mr. Dixon's fraudulent intent. At this early point in the proceedings, I find the trustee's allegations are sufficient to permit count V to survive beyond the pleading stage and will enter an order denying Mr. Dixon's motion to dismiss count V.

### E. Count VII- Bankruptcy Code § 550

Count VII is brought under Bankruptcy Code § 550 against the count I and II defendants, among others, to effectuate any judgment the trustee might recover under those counts alleging Bankruptcy Code § 548(a) fraudulent transfers. Count VII is thus applicable to Mr. Dixon as a count I and II defendant, and the dismissal of counts I and II against him necessitates the dismissal of count VII against him as well. I note that the trustee's fraudulent transfer counts against Mr. Dixon which survive the motion to dismiss (counts III through V) as well as count X (statutory reach and apply) discussed below, also contain references to Bankruptcy Code §§ 544 and 550 and would enable the trustee, if successful, to recover fraudulently transferred property from Mr. Dixon. I will enter an order allowing Mr. Dixon's motion to dismiss count VII.

### F. Count X-Statutory Reach and Apply-Code §§ 544, 550; Mass. Gen. Laws ch. 214, § 3(8)

In count X, the trustee asserts claims under Bankruptcy Code §§ 544 and 550 and under Mass. Gen. Laws ch. 214, § 3(8) to reach and apply the assets formerly held by BFG that are now owned, controlled, or in the possession of Mr. Dixon as result of the alleged actual fraudulent transfers. Mr. Dixon asserts that the count must be dismissed because it presupposes

a transfer of property by BFG to Mr. Dixon, which he contends the complaint does not credibly allege.

### 1. *Applicable Law*

Bankruptcy Code §§ 544 and 550 are discussed at length above.  Mass. Gen Laws ch. 214, § 3(8) provides:

> Section 3. The supreme judicial and superior courts shall have original and concurrent jurisdiction of the following cases:
> . . . (8) Actions to reach and apply in payment of a debt any property, right, title or interest, real or personal, of a debtor, liable to be attached or taken on execution in a civil action against him and fraudulently conveyed by him with intent to defeat, delay or defraud his creditors, or purchased, or directly or indirectly paid for, by him, the record or other title to which is retained in the vendor or is conveyed to a third person with intent to defeat, delay or defraud the creditors of the debtor.

Mass. Gen. Laws ch. 214, § 3(8).  The statute "authorizes a statutory reach and apply action to reach assets that have been conveyed by the defendant debtor to a third party with intent to defeat, delay, or defraud the debtor's creditors and is coextensive with the [MUFTA]." *De Prins v. Michaeles*, 236 F. Supp. 3d 482, 490 (D. Mass. 2017).   "Resolution of the question as to whether [a creditor] has a plausible claim under the [M]UFTA and Mass. Gen. L. c. 214, § 3(8) therefore, turns on whether [a creditor] has alleged sufficient facts to show that [a debtor] transferred his assets . . . with the intent to defraud his creditors."  *Id*.

### 2. *Discussion*

As stated above, the trustee has asserted a plausible claim under the MUFTA that BFG transferred assets to the Cape Real Estate Entities for the benefit of Mr. Dixon with actual intent to hinder, delay or defraud its creditors and that Mr. Dixon was a subsequent transferee of the sale proceeds when those properties were later sold. Thus, those assets which have been allegedly fraudulently transferred and the persons holding them could be the subject of claims

30

under the Massachusetts reach and apply statute.  Accordingly, I will enter an order denying Mr. Dixon's motion to dismiss count X.

## G. Count XVI-Conspiracy

In count XVI, the trustee alleges that, beginning no later than 2012 and continuing at least through BFG's bankruptcy filing date, Mr. Dixon and other count XVI defendants, including Lexfit, Newfit, CapeCapital, the Cape Real Estate Entities, Blast Acquisition and others, formed a "confederation" to siphon assets away from BFG, defraud BFG's creditors, and convert and steal BFG's assets, damaging its creditors.  Mr. Dixon asserts that the complaint contains only broad and vague allegations of conspiracy which are insufficient to support the trustee's claim.

### 1. Applicable Law

In *Aetna Cas. Sur. Co. v. P & B Autobody*, the United States Court of Appeals for the First Circuit, applying Massachusetts law, identified two types of civil conspiracy.  43 F.3d 1546, 1563-64 (1st Cir. 1994).  The first is a "very limited" "coercive type" of conspiracy where "'[i]n order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'" *Id*. at 1563 (quoting *Jurgens v. Abraham*, 616 F. Supp. 1381, 1386 (D. Mass. 1985) and citing *Fleming v. Dane*, 304 Mass. 46 (1939)). The second type of civil conspiracy, and the one upon which the trustee relies here, is "akin to a theory of common law joint liability in tort" where the word "conspiracy" is used to denote "vicarious liability" in tort for concerted action. *Id.* at 1564. The elements are (1) common design or agreement between two or more people to commit a wrongful act and (2) proof of some tortious act in furtherance of the agreement.  *Id*. (citing Restatement (Second) of Torts § 876 cmt.

b (Am. Law Inst. 1979)).  "Where two or more persons act in concert, each will be jointly and

severally liable for the tort." *Id.*   There is a three year statute of limitations for the tort of civil

conspiracy. *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977) (citing Mass. Gen. Laws

ch. 260, § 2A) (applying a prior version of the statute which provided for a two year limitations

period).[25]

Mr. Dixon asserts that when agents of the same legal entity make agreements in the

course of their official duties, their acts are attributed to the principal and, therefore, they cannot

be deemed to have conspired with each other, citing *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct.

1843, 1867 (2017) ("Conspiracy requires an agreement—and in particular an agreement to do an

unlawful act—between or among two or more separate persons. When two agents of the same

legal entity make an agreement in the course of their official duties, however, as a practical and

legal matter their acts are attributed to their principal. And it then follows that there has not been

an agreement between two or more separate people.") (citing *Copperweld Corp. v. Independence

Tube Corp.*, 467 U.S. 752, 769–771 (1984)).

### 2. *Discussion*

I find that the trustee has sufficiently pleaded allegations of a common design or plan

between Mr. Dixon and the Cape Real Estate Entities, who were not agents of the same legal

---

[25] The statute provides: "Except as otherwise provided, actions of tort, actions of contract to
recover for personal injuries, and actions of replevin, shall be commenced only within three
years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A.  *See also*
Bankruptcy Code § 108, which provides, in part: "(a) If applicable nonbankruptcy law . . . fixes a
period within which the debtor may commence an action, and such period has not expired before
the date of the filing of the petition, the trustee may commence such action only before the later
of--
(1) the end of such period, including any suspension of such period occurring on or after the
commencement of the case; or
(2) two years after the order for relief."  11 U.S.C. § 108(a)(1) and (2).

entity, to fraudulently misappropriate and convert BFG's rights to acquire the Bally real estate

and deprive BFG of the value of the properties it paid for in order to hinder, delay and defraud

BFG's creditors, including Ms. Beninati.  Furthermore, I find that the trustee has also sufficiently

pleaded that their plan, and resulting injury to BFG, actively continued through December 31,

2014 when the sale proceeds of the last sold property were allegedly distributed to Mr. Dixon

and not BFG. Moreover, there are sufficient allegations in the complaint that on January 30,

2013, a date within three years of the bankruptcy filing on January 26, 2016, Mr. Dixon,

CapeCapital, and Newfit engaged in a plan to convert and transfer, without full consideration,

profitable BFG clubs to Newfit to hinder, delay and defraud BFG's creditors, including Ms.

Beninati (with Mr. Dixon later personally receiving payments from Mr. Eskandarian).

Accordingly, I will enter an order denying Mr. Dixon's motion to dismiss count XVI.

## H.  Count XVIII-Conversion and Civil Theft

In count XVIII, the trustee alleges that Mr. Dixon and the other count XVIII defendants

converted BFG's funds and assets for their own use and benefit.  In his brief, he asserts that Mr.

Dixon exercised dominion and control over BFG's right to acquire the Bally real estate when he

misappropriated that right and permitted the Cape Real Estate Entities to acquire title instead of

BFG.  He additionally relies on the transfers between BFG and Newfit to support his claim for

conversion against Mr. Dixon.

### 1.  Applicable Law

"The tort of conversion requires an intentional or wrongful exercise of dominion or

control over personal property of another by one with no right to immediate possession." *Kelley*

*v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002) (citing *Third Nat'l Bank v. Continental Ins. Co.*,

388 Mass. 240, 244 (Mass. 1983); Restatement (Second) of Torts § 222A (Am. Law Inst. 1965)).

"An action for conversion 'cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.'" *Id*. at 12 (citing *Grande v. PFL Life Ins. Co*., No. 9663, 2000 WL 1476676, at *4 (Mass. App. Div. Sept. 27, 2000) (quoting *Spooner v. Manchester*, 133 Mass. 270, 273 (1882)). The statute of limitations for conversion claims is three years. *See* Mass. Gen Laws ch. 260, § 2A, *supra*.

### 2. Discussion

As stated above, the alleged misappropriation and conversion of BFG's rights to acquire the Bally real estate occurred in April of 2012, well beyond the statute of limitations. Accordingly, the trustee has failed to state a plausible claim for conversion based upon Mr. Dixon's alleged misappropriation and conversion of the rights to the Bally real estate within the limitations period. There are, however, sufficient allegations in the complaint that on January 30, 2013, a date within three years of the bankruptcy filing on January 26, 2016, Mr. Dixon and CapeCapital exercised dominion and control over BFG's property by transferring eight of its profitable clubs to Newfit, which was managed by Mr. Dixon, without full consideration in order to shield assets from BFG's creditors (with Mr. Dixon later personally receiving payments from Mr. Eskandarian). I will enter an order denying Mr. Dixon's motion to dismiss count XVIII.

## I. Count XIX-Fraud

With respect to count XIX, the trustee asserts that Mr. Dixon committed fraud against BFG when he presented to the other members of BFG a members' consent fraudulently indicating that the Bally real estate would be acquired by a BFG subsidiary while he simultaneously orchestrated the transfers of the Bally real estate to the Cape Real Estate Entities.

34

### 1. *Applicable Law*

 "Under Massachusetts law, [a determination of] fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 357 (1st Cir. 2013) (citing *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002)).  Mr. Dixon asserts that the complaint fails to allege that he made any representation, let alone one that was false, material, or reasonably relied upon by BFG.  However, failure to disclose material information may give rise to liability under common law fraud where a defendant was under a duty to disclose the information.  *See Milton v. Van Dorn Co.*, 961 F.2d 965, 968 n.4 (1st Cir. 1992) (citing *Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991); *Nei v. Burley*, 388 Mass. 307, 310-311 (1983)). A limited liability company, like a corporation, "is not a living person, [and] it can act only through its agents."  *Am.'s Test Kitchen, Inc. v. Kimball*, No. 1684CV03325BLS2, 2018 WL 2049490, at *2 (Mass. Super. Ct. Apr. 2, 2018) (quoting *Commonwealth v. Angelo Todesca Corp.*, 446 Mass. 128, 135 (2006)).

### 2. *Discussion*

The complaint sufficiently alleges that Mr. Dixon knew that neither BFG nor its subsidiaries would acquire the Bally real estate at the time he caused the members' consent to be presented to BFG's members and that the members of BFG relied on that members' consent and believed BFG would acquire the real estate when they approved the admission of the Dixon Family Limited Partnership as a member of BFG and allowed the Bally transaction to proceed. As the CEO of BFG and the agent of BFG's manager, CapeCapital, Mr. Dixon had a duty to disclose truthful information about the planned disposition of the Bally real estate.  For the

reasons stated above and in *Blast I*, I find that the complaint sufficiently alleges that the plan to misappropriate and divert the Bally real estate to entities not owned by BFG was a material matter which Mr. Dixon failed to disclose to, and allegedly concealed from, the other members of BFG constituting material omissions which harmed BFG. The trustee has alleged sufficient facts to state a plausible claim for fraud against Mr. Dixon, and I will enter an order denying his motion to dismiss count XIX.

## J. Count XXV-Alter Ego/Piercing the Corporate Veil

In count XXV, the trustee asserts that defendants including Mr. Dixon, CapeCapital, the Dixon Family Limited Partnership, Newfit, Lexfit, the BFG subsidiaries, the Cape Real Estate Entities and others each exercised pervasive control over BFG (and each other) and engaged in confused intermingling of business activity, assets and management. He seeks an order piercing the corporate veils separating those defendants and BFG and an order finding them liable as "alter egos" and thus liable for BFG's debts.

### 1. Applicable Law

In Massachusetts, corporations and their shareholders are generally deemed to be distinct legal entities. *See Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657 (1993). Under unusual circumstances, however, a court may disregard the separateness of entities, particularly to defeat fraud or remedy an injury. *See id*. These efforts are often characterized as veil piercing or establishing alter ego status. "The doctrines of veil piercing . . . and alter ego are interrelated and litigants often use the terms interchangeably. Indeed, a party may seek to pierce a corporate veil under an alter ego theory which is equitable in nature." *Butler v. Candlewood Road Partners, LLC (In re Raymond)*, 529 B.R. 455, 471 (Bankr. D. Mass. 2015) (citing *Weiss v. Lockwood*, 499 B.R. 392, 394 (D. Mass. 2013) (citing *Miranda v. Gonzalez (In re Gonzalez)*, No. 02–05485–

BKT, Adv. P. No. 09–150, 2010 WL 3395677, at *2 (Bankr. D.P.R. Aug. 23, 2013) (footnote

omitted)).  "Nevertheless, veil piercing and alter ego can be distinguished." *The Patriot Grp.,*

*LLC v. Fustolo (In re Fustolo)*, 597 B.R. 1, 47 (Bankr. D. Mass. 2019) (citing *U.S. Trustee v.*

*Zhang (In re Zhang)*, 463 B.R. 66, 81 (Bankr. S.D. Ohio 2012)). "'The former asks a court to

hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity

and therefore liability is direct.'" *Id.* (citing *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th

Cir. 2005) (footnote omitted)).

In *My Bread Baking Co. v. Cumberland Farms, Inc*., the Massachusetts Supreme Judicial

Court ("SJC") considered "[t]he circumstances in which one corporation, or a person controlling

it, may become liable for the acts or torts of an affiliate or a subsidiary under common control . .

. ." 353 Mass. 614, 618-19 (1968).  It explained that it is appropriate to depart from the general

principle of corporate separateness in two situations:

> (a) when there is active and direct participation by the representatives of one
> corporation, apparently exercising some form of pervasive control, in the
> activities of another and there is some fraudulent or injurious consequence of the
> intercorporate relationship, or (b) when there is a confused intermingling of
> activity of two or more corporations engaged in a common enterprise with
> substantial disregard of the separate nature of the corporate entities, or serious
> ambiguity about the manner and capacity in which the various corporations and
> their respective representatives are acting. In such circumstances, in imposing
> liability upon one or more of a group of 'closely identified' corporations a court
> 'need not consider with nicety which of them' ought to be held liable for the act
> of one corporation 'for which the plaintiff deserves payment.'

*Id.* (internal citation omitted).[26]

---

[26] *See Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 36 (Bankr.
D. Mass. 2011) ( "Although the standards for piercing the corporate veil are articulated most
frequently with respect to corporations, this Court concludes that the same principles would
apply for alter ego liability to attach to members of limited liability companies.").

"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000). In *M.C.K*, the SJC listed the factors to be considered when courts engage in an analysis of the *My Bread* principles:

> The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id.* at 555 n.19 (citing *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria set forth in *My Bread*); *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991)); *see also Birbara v. Locke*, 99 F.3d 1233, 1240 (1st Cir. 1996) ("*My Bread* sets the standard for deciding when to pierce the corporate veil under Massachusetts law; *Pepsi-Cola* elucidates some factors that may be considered when engaging in a *My Bread* analysis."). "Massachusetts courts employ the alter ego doctrine to determine whether a principal of a corporation is its alter ego using the *My Bread Baking Co.* factors." *In re Fustolo*, 597 B.R. at 50.

Since its ruling in *My Bread*, the SJC has observed that under Massachusetts law, the corporate veil will only be pierced in rare situations. *See, e.g.*, *Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.") (citing *My Bread*, 353 Mass. at 620).

### 2. *Discussion*

With respect to count XXV, I find the trustee has alleged sufficient facts supporting "fraudulent or injurious consequence of the intercorporate relationship" and "confused intermingling" as a basis for corporate disregard under *My Bread*, having specifically pleaded a number of the factors set forth in *M.C.K.*  The gravamen of the complaint against Mr. Dixon is the gross inequity and injury to BFG's creditors resulting from his alleged fraudulent and improper use of numerous entities he controlled (and which also controlled BFG) to misappropriate and divert BFG's assets beyond creditors' reach while BFG was insolvent.  The trustee has sufficiently supported his claims with specific allegations concerning Mr. Dixon's pervasive control over the Cape Real Estate Entities, Lexfit, Newfit, and CapeCapital (and their control over BFG), all of which were managed by Mr. Dixon directly and/or by CapeCapital, of which he was the sole manager and a member.  Further, the trustee has sufficiently alleged that Mr. Dixon formed and/or used those entities to promote fraudulent transactions in a common enterprise which benefited him and his affiliates. Lastly, he has included numerous allegations regarding intermingling of business activity and assets among the entities.   While mindful that veil piercing will be permitted in only rare situations, I find at the Rule 12(b)(6) stage, with all reasonable inferences drawn in the trustee's favor, the allegations are sufficient to support a plausible claim for veil piercing and/or alter ego determination against Mr. Dixon and the numerous Dixon-controlled entities. I will enter an order denying Mr. Dixon's motion to dismiss count XXV.

## V. <u>Conclusion</u>

Based on the foregoing, an order shall enter granting Mr. Dixon's motion to dismiss with respect to counts I, II, VI, VII, VIII, XVII, XX, XXI, XXIII, and XXIX of the trustee's amended

complaint and denying the motion with respect to counts III, IV, V, X, XVI, XVIII, XIX, and

XXV.


Dated: April 30, 2019                         By the Court,



                                              Melvin. S. Hoffman
                                              United States Bankruptcy Judge

            Counsel Appearing: Ilyas J. Rona, Esq.
                               Milligan Rona Duran & King LLC
                               Boston, MA
                                  for the plaintiff, Gary W. Cruickshank,
                                  Trustee of the Estate of Blast Fitness
                                  Group, LLC


                               Joseph S.U. Bodoff, Esq.
                               Rubin & Rudman LLP
                               Boston, MA
                                  for the defendant, Harold R. Dixon