# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 16-10236-MSH |
| BLAST FITNESS GROUP, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| GARY W. CRUICKSHANK, | ) | |
| CHAPTER 7 TRUSTEE OF THE | ) | |
| ESTATE OF BLAST FITNESS | ) | |
| FITNESS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | Case No. 18-01011 |
| v. | ) | |
| | ) | |
| HAROLD R. DIXON *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF DECISION ON MOTION TO DISMISS OF CAPECAPITAL LLC

### I. Introduction

In a thirty-count complaint,[1] Gary W. Cruickshank, the plaintiff and chapter 7 trustee of the bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief against over forty named and dozens of unnamed defendants, including CapeCapital LLC, a Massachusetts limited liability company, whose sole manager is defendant, Harold R. Dixon. CapeCapital was the sole manager of BFG. BFG filed a voluntary petition under Chapter 7 of the

---

[1] As amended by a first amended complaint (ECF #130).

United States Bankruptcy Code[2] on January 26, 2016, at which time its debts exceeded $16 million.  This adversary proceeding was commenced two years after the petition date on January 26, 2018.

CapeCapital has moved under Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b), to dismiss 18 of 23 counts against it.[3]  Specifically, it seeks dismissal of count I (constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B)), count II (actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A)), count III (constructive fraudulent transfer under Massachusetts Fraudulent Transfer Act ("MFTA") § 5(a)(2)), count IV (constructive fraudulent transfer under MFTA § 6(a)), count V (actual fraudulent transfer under MFTA § 5(a)(1)), count VII ("turnover" under Bankruptcy Code § 550),[4] count VIII (unjust enrichment), count X (statutory reach and apply/Bankruptcy Code §§ 544 and 550 and Mass. Gen. Laws ch. 214, § 3(8)), count XI (establishment of a resulting/constructive trust), count XVI (conspiracy), count XVII (aiding and abetting), count XVIII (conversion and civil theft), count XIX (fraud), count XX (intentional interference with contractual advantage), count XXI (tortious interference with contractual advantage), count XXIII (substantive consolidation), count XXV (alter ego/piercing the corporate veil), and count XXIX (attorneys' fees).   It does not seek dismissal of the remaining counts against it for breach of fiduciary duty (count XV and XXVI),[5] corporate waste (count XXVII), breach of duty to preserve assets, deepening insolvency (count XXVIII), or costs (XXX).

[2] All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 *et seq.*
[3] ECF #191.  The motion relates to the first amended complaint (ECF# 130).
[4] "Turnover" is a misnomer as the statute governs liability of transferees of avoided transfers.
[5] CapeCapital references count XXVI in the first paragraph of its brief as both a count to be dismissed and reserved for summary judgment or trial.  As it does not argue for dismissal of that count in its brief, I will not address it here.

At the outset, I note that the trustee does not contest dismissal of count XXIX. I will, therefore, grant CapeCapital's motion to dismiss that count.

## II. Procedural History

In addition to CapeCapital, other defendants, including Mr. Dixon, the law firm of Goodwin Procter LLP ("Goodwin") and two of its attorneys (collectively, the "Goodwin Defendants") also filed motions to dismiss. At a hearing held on these motions and others on June 14, 2018, the trustee agreed to the dismissal of his claim against CapeCapital for substantive consolidation (count XXIII), and I will therefore grant the motion to dismiss that count. The Goodwin Defendants' motions to dismiss were allowed in part and denied in part by my memorandum and order dated January 8, 2019. *See Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, No. 16-10236-MSH, 2019 WL 137109 (Bankr. D. Mass. Jan. 8, 2019) ("*Blast I*").

Today, I have also issued a memorandum and order, allowing in part and denying in part Mr. Dixon's motion to dismiss ("*Blast II*"). A complete procedural history and recitation of the trustee's factual allegations, and my legal findings on certain of the trustee's claims are set forth in *Blast I* and *II*, which are incorporated herein by reference. Nevertheless, I reiterate below some of those factual allegations and supplement them with additional allegations as necessary to determine CapeCapital's motion to dismiss.

There are a number of other defendants in this adversary proceeding which have not answered or otherwise responded to the complaint, including certain BFG subsidiaries, as more fully discussed below. These subsidiaries are the subject of, among other claims, the trustee's claim in count XXIII for substantive consolidation with BFG. Although those defendants have

not yet been defaulted, I will assume for purposes of this decision that BFG and its subsidiaries are consolidated.

### III. <u>Motion to Dismiss</u>

#### A. *Legal Standard*

In ruling on the motion to dismiss, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences in the trustee's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). A claim cannot be dismissed if the trustee has demonstrated a "plausible entitlement to relief." *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's obligation requires more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Inquiry into plausibility is a two-step process. "First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited)." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citing *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim to relief." *Id*. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels us 'to draw on' our 'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). "'Moreover, *each* defendant's role in the [adverse action] must be sufficiently alleged to make him or her a plausible defendant. After all, we must determine whether, *as to each defendant*, a

4

plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" *Rodriguez-Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40-41 (1st Cir. 2012) (quoting *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 16 (1st Cir. 2011) (emphasis in original). *See also Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant.").

### B. Trustee's Factual Allegations[6]

#### 1. BFG and CapeCapital

On February 14, 2011, CapeCapital, acting through Mr. Dixon, formed BFG, a Massachusetts limited liability company.[7] ¶ 74. CapeCapital was the sole manager of BFG, and Mr. Dixon, in turn, was the sole manager and a member of CapeCapital. ¶ 3.  At all relevant times, BFG acted at the direction of CapeCapital and Mr. Dixon. ¶ 92.

BFG owned, entirely or partially, seventeen subsidiaries through which it operated its business.[8]  ¶ 53. Fitness clubs at different locations were often operated through separate BFG subsidiaries, and those subsidiaries were often the actual tenants under the applicable leases for the premises.  ¶¶ 251-52, 255-56.  At all times relevant to the claims and causes of action alleged in the complaint, BFG was insolvent and insufficiently capitalized. ¶¶ 310-12.

---

[6] Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the first amended complaint.

[7] Although not specifically pleaded in the complaint, there is no dispute that BFG is a Massachusetts limited liability company.

[8] Each of the seventeen BFG subsidiaries is a defendant here.  The subsidiaries are named in numerous counts of the complaint, including counts for fraudulent transfers, piercing the corporate veil/alter ego and substantive consolidation.  None of the BFG subsidiaries has filed a responsive pleading to the complaint.

### 2. *The Bally Transaction*

Under the terms of an asset purchase agreement dated April 10, 2012 between Bally
Total Fitness, Inc. and BFG's wholly-owned subsidiary, Blast Fitness Acquisition, LLC ("Blast
Acquisition"), Blast Acquisition was to acquire thirty-nine fitness clubs from Bally and BFG was
to receive three pieces of commercial real estate from Bally located in Maryland Heights,
Missouri, West Hartford, Connecticut and Irving, Texas which were to be "sold pursuant to the
terms of a separate purchase agreement . . . for an aggregate purchase price of $1,000,000 to an
entity identified by [BFG] prior to Closing." ¶¶ 62-63, 114, 118. Additionally, under the terms
of the asset purchase agreement, BFG was to receive 28 residual revenue streams associated with
28 closed Bally's fitness clubs which were derived from monthly electronic fund transfers of
members of the closed fitness clubs. ¶ 115.

On April 25, 2012, Mr. Dixon formed CapeCapital Maryland Heights, LLC, a Missouri
limited liability company, CapeCapital West Hartford, LLC, a Connecticut limited liability
company, and CapeCapital Irving, LLC, a Texas limited liability company, all of which were
managed by Mr. Dixon and effectively owned by him (collectively, the "Cape Real Estate
Entities") in order to take title to the Bally real estate. ¶¶ 18, 20, 22, 62, 145, 152, 157, 164. None
of these entities was owned by BFG. ¶¶ 62, 163-64.

To raise part of the cash needed to complete the Bally transaction, the members of BFG
agreed to sell a preferred membership interest in BFG to the Dixon Family Limited Partnership
(an affiliate of Dixon and also a defendant in this action). ¶¶ 138-39. The Goodwin Defendants
drafted and presented to BFG and its members a member consent dated April 27, 2012, which
provided in part:

> WHEREAS, the Members and Managers [of BFG] are seeking to raise additional
> capital for the Company for purposes including, but not limited [sic], financing the

6

growth of the Company's business through the acquisition, from Bally Total Fitness
Corporation, a Delaware corporation ("Bally") and certain of ts [sic] affiliates, of
operating assets **and real property associated with additional health club facilities
(the "Bally Acquisition") by a direct subsidiary of the Company.** (Emphasis
added).

*Id*. This consent was presented to BFG's members at a time when Mr. Dixon and the Goodwin

Defendants were already planning to transfer the Bally real estate to entities not owned by BFG.

¶ 140.  Members of BFG, including Steven Borghi, relied on the member consent when they

approved the admission of the Dixon Family Limited Partnership as a member of BFG and

allowed the Bally transaction to move forward. ¶ 142. They did so believing that BFG would

receive the Bally real estate. *Id*.  According to emails exchanged between Goodwin attorneys and

Bally's counsel on April 12, 2012, the Goodwin Defendants knew by that date that Mr. Dixon

wanted to designate entities not owned by BFG to take title to the Bally real estate. ¶¶ 131-133.

By the time the Bally transaction closed on April 30, 2012, Bally had sold the Bally real

estate, worth over $4 million, to Mr. Dixon's LLCs, the Cape Real Estate Entities, for

approximately $1 million. ¶¶ 62, 146, 153, 158. Mr. Dixon used BFG funds to subsidize his

purchase of the Bally real estate. ¶¶ 63, 146, 153, 158, 178.  In addition to the diversion of the

Bally real estate to entities not owned by BFG, BFG also "did not receive the full benefit of the

Residual Bally Revenue Streams," as CapeCapital and Mr. Dixon directed that they be

transferred to themselves or other third parties.[9]  ¶¶ 116-117.

At the time of the Bally transaction, BFG, Mr. Dixon and Mr. Borghi, Mr. Dixon's

business partner and a member of BFG, were mired in a dispute with Elizabeth Beninati, the

widow of Mr. Borghi's previous business partner in the discount fitness club business. ¶¶ 71, 73,

---

[9] The dates through which CapeCapital continued to receive the revenue stream payments were
not alleged in the complaint.

76-79. Ms. Beninati commenced a Massachusetts state court lawsuit against Mr. Dixon, Mr.

Borghi and BFG on May 24, 2012, seeking millions of dollars in damages. ¶¶ 79, 376.

Following the Cape Real Estate Entities' acquisition of the Bally real estate, Mr. Dixon

and CapeCapital directed BFG and/or its subsidiaries to enter into leases with the Cape Real

Estate Entities and to make "potentially over-market" lease payments to them for the BFG clubs

operating at the three Dixon-controlled properties at a time when BFG was insolvent. ¶¶ 63, 166,

181-83.[10] At the direction of Mr. Dixon, the Cape Real Estate Entities sold the properties to third

parties in separate transactions on December 31, 2013, June 26, 2014 and December 31, 2014, ¶¶

148, 151, 154, 156, 159, 161, for prices significantly in excess of their purchase prices, with the

proceeds being distributed to Mr. Dixon or to unknown John Doe defendants. ¶¶ 148, 149, 154,

155, 159, 160. The Cape Real Estate Entities breached their lease agreements with BFG and/or

its subsidiaries by terminating these leases prematurely to facilitate the sale of the Bally real

estate, and CapeCapital and Mr. Dixon directed the closing of the clubs at those locations for that

purpose. ¶¶ 150, 156, 161, 184.

### 3. The Lexfit and Newfit Transactions

In late 2012, while BFG was in litigation with Ms. Beninati, Mr. Dixon began

transferring profitable BFG clubs to new entities in order to shield them from BFG's creditors

such as Ms. Beninati. ¶¶ 82, 273, 308-309. Defendants, Lexfit, LLC, a Massachusetts limited

liability company, and Newfit, LLC, a Delaware limited liability company, both managed by Mr.

Dixon and/or CapeCapital, were two of these entities.  ¶¶ 9, 10, 103, 273.

---

[10] The trustee did not allege any facts concerning the amount of rent charged, the amount of rent
payments made by BFG (or its subsidiaries) or how the amounts paid compared to market rates
at the time.

On December 6, 2012, Mr. Dixon, CapeCapital and another defendant transferred sixteen of BFG's more profitable fitness clubs to Lexfit for no or nominal consideration. ¶¶ 274, 276. On January 30, 2013, Mr. Dixon, CapeCapital and another defendant transferred an additional eight of BFG's more profitable clubs to Newfit. ¶ 283-84. BFG did not receive full consideration for these transfers. ¶ 285.  Also on January 30, 2013, Lexfit transferred eight of the clubs received from BFG in the December 2012 transaction to Newfit for less than full consideration. ¶¶ 289, 291, 293.

### 4. *Other Transactions with Third Parties*

BFG could not pay its debts as they arose and it implemented a strategy, through Mr. Dixon and CapeCapital, of shifting assets from one fitness club to another.  ¶¶ 255, 259, 312. At the direction of Mr. Dixon and CapeCapital, BFG would shut down a profitable club, transfer the club's assets—owned by a particular subsidiary of BFG—to one of its other wholly owned subsidiaries and leave the now asset-less subsidiary with its liabilities. ¶¶ 247, 255, 262.  The transferred assets included, membership lists, club equipment, cash, receivables in the form of electronic funds transfers for scheduled membership payments, which were drawn from members' accounts, and other assets.  ¶ 255.

A large number of BFG's creditors are landlords who leased space to wholly-owned entities of BFG.  ¶ 248. The landlords relied on guaranties from BFG, third party guarantors, or other obligors under the leases. ¶ 249.  BFG purchased workout clubs from sellers (such as Bally), assumed the sellers' obligations under existing leases and often breached its obligations to remove the sellers as obligors under the leases.  ¶¶ 250, 359. When clubs were shut down, the subsidiary, which was the actual tenant under the lease, would stop making rent payments to the landlord. ¶ 256.  The landlord would sue the tenant, only to find that the assets of the tenant had

been transferred to another subsidiary of BFG.  ¶ 257.  Landlords, guarantors, and obligors then

pursued fraudulent transfer, indemnification and other claims against BFG and others. ¶¶ 198,

232, 257, 359-60.

From 2014 to 2016, BFG was involved in numerous lawsuits commenced by landlords

and others for unpaid rents and other lease defaults. ¶¶ 186, 198-199, 231-33, 261. BFG could

not satisfy its debts to landlords due to its insolvency. ¶ 186.

### 5. *Executive Compensation and Lease Payments to Mykonos Holdings, LLC*

CapeCapital received unspecified executive compensation or fees and other valuable

direct and indirect compensation from BFG and its subsidiaries to which it was not entitled.[11]  ¶¶

369, 373.   Additionally, CapeCapital was an owner of defendant, Mykonos Holdings, LLC,

which, at all material times, was BFG's landlord for the corporate offices it leased in

Auburndale, Massachusetts.  ¶¶ 75 n.1, 358, 375.  BFG leased a portion of its office space from

Mykonos at above-market rates of $4,721 per month, an amount less than other tenants,

including Newfit, paid for rent in the same building.  ¶ 358.   The lease payments made by

Newfit "were less than 35% as much as [BFG's]." ¶ 358.  Many of BFG's subsidiaries and Mr.

Dixon's affiliates listed their addresses at the same Auburndale location.  ¶ 375.

### IV. Trustee's Claims Against CapeCapital

#### A. *Fraudulent Transfer Claims Generally*

In his complaint, the trustee alleges numerous fraudulent transfers involving multiple

defendants, including CapeCapital.  In counts I through V, he asserts claims against it and other

defendants under Bankruptcy Code § 548(a)(1)(A) and (B) (counts II and I, respectively) which

permit a trustee to avoid actual and constructive fraudulent transfers, and under Bankruptcy Code

---

[11] The complaint contains no dates or amounts for the alleged payments and compensation.

§ 544(b) (counts III, IV and V) which permits a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding [an allowed unsecured claim]. . . ." 11 U.S.C. § 544(b).  The "applicable law" here is the Massachusetts Uniform Fraudulent Transfer Act ("MUFTA"), Mass. Gen. Laws. ch. 109A.  Pursuant to MUFTA §§ 5(a)(2) and 6(a), the trustee seeks avoidance of constructive fraudulent transfers (counts III and IV) and pursuant to MUFTA § 5(a)(1), he seeks avoidance of transfers committed with actual fraudulent intent (count V).[12]  The trustee fails to identify which transfers he seeks to avoid in the respective fraudulent transfer counts.

CapeCapital asserts that the fraudulent transfer claims against it (counts I through V) as well as claims dependent on the fraudulent transfer claims (counts VII, VIII, X and XI) should be dismissed because the trustee has failed to allege that BFG transferred any property to it.  As stated above, the complaint does not set forth which of the numerous alleged fraudulent transfers are applicable to specific counts in the complaint or to specific defendants.  The trustee's opposition to CapeCapital's motion to dismiss provides clarification.  The transfers the trustee seeks to avoid, in which CapeCapital was involved, consist of 1) the transfer to CapeCapital of BFG's interest in the Bally residual revenue streams; 2) BFG's payment of above market rent to Mykonos which is partially owned by CapeCapital; and 3) BFG's payment to CapeCapital of executive compensation and fees.

**B.  Counts I and II-Bankruptcy Code § 548**

    **1.  Applicable Law**

Bankruptcy Code § 548 provides:

---

[12] In counts III-V, the trustee also references Bankruptcy Code § 550 and MUFTA § 8(a), which is the remedy provision of the MUFTA.

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

11 U.S.C. § 548(a)(1)(A) and (B).

### 2. *Discussion*

The alleged fraudulent transfers involving CapeCapital asserted by the trustee consist of 1) the transfer of BFG's interest in the Bally residual revenue streams to CapeCapital; 2) BFG's payment of above market rent to Mykonos which benefited CapeCapital; and 3) BFG's payment to CapeCapital of executive compensation and fees.

With respect to the Bally residual revenue streams, BFG's alleged transfer of its right to acquire those revenue streams occurred in 2012, well before the two year "reach back" period under Bankruptcy Code § 548. If CapeCapital or others continued to receive those monies after 2012, those facts are not alleged in the complaint, and the trustee concedes in his brief that he will require discovery to determine when these payments ended. Although I will consider the voidability of the transfer of the Bally residual revenue streams with reference to counts III, IV and V, based on the MUFTA, it cannot form the basis of a fraudulent transfer claim under Bankruptcy Code § 548 due to the temporal restrictions of the statute.

With respect to the other alleged transfers, I find that the trustee has not pleaded sufficient facts to support plausible avoidance claims under Bankruptcy Code § 548 or the MUFTA. Other than the amount of BFG's monthly rent at the Auburndale location at some

point in time ($4,721), the complaint contains no allegations concerning the dates of rent

payments made by BFG or why the lease should be considered above-market other than the

allegation that one CapeCapital/Dixon affiliate, Newfit, paid a lower rental rate to Mykonos for

an unspecified amount of office space.  While one can infer that BFG leased the property "at all

material times," and paid the quoted rate at some point in time, one cannot determine from the

complaint the amount of office space rented by BFG (and whether it was more or less than

Newfit), or the market rates at the time for comparable office space.  I am unable to draw a

reasonable inference that BFG did not receive reasonably equivalent value in exchange for lease

payments or that it made the lease payments with actual intent to hinder, delay or defraud

creditors.  The allegations concerning the Mykonos lease payments are conclusory and do not

rise above the level of speculation for purposes of any fraudulent transfer count in the complaint,

although they may form the basis for other plausible claims in the complaint against CapeCapital

or other defendants.

Likewise, the trustee has pleaded no facts concerning the dates or amounts of

compensation or fees allegedly received by CapeCapital from BFG or its subsidiaries.

Accordingly, I will not consider those claims in connection with any fraudulent transfer count in

the complaint. I will enter an order allowing CapeCapital's motion to dismiss counts I and II

against it.

**C.  *Counts III and IV- MUFTA §§ 5(a)(2) and 6(a) and Bankruptcy Code §§ 544(b) and 550***

Counts III and IV allege that the transfer of BFG's interest in the Bally residual revenue

streams to CapeCapital was fraudulent under MUFTA §§ 5(a)(2) and 6(a).

*1.  Applicable Law*

MUFTA §§ 5 and 6, in relevant part, provide:

13

Section 5. (a) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . :

> . . . (2) without receiving a reasonably equivalent value in exchange for the transfer . . , and the debtor:
>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. . . .

Section 6. (a) A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

Mass. Gen. Laws ch. 109A, §§ 5(a)(2) and 6(a).

A creditor is defined as "a person who has a claim." Mass. Gen. Laws ch. 109A, § 2. A claim is defined as "a right to payment . . . ." *Id.* An asset is defined as "property of a debtor. . . ." *Id*. A transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. . . ." *Id*. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation[,]" and "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id*. at § 3(a) and (b). "Value is given for a transfer . . . if, in exchange for the transfer . . . property is transferred or an antecedent debt is secured or satisfied . . . ." *Id*. at § 4(a). Avoidance actions under MUFTA §§ 5(a) and 6(a) must be brought within four (4) years from the date of the transfers. *Id*. at § 10.[13]

---

[13] That section provides:

"Section 10. A cause of action with respect to a fraudulent transfer or obligation under this chapter shall be extinguished unless action is brought:

14

Section § 8(a) of the MUFTA provides a range of remedies and types of recoveries

available against either a fraudulent transferor or transferee to aid a creditor in collection. *See*

*Bakwin v. Mardirosian,* 467 Mass. 631, 637 (2014).  Section 8(a) provides:

> Section 8. (a) In an action for relief against a transfer or obligation under
> this chapter, a creditor, subject to the limitations in section nine, may obtain:
>> (1) avoidance of the transfer or obligation to the extent necessary
>> to satisfy the creditor's claim;
>> (2) an attachment or other provisional remedy against the asset
>> transferred or other property of the transferee in accordance with the
>> applicable procedure set forth in chapter two hundred and fourteen for
>> actions to reach and apply chapter two hundred and twenty-three for
>> attachments, and chapter two hundred and forty-six for trustee process and
>> in accordance with applicable rules of civil procedure;
>> (3) subject to applicable principles of equity and in accordance
>> with applicable rules of civil procedure,
>>> (i) an injunction against further disposition by the debtor or a
>>> transferee, or both, of the asset transferred or of other property;
>>> (ii) appointment of a receiver to take charge of the asset
>>> transferred or of other property of the transferee; or
>>> (iii) any other relief the circumstances may require.

Mass. Gen. Laws ch. 109A, § 8(a).  MUFTA § 9, in turn, provides, in part, that "to the extent a

transfer is voidable in an action by a creditor under [§ 8(a)(1)], the creditor may recover

judgment for the value of the asset transferred . . . or the amount necessary to satisfy the

creditor's claim, whichever is less . . . ," Mass. Gen. Laws ch. 109A, § 9(b), and the judgment

may be entered against either "(1) the first transferee of the asset or the person for whose benefit

the transfer was made; or (2) any subsequent transferee other than a good-faith transferee . . . .

who took for value or from any subsequent transferee. . . ." *Id*. at § 9(b)(1) and (2).  Finally,

---

(a) under paragraph (1) of subsection (a) of section five, within four years after the
transfer was made . . . or, if later, within one year after the transfer . . . was or could
reasonably have been discovered by the claimant;
(b) under paragraph (2) of subsection (a) of section five or subsection (a) of section six,
within four years after the transfer was made . . . . "
Mass. Gen. Laws ch. 109A, § 10(a) and (b).

MUFTA expressly provides that its provisions are to be supplemented by the "principles of law
and equity." *Id*. at § 11.

"Code § 550 provides a recovery action against certain transferees where the trustee or
estate representative has successfully avoided a transfer under one of the avoiding powers . . . ."
2 Joan N. Feeney et al., *Bankruptcy Law Manual* § 9:54 (5th ed. 2018).  If there are voidable
transfers under state or federal law, Code § 550 determines from whom the estate may recover
fraudulently transferred assets or their value and permits recovery from "(1) the initial transferee
of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or
mediate transferee of such initial transferee."  11 U.S.C. § 550(a)(1) and (2).

MUFTA §§ 5(a)(2) and 6(a) provide two similar bases upon which a transfer can be held
to be constructively fraudulent.  Section 5(a) applies to a creditor whether its claim "arose before
or after the transfer was made," whereas § 6(a) applies only to a creditor "whose claim arose
before the transfer was made." In this case, the trustee has sufficiently alleged the existence of
creditors whose claims arose both before and after the alleged fraudulent transfer, including Ms.
Beninati and the landlords, guarantors, and other obligors of the fitness center leases to which
BFG and/or the BFG subsidiaries were a party.

"To establish a claim for constructive fraudulent transfer [under MUFTA § 5(a)(2)], the
trustee has the burden of proof on the following elements: (1) that the Debtor made a transfer, (2)
without receiving a reasonably equivalent value in exchange, and (3) the Debtor intended to
incur, or believed or reasonably should have believed that it would incur, debts beyond its ability
to pay as they became due."  *Nickless v. Pappas (In re Prime Mortg. Fin., Inc.)*, No. Adv. P. No.
09-04047-MSH, 2011 WL 4572006, at *3 (B.A.P. 1st Cir. Feb. 14, 2011) (citing Mass. Gen.
Laws ch. 109A, § 5(a)(2)). The elements of a cause of action under § 6(a) of the MUFTA are

16

similar: "(1) a transfer was made by the Debtor; (2) the Debtor made the transfer without receiving a reasonably equivalent value in exchange for the transferred property; and (3) the Debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer." *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 736 (Bankr. N.D. Ill. 2006), *aff'd sub nom. Knippen v. Grochocinski*, Civ. A. No. 07C1697, 2007 WL 1498906 (N.D. Ill. May 18, 2007) (applying 740 Ill. Comp. Stat. 160/6(a), which is identical to MUFTA § 6(a)).

### 2. *The Bally Residual Revenue Stream Transfer*

BFG's contractual right to receive the Bally residual revenue streams was allegedly transferred by BFG to CapeCapital at some point after the closing of the Bally transaction in April of 2012, within four years of BFG's bankruptcy filing on January 26, 2016.  The trustee has pleaded sufficient facts to support a plausible claim that, in April of 2012, BFG had a contractual right to acquire the revenue streams for 28 closed Bally fitness centers, that it paid some amount under the Bally asset purchase agreement for that right, and that such right constituted an "asset" of BFG as defined in MUFTA § 2.  Under the MUFTA's broad definition of "transfer," which includes "direct or indirect, absolute or conditional, voluntary or involuntary" transfers of an asset or an interest in an asset, the trustee has also sufficiently alleged that BFG transferred its right to acquire the Bally residual revenue streams to CapeCapital in cooperation with Mr. Dixon.  The trustee, however, failed to plead any facts concerning the value of the revenue streams, including how much it paid Bally for the right to acquire them, or what value, if any, it received from CapeCapital for the transfer.  The trustee merely alleged that BFG "did not receive the full benefit of the Residual Bally Revenue Streams."  I construe that to mean that BFG acquired at least some value from the transfer to

CapeCapital.  Accordingly, I am unable to draw a reasonable inference that BFG made the transfer without receiving "reasonably equivalent value" in exchange.

The complaint fails to state a plausible claim for constructive fraudulent transfer under MUFTA § 5(a)(2) or 6(a) with respect to the transfer of BFG's rights to the Bally residual revenue streams.  I will enter an order allowing CapeCapital's motion to dismiss counts III and IV.

### D.  Count V- MUFTA § 5(a)(1) and Bankruptcy Code §§ 544(b) and 550

In count V, the trustee asserts fraudulent transfer claims against CapeCapital under MUFTA § 5(a)(1).  That statute permits the avoidance of a transfer made with actual intent to hinder, delay or defraud with respect to creditors whose claims arose before or after the transfer was made.  Bankruptcy Code § 544(b) arms the trustee with the powers of such creditors.

#### 1.  Applicable Law

MUFTA § 5(a)(1) provides:

Section 5. (a) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . :
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor. . . .

Mass. Gen. Laws ch. 109A, § 5(a)(1).  MUFTA § 5(b) contains a non-exhaustive list of factors, or "badges of fraud," courts may consider when determining actual intent of a debtor to hinder, delay, or defraud a creditor. The list includes:

whether (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer . . . was disclosed or concealed; (4) before the transfer was made . . . the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ; (9) the debtor was insolvent or became insolvent shortly after the transfer was made. . . ; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11)

18

the debtor transferred the essential assets of the business to a lienor who
transferred the assets to an insider of the debtor.

Mass. Gen. Laws ch. 109A, § 5(b).

### 2. *Discussion*

Although the complaint fails to adequately allege the value of the Bally residual revenue

streams or the amount, if any, it received when it transferred those rights to CapeCapital, the

receipt of less than reasonably equivalent value is not a requirement under MUFTA § 5(a)(1).

*See Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R.

624, 629 (Bankr. S.D.N.Y. 2007) (case involving the analogous Bankruptcy Code § 548(a)(1)(A)

in which the court stated: "[T]he entirety of the transfer is avoidable whether or not the debtor

received value in exchange, and the plaintiff need not allege and prove that the transfer was for

less than fair value if actual intent is alleged and proved under Section 548(a)(1)(A)").

The trustee has pleaded the existence of some of the badges of fraud in connection with

BFG's alleged transfer of its rights to the Bally residual revenue streams to CapeCapital,

including that: BFG transferred its rights to an insider, its manager, CapeCapital, prior to the

transfer, BFG was under threat of suit by Ms. Beninati (who brought suit against it less than a

month after the close of the Bally transaction); and the transfer was made at a time when BFG

was insolvent.  These allegations are supported by the numerous other allegations in the

complaint concerning the general plan undertaken by CapeCapital and Mr. Dixon to transfer

numerous assets away from BFG, such as in the Lexfit/Newfit transfers, during the Beninati

litigation in which BFG was a defendant, which resulted in a diminution in assets available to

BFG's creditors.

Courts applying MUFTA § 5(a)(1) and analogous provisions of Bankruptcy Code §

548(a)(1)(A) permit a finding of intent to defraud where a transferee is in a position of

dominance or control over a debtor's disposition of property, such that the transferee's intent to hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer fraudulent. *See Baldiga v. Moog, Inc. (In re Comprehensive Power, Inc.),* 578 B.R. 14, 34 (Bankr. D. Mass. 2017) ("[T]he Trustee has alleged sufficient facts to state a plausible claim that [secured creditor's] intent should be imputed to the Debtor through its 'control' and that the Debtor was complicit in the transfer of its assets in relinquishing rights and facilitating a purported secured party sale.") (citing *Consove v. Cohen* (*In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983) ("We may impute any fraudulent intent of Consove to the transferor [debtor] because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property.")). Based upon Mr. Dixon's alleged domination and control over BFG through CapeCapital, its manager, and the benefit he and CapeCapital allegedly received from the transfer of the Bally residual revenue streams, the complaint contains sufficient allegations which, if true, would impute to BFG Mr. Dixon's fraudulent intent.

As the trustee has also pleaded that BFG transferred the Bally residual revenue streams to CapeCapital, he has also sufficiently pleaded that CapeCapital was the "first transferee of the asset" under MUFTA § 9(b)(1) and an "initial transferee of such transfer" under Bankruptcy Code § 550(a)(1). For the above reasons, I find the complaint sufficiently alleges that BFG transferred the Bally residual revenue streams to CapeCapital with actual intent to hinder, delay or defraud its creditors, and I will enter an order denying CapeCapital's motion to dismiss count V.

### E. Count VII- Bankruptcy Code § 550

Count VII is brought under Bankruptcy Code § 550 against the count I and II defendants, among others, to effectuate any judgment the trustee might recover under those counts alleging

Bankruptcy Code § 548(a) fraudulent transfers. Count VII is thus applicable to CapeCapital as a count I and II defendant, and the dismissal of counts I and II against it necessitates the dismissal of count VII against it as well. I note that the trustee's sole fraudulent transfer counts against CapeCapital which survives the motion to dismiss (count V) as well as count X (statutory reach and apply) discussed below, also contain references to Bankruptcy Code §§ 544 and 550 and would enable the trustee, if successful, to recover fraudulently transferred property from CapeCapital.  I will enter an order allowing CapeCapital's motion to dismiss count VII.

## F.  Count VIII-Unjust Enrichment

In count VIII, the trustee asserts that BFG transferred all or almost all of its valuable assets to the count VIII defendants, including CapeCapital, thereby conferring inequitable and unjust benefits upon them which they now retain to the detriment of the estate.  CapeCapital maintains it never received any property from BFG to support a claim for unjust enrichment. The trustee counters that CapeCapital was unjustly enriched when it received monthly Bally residual revenue stream payments and the above-market monthly lease payments made by BFG to Mykonos which was partially owned by CapeCapital.

### 1.  Applicable Law

In a claim for unjust enrichment, "a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." *Watkins v. Omni Life Sci., Inc.*, 692 F. Supp. 2d 170, 179 (D. Mass. 2010).  To prevail on a such a claim, "a plaintiff must show: '(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law.'" *Id.* (quoting *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279,

294–295 (D. Del. 2000) (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)).

### 2. Discussion

CapeCapital maintains that count VIII should be dismissed against it because the trustee has pleaded no plausible facts that it received any of BFG's assets.  As discussed above, however, the trustee has adequately pleaded an actual fraudulent transfer claim against CapeCapital under MUFTA § 5(a)(1), based on the transfer of the Bally residual revenue streams.  Additionally, the trustee has alleged that CapeCapital received above-market lease payments from BFG through its intermediary, Mykonos.  While the latter allegations are insufficient to support a fraudulent transfer claim, I find that they, along with the allegations concerning the revenue streams, are enough to satisfy the pleading standards for the first four of the above-enumerated elements of a claim for unjust enrichment.  Given the number of alternative counts and theories of recovery set forth in the complaint, I cannot yet determine whether there is an "absence of a remedy provided by law" which is the fifth requirement of a claim for unjust enrichment.[14]  Accordingly, I will deny CapeCapital's motion to dismiss count VIII at this time.

### G.  Count X-Statutory Reach and Apply-Code §§ 544, 550; Mass. Gen. Laws ch. 214, § 3(8)

In count X, the trustee asserts claims under Bankruptcy Code §§ 544 and 550 and under Mass. Gen. Laws ch. 214, § 3(8) to reach and apply the assets formerly held by BFG that are now owned, controlled, or in the possession of CapeCapital as result of the alleged actual fraudulent transfers.  CapeCapital asserts that the count must be dismissed because it

---

[14] "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3), made applicable per Fed. R. Bankr. P. 7008.

presupposes a transfer of property by BFG to it, which it contends the complaint does not

credibly allege.

### 1.  *Applicable Law*

Bankruptcy Code §§ 544 and 550 are discussed above.  Mass. Gen Laws ch. 214, § 3(8)

provides:

> Section 3. The supreme judicial and superior courts shall have original and
> concurrent jurisdiction of the following cases:
> . . . (8) Actions to reach and apply in payment of a debt any property, right, title or
> interest, real or personal, of a debtor, liable to be attached or taken on execution in
> a civil action against him and fraudulently conveyed by him with intent to defeat,
> delay or defraud his creditors, or purchased, or directly or indirectly paid for, by
> him, the record or other title to which is retained in the vendor or is conveyed to a
> third person with intent to defeat, delay or defraud the creditors of the debtor.

Mass. Gen. Laws ch. 214, § 3(8).  The statute "authorizes a statutory reach and apply action to

reach assets that have been conveyed by the defendant debtor to a third party with intent to

defeat, delay, or defraud the debtor's creditors and is coextensive with the [MUFTA]." *De Prins*

*v. Michaeles*, 236 F. Supp. 3d 482, 490 (D. Mass. 2017).   "Resolution of the question as to

whether [a creditor] has a plausible claim under the [M]UFTA and Mass. Gen. L. c. 214, § 3(8)

therefore, turns on whether [a creditor] has alleged sufficient facts to show that [a debtor]

transferred his assets . . . with the intent to defraud his creditors."  *Id*.

### 2.  *Discussion*

As stated above, the trustee has asserted a plausible claim under the MUFTA that BFG

transferred the Bally residual revenue streams to CapeCapital with actual intent to hinder, delay

or defraud its creditors.  Thus, those assets which have been allegedly fraudulently transferred

and the persons holding them could be the subject of claims under the Massachusetts reach and

apply statute.  Accordingly, I will enter an order denying CapeCapital's motion to dismiss count

X.

### H.  Count XI-Establishment of a Resulting/Constructive Trust

The trustee asserts that he has a constructive trust claim against CapeCapital because BFG paid for the Bally residual revenue streams while CapeCapital received the benefit. CapeCapital maintains there are no allegations it received any property from BFG.

#### 1.  Applicable Law

In Massachusetts, a constructive trust is "a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to property amounts to unjust enrichment." *Maffei v. Roman Catholic Archbishop of Boston*, 449 Mass. 235, 246 (2007) (citing *Fortin v. Roman Catholic Bishop of Worcester*, 416 Mass. 781, 789 (1994)), *cert. denied*, 552 U.S. 1099 (2008). "In cases where no express trust exists, a judge may employ the equitable remedies of constructive or resulting trust to avoid injustice to the grantee. . . ." *Id.* at n.23. (citing J.R. Nolan & L.J. Sartorio, Equitable Remedies § 351 (2d ed. 1993)).   "A *resulting trust* is an equitable device, employed to correct a defect in the execution of a transferor's intent. . . . On the other hand, a *constructive trust* 'is imposed not because of the legally inferred intention of the parties but because the court concludes that the person holding the title to the property, if permitted to keep it, would profit by a wrong or would be unjustly enriched, having acquired the property through fraud, mistake, breach of duty, and the like.'" *Lassman v. McQuillan (In re Charles River Press Lithography, Inc.)*, 338 B.R. 148, 160–61 (Bankr. D. Mass. 2006) (emphasis in original) (quoting Restatement (Third) of Trusts, § 7 cmt. d (Am. Law Inst. 2003)).

### 2. Discussion

The trustee has sufficiently pleaded facts to support a plausible claim that BFG transferred the Bally residual revenue streams it paid for to and for the benefit of its manager, CapeCapital, to shield those assets from its creditors, including Ms. Beninati.  From these facts, one can plausibly conclude that CapeCapital was unjustly enriched as having received the property as a result of a fraud or breach of fiduciary duty and that such conduct could require the imposition of a constructive trust.  I will enter an order denying CapeCapital's motion to dismiss count XI.

## I.  Count XVI-Conspiracy

In count XVI, the trustee alleges that, beginning no later than 2012 and continuing at least through BFG's bankruptcy filing date, CapeCapital and other count XVI defendants, including Mr. Dixon, Lexfit, Newfit, the Cape Real Estate Entities, Blast Acquisition and others, formed a "confederation" to siphon assets away from BFG, defraud BFG's creditors, and convert and steal BFG's assets, damaging its creditors.  CapeCapital asserts that the complaint contains only broad and vague allegations of conspiracy which are insufficient to support the trustee's claim.

### 1. Applicable Law

In *Aetna Cas. Sur. Co. v. P & B Autobody*, the United States Court of Appeals for the First Circuit, applying Massachusetts law, identified two types of civil conspiracy.  43 F.3d 1546, 1563-64 (1st Cir. 1994).  The first is a "very limited" "coercive type" of conspiracy where "'[i]n order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'" *Id*. at 1563 (quoting *Jurgens v. Abraham*,

616 F. Supp. 1381, 1386 (D. Mass. 1985) and citing *Fleming v. Dane*, 304 Mass. 46 (1939)). The second type of civil conspiracy, and the one upon which the trustee relies here, is "akin to a theory of common law joint liability in tort" where the word "conspiracy" is used to denote "vicarious liability" in tort for concerted action. *Id.* at 1564. The elements are (1) common design or agreement between two or more people to commit a wrongful act and (2) proof of some tortious act in furtherance of the agreement. *Id.* (citing Restatement (Second) of Torts § 876 cmt. b (Am. Law Inst. 1979)). "Where two or more persons act in concert, each will be jointly and severally liable for the tort." *Id.* There is a three year statute of limitations for the tort of civil conspiracy. *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977) (citing Mass. Gen. Laws ch. 260, § 2A) (applying a prior version of the statute which provided for a two year limitations period).[15]

CapeCapital asserts that when agents of the same legal entity make agreements in the course of their official duties, their acts are attributed to the principal and, therefore, they cannot be deemed to have conspired with each other, citing *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843, 1867 (2017) ("Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and

---

[15] The statute provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues." Mass. Gen. Laws ch. 260, § 2A. *See also* Bankruptcy Code § 108, which provides, in part: "(a) If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief." 11 U.S.C. § 108(a)(1) and (2).

legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people.") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769–771 (1984)).

### 2. Discussion

I find that the trustee has sufficiently pleaded allegations of a common design or plan among CapeCapital, Mr. Dixon and the Cape Real Estate Entities to close fitness centers at the Bally real estate locations and interfere with BFG's contractual rights by breaching leases between BFG and the Cape Real Estate Entities in bad faith for the purpose of allowing Mr. Dixon to achieve personal financial gain through the sale of the Bally real estate. The latest of these closures was effected to permit a sale that occurred on December 31, 2014, a date within three years of BFG's bankruptcy filing. Accordingly, I will enter an order denying CapeCapital's motion to dismiss count XVI.

### J. Count XVII-Aiding and Abetting

In count XVII, the trustee asserts that certain defendants, including CapeCapital and Mr. Dixon, owed the members of BFG the fiduciary duty of care, loyalty and good faith, they breached those duties when they defrauded BFG's members and converted BFG's funds and assets, and they each aided and abetted such breaches. CapeCapital asserts that the same rationale for dismissing conspiracy count XVI applies to count XVII for aiding and abetting.

### 1. Applicable Law

The tort of aiding and abetting a breach of fiduciary duty requires that "(1) there must be a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants must have actively participated or substantially assisted in or encouraged the breach to such a degree that they could not reasonably have been acting in good faith." *Baker v. Wilmer Cutler*

*Pickering Hale & Dorr LLP*, 91 Mass. App. Ct. 835, 847 (2017) (citing *Arcidi v. Nat'l Assn. of Gov't Employees*, 447 Mass. 616, 623-624 (2006)).  In the context of a claim for conspiracy for breach of fiduciary duty, "[t]he claim for civil conspiracy . . . similarly requires a showing that the defendants (1) knew that the conduct . . . constituted a breach of fiduciary duty and (2) substantially assisted in or encouraged that conduct." *Id*. at 847-48 (citing *Kurker v. Hill*, 44 Mass. App. Ct. 184, 189 (1998)) (footnote omitted).

### 2. Discussion

There are numerous specific allegations in the complaint to support a plausible claim that CapeCapital and Mr. Dixon knowingly engaged in breaches of their fiduciary duties to BFG and its members and that each substantially assisted the other in that conduct for Mr. Dixon's benefit and not in good faith.  Therefore, I will enter an order denying CapeCapital's motion to dismiss count XVII.

### K. Count XVIII-Conversion and Civil Theft

In count XVIII, the trustee alleges that CapeCapital and the other count XVIII defendants converted BFG's funds and assets for their own use and benefit.  CapeCapital contends that none of the complaint's allegations assert that CapeCapital converted anything.

### 1. Applicable Law

"The tort of conversion requires an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession." *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002) (citing *Third Nat'l Bank v. Continental Ins. Co.*, 388 Mass. 240, 244 (Mass. 1983); Restatement (Second) of Torts § 222A (Am. Law Inst. 1965)).  "An action for conversion 'cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive

28

the rightful owner of it, or destroyed the property.'" *Id*. at 12 (citing *Grande v. PFL Life Ins. Co.*, No. 9663, 2000 WL 1476676, at *4 (Mass. App. Div. Sept. 27, 2000) (quoting *Spooner v. Manchester*, 133 Mass. 270, 273 (1882)).  The statute of limitations for conversion claims is three years.  *See* Mass. Gen Laws ch. 260, § 2A, *supra*.

### 2. Discussion

In the complaint, the trustee failed to allege the date of the transfer of BFG's right to receive the Bally residual revenue streams, although I infer that it occurred at the time of the Bally closing in April of 2012.  The trustee also did not allege the dates through which CapeCapital allegedly continued to receive the revenue stream payments.  Accordingly, I cannot plausibly conclude that any conversion of BFG's right to receive the revenue streams took place during the applicable statute of limitations period.   Likewise, there are insufficient facts in the complaint to plausibly support the conclusion that BFG paid over-market rents to Mykonos during the statute of limitations period.  There are, however, sufficient allegations in the complaint that on January 30, 2013, a date within three years of the bankruptcy filing on January 26, 2016, Mr. Dixon and CapeCapital exercised dominion and control over BFG's property for the purpose of transferring eight of its profitable clubs to Newfit, which was managed by Mr. Dixon, without full consideration in order to shield assets from BFG's creditors (with Mr. Dixon later personally receiving payments from Mr. Eskandarian). For this reason, I will enter an order denying CapeCapital's motion to dismiss count XVIII.

### L.  Count XIX-Fraud

With respect to count XIX, the trustee asserts that Mr. Dixon, as the manager and agent of CapeCapital, and on behalf of CapeCapital, committed fraud against BFG and its members when he presented to the other members of BFG a members' consent fraudulently indicating that

the Bally real estate would be acquired by a BFG subsidiary while he simultaneously orchestrated the transfers of the Bally real estate to the Cape Real Estate Entities.

### 1. *Applicable Law*

 "Under Massachusetts law, [a determination of] fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 357 (1st Cir. 2013) (citing *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002)).  CapeCapital asserts that the complaint fails to allege that it made any representation, let alone one that was false, material, or reasonably relied upon by BFG.  However, failure to disclose material information may give rise to liability under common law fraud where a defendant was under a duty to disclose the information.  *See Milton v. Van Dorn Co.*, 961 F.2d 965, 968 n.4 (1st Cir. 1992) (citing *Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991); *Nei v. Burley*, 388 Mass. 307, 310-311 (1983)).  A limited liability company, like a corporation, "is not a living person, [and] it can act only through its agents."  *Am.'s Test Kitchen, Inc. v. Kimball*, No. 1684CV03325BLS2, 2018 WL 2049490, at *2 (Mass. Super. Ct. Apr. 2, 2018) (quoting *Commonwealth v. Angelo Todesca Corp.*, 446 Mass. 128, 135 (2006)).

### 2. *Discussion*

The complaint sufficiently alleges that Mr. Dixon, as the agent of CapeCapital, knew that neither BFG nor its subsidiaries would acquire the Bally real estate at the time he caused the members' consent to be presented to BFG's members and that the members of BFG relied on that members' consent and believed BFG would acquire the real estate when they approved the admission of the Dixon Family Limited Partnership as a member of BFG and allowed the Bally

transaction to proceed.  As the agent of BFG's manager, CapeCapital, Mr. Dixon had a duty to

disclose truthful information about the planned disposition of the Bally real estate.  For the

reasons stated above and in *Blast I*, I find that the complaint sufficiently alleges that the plan to

misappropriate and divert the Bally real estate to entities not owned by BFG was a material

matter which Mr. Dixon, as the agent of CapeCapital, failed to disclose to, and allegedly

concealed from, the other members of BFG constituting material omissions which harmed BFG.

The trustee has alleged sufficient facts to state a plausible claim for fraud against Mr. Dixon as

the agent of CapeCapital, and I will enter an order denying CapeCapital's motion to dismiss

count XIX.

### M.  Counts XX and XXI – Intentional and Tortious Interference with Contractual Advantage

With respect to counts XX and XXI, the trustee asserts that CapeCapital's direction to

transfer the Bally real estate away from BFG for the benefit of Mr. Dixon was interference with

contractual advantage.

#### 1.  Applicable Law

To prevail in an action for intentional interference with contractual relations, a plaintiff

must establish that "(1) he had a contract with a third party; (2) the defendant knowingly induced

the third party to break that contract; (3) the defendant's interference, in addition to being

intentional, was improper in motive or means; and (4) the plaintiff was harmed by the

defendant's actions."  *G.S. Enters., Inc. v. Falmouth Marine, Inc*., 410 Mass. 262, 272 (1991)

(citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812-817 (1990)); *see also Psy-*

*Ed Corp. v. Klein*, 459 Mass. 697, 715 (2011) (setting forth the same standard for "tortious

interference with contract" and citing *G.S. Enters., Inc.,* 410 Mass. at 272*)*.  "A claim for

intentional interference with contractual relations is one sounding in tort." *Pure Distribs., Inc. v.*

31

*Baker,* 285 F.3d 150, 154–55 (1st Cir. 2002) (citing *United Truck Leasing Corp.*, 406 Mass. at

812). "As such, it is subject to a three-year statute of limitations under Massachusetts law." *Id*.

(citing Mass. Gen. Laws Ann. ch. 260, § 2A (1992)).

### 2.  Discussion

The Bally transaction closed on April 30, 2012.  By that date, BFG's right to acquire the

Bally real estate was allegedly diverted and transferred to the Cape Real Estate Entities. Thus,

the complaint fails to state a plausible claim for interference with contractual relations by

CapeCapital within the applicable statute of limitations period, and I will enter an order allowing

CapeCapital's motion to dismiss counts XX and XXI.

### N.  Count XXV-Alter Ego/Piercing the Corporate Veil

In count XXV, the trustee asserts that defendants including CapeCapital, Mr. Dixon, the

Dixon Family Limited Partnership, Newfit, Lexfit, the BFG subsidiaries, the Cape Real Estate

Entities and others each exercised pervasive control over BFG (and each other) and engaged in

confused intermingling of business activity, assets and management. He seeks an order piercing

the corporate veils separating those defendants and BFG and an order finding them liable as

"alter egos" and thus liable for BFG's debts.

### 1.  Applicable Law

In Massachusetts, corporations and their shareholders are generally deemed to be distinct

legal entities. *See Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657 (1993). Under unusual

circumstances, however, a court may disregard the separateness of entities, particularly to defeat

fraud or remedy an injury. *See id*. These efforts are often characterized as veil piercing or

establishing alter ego status.  "The doctrines of veil piercing . . . and alter ego are interrelated and

litigants often use the terms interchangeably.  Indeed, a party may seek to pierce a corporate veil

under an alter ego theory which is equitable in nature." *Butler v. Candlewood Road Partners, LLC (In re Raymond)*, 529 B.R. 455, 471 (Bankr. D. Mass. 2015) (citing *Weiss v. Lockwood*, 499 B.R. 392, 394 (D. Mass. 2013) (citing *Miranda v. Gonzalez (In re Gonzalez)*, No. 02–05485–BKT, Adv. P. No. 09–150, 2010 WL 3395677, at *2 (Bankr. D.P.R. Aug. 23, 2013) (footnote omitted)). "Nevertheless, veil piercing and alter ego can be distinguished." *The Patriot Grp., LLC v. Fustolo (In re Fustolo)*, 597 B.R. 1, 47 (Bankr. D. Mass. 2019) (citing *U.S. Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 81 (Bankr. S.D. Ohio 2012)). "'The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct.'" *Id.* (citing *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) (footnote omitted)).

In *My Bread Baking Co. v. Cumberland Farms, Inc.*, the Massachusetts Supreme Judicial Court ("SJC") considered "[t]he circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary under common control . . . ." 353 Mass. 614, 618-19 (1968). It explained that it is appropriate to depart from the general principle of corporate separateness in two situations:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of 'closely identified' corporations a court 'need not consider with nicety which of them' ought to be held liable for the act of one corporation 'for which the plaintiff deserves payment.'

*Id.* (internal citation omitted).[16]

---

[16] *See Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 36 (Bankr. D. Mass. 2011) ( "Although the standards for piercing the corporate veil are articulated most

"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 555 (2000). In *M.C.K*, the SJC listed the factors to be considered when courts engage in an analysis of the *My Bread* principles:

> The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id.* at 555 n.19 (citing *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria set forth in *My Bread*); *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991)); *see also Birbara v. Locke*, 99 F.3d 1233, 1240 (1st Cir. 1996) ("*My Bread* sets the standard for deciding when to pierce the corporate veil under Massachusetts law; *Pepsi-Cola* elucidates some factors that may be considered when engaging in a *My Bread* analysis."). "Massachusetts courts employ the alter ego doctrine to determine whether a principal of a corporation is its alter ego using the *My Bread Baking Co.* factors." *In re Fustolo*, 597 B.R. at 50.

Since its ruling in *My Bread*, the SJC has observed that under Massachusetts law, the corporate veil will only be pierced in rare situations. *See, e.g.*, *Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.") (citing *My Bread*, 353 Mass. at 620).

---

frequently with respect to corporations, this Court concludes that the same principles would apply for alter ego liability to attach to members of limited liability companies.").

34

## 2. *Discussion*

With respect to count XXV, I find the trustee has alleged sufficient facts supporting "fraudulent or injurious consequence of the intercorporate relationship" and "confused intermingling" as a basis for corporate disregard under *My Bread*, having specifically pleaded a number of the factors set forth in *M.C.K.*  The gravamen of the complaint against CapeCapital and Mr. Dixon is the gross inequity and injury to BFG's creditors resulting from the alleged fraudulent and improper use of numerous entities Mr. Dixon controlled (and which also controlled BFG) to misappropriate and divert BFG's assets beyond creditors' reach while BFG was insolvent.  The trustee has sufficiently supported his claims with specific allegations concerning CapeCapital's pervasive control over BFG and Mr. Dixon's pervasive control over CapeCapital as well as the other entities.  Further, the trustee has sufficiently alleged that Mr. Dixon used CapeCapital to promote fraudulent transactions in a common enterprise which benefited him and his other affiliates. Lastly, he has included numerous allegations about intermingling of business activity and assets among the entities.   While mindful that veil piercing will be permitted in only rare situations, I find at the Rule 12(b)(6) stage, with all reasonable inferences drawn in the trustee's favor, the allegations are sufficient to support a plausible claim for veil piercing and/or alter ego determination against CapeCapital. I will enter an order denying CapeCapital's motion to dismiss count XXV.

## V. <u>Conclusion</u>

Based on the foregoing, an order shall enter granting CapeCapital's motion to dismiss with respect to counts I, II, III, IV, VII, XX, XXI, XXIII, and XXIX of the trustee's amended complaint and denying the motion with respect to counts V, VIII, X, XI, XVI, XVII, XVIII, XIX, and XXV.

Dated: April 30, 2019                                      By the Court,

                                                          Melvin. S. Hoffman
                                                          United States Bankruptcy Judge

Counsel Appearing: Ilyas J. Rona, Esq.
                   Milligan Rona Duran & King LLC
                   Boston, MA
                      for the plaintiff, Gary W. Cruickshank,
                      Trustee of the Estate of Blast Fitness
                      Group, LLC


                   Joseph S.U. Bodoff, Esq.
                   Rubin & Rudman LLP
                   Boston, MA
                      for the defendant, CapeCapital LLC