**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | | |
|---|---|---|
| _____ ) | | |
| In re: ) | | Chapter 7 |
| ) | | Case No. 16-10236-MSH |
| BLAST FITNESS GROUP, LLC, ) | | |
| ) | | |
| Debtor ) | | |
| _____ ) | | |
| ) | | |
| GARY W. CRUICKSHANK, ) | | |
| CHAPTER 7 TRUSTEE OF THE ) | | |
| ESTATE OF BLAST FITNESS ) | | |
| GROUP, LLC, ) | | |
| ) | | |
| Plaintiff, ) | | Adversary Proceeding |
| ) | | No. 18-01011 |
| v. ) | | |
| ) | | |
| HAROLD R. DIXON *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| _____ ) | | |

**MEMORANDUM OF DECISION ON MOTION TO DISMISS OF
NEWFIT, LLC**

**I.  <u>Introduction</u>**

In a thirty-count complaint,[1] Gary W. Cruickshank, the plaintiff and chapter 7 trustee of

the bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief

against over forty named and dozens of unnamed defendants, including Newfit, LLC,[2] a

Delaware limited liability company whose managers are defendants, Harold R. Dixon, who

controlled BFG, and CapeCapital LLC, a Massachusetts limited liability company.  CapeCapital,

in turn, was BFG's sole manager and was, itself, managed by Mr. Dixon.  BFG filed a voluntary

---

[1] As amended by a first amended complaint (ECF #130).
[2] The complaint refers to Newfit, LLC while the motion to dismiss refers to NewFit, LLC.

petition under Chapter 7 of the United States Bankruptcy Code[3] on January 26, 2016, at which time its debts exceeded $16 million.  This adversary proceeding was commenced two years after the petition date on January 26, 2018.

Newfit has moved under Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b), to dismiss[4] count VI (turnover under Bankruptcy Code § 542(b)), count XVI (conspiracy), count XVII (aiding and abetting), count XIX (fraud), count XX (intentional interference with contractual advantage), count XXI (tortious interference with contractual advantage), count XXIII (substantive consolidation), count XXIV (successor liability), count XXV (alter ego/piercing the corporate veil), and count XXIX (attorneys' fees).  Newfit does not seek dismissal of the remaining counts against it for constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B) (count I), actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A) (count II), constructive fraudulent transfer under Massachusetts Fraudulent Transfer Act ("MFTA") § 5(a)(2) (count III), constructive fraudulent transfer under MFTA § 6(a) (count IV), actual fraudulent transfer under MFTA § 5(a)(1) (count V), turnover (count VII), unjust enrichment (count VIII), preferential transfer under Bankruptcy Code § 547 and MFTA § 6(b) (count IX), statutory reach and apply under Bankruptcy Code §§ 544 and 550 and Mass. Gen. Laws ch. 214, § 3(8) (count X), establishment of a resulting/constructive trust (count XI), and costs (XXX), and it asserts it will deal with those counts either through summary judgment or at trial.

---

[3] All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 *et seq.*
[4] ECF #171.

At the outset, I note that the trustee does not contest dismissal of count XIX (fraud), count XXIV (successor liability) or XXIX (attorney's fees). I will, therefore, grant Newfit's motion to dismiss those counts.

## II. Procedural History

In addition to Newfit, other defendants, including Mr. Dixon, CapeCapital, the law firm of Goodwin Procter LLP ("Goodwin") and two of its attorneys (collectively, the "Goodwin Defendants"), CapeCapital Maryland Heights, LLC, CapeCapital West Hartford, LLC, CapeCapital Irving, LLC (collectively, the "Cape Real Estate Entities"), and other defendants[5] also filed motions to dismiss. A hearing was held on these motions on June 14, 2018. The Goodwin Defendants' motions to dismiss were allowed in part and denied in part by my memorandum and order dated January 8, 2019. *See Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, No. 16-10236-MSH, 2019 WL 137109 (Bankr. D. Mass. Jan. 8, 2019) ("*Blast I*"). The motions to dismiss of Mr. Dixon, CapeCapital, and the Cape Real Estate Entities were allowed in part and denied in part pursuant to separate memoranda and orders dated April 30, 2019 (*Blast II, Blast III* and *Blast IV*, respectively).[6] A complete procedural history and recitation of the trustee's factual allegations and my legal findings on certain of the trustee's claims are set forth in *Blast I, II, III,* and *IV*, which are incorporated herein by reference. Nevertheless, I

---

[5] Defendants Juliet J. Dixon, and Thomas F. Walsh and Michael J. Craffey, as trustees of Harold R. Dixon IV GST Trust, George L. Dixon GST Trust, William A. Dixon GST Trust, John E. Dixon GST Trust, 31 Green Lane Nominee Trust and 63 Cart Path Road Nominee Trust also filed motions to dismiss which were allowed by separate memoranda and orders dated April 30, 2019.

[6] See *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, No. 16-10236-MSH, 2019 WL 1950002 (Bankr. D. Mass. April 30, 2019) (*Blast II*) and *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, No. 16-10236-MSH, 2019 WL 1978344 (Bankr. D. Mass. April 30, 2019) (*Blast III*).

3

reiterate below some of those factual allegations and supplement them with additional allegations

as necessary to determine Newfit's motion to dismiss.[7]

## III. <u>Motion to Dismiss</u>

### A.  *Legal Standard*

In ruling on the motion to dismiss, I must accept all well-pleaded factual allegations in

the complaint as true, drawing all reasonable inferences in the trustee's favor.  *Langadinos v.*

*American Airlines, Inc*., 199 F.3d 68, 69 (1st Cir. 2000).  A claim cannot be dismissed if the

trustee has demonstrated a "plausible entitlement to relief." *Sanchez v. Pereira–Castillo*, 590

F.3d 31, 41 (1st Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's

obligation requires more than "labels and conclusions" and "a formulaic recitation of the

elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007).

Inquiry into plausibility is a two-step process.  "First, the court must sift through the

averments in the complaint, separating conclusory legal allegations (which may be disregarded)

from allegations of fact (which must be credited)." *Rodriguez-Reyes v. Molina-Rodriguez*, 711

F.3d 49, 53 (1st Cir. 2013) (citing *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir.

2012)).  "Second, the court must consider whether the winnowed residue of factual allegations

gives rise to a plausible claim to relief." *Id*.  "Plausible, of course, means something more than

merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that

---

[7] There are a number of other defendants in this adversary proceeding which have not answered
or otherwise responded to the complaint, including certain BFG subsidiaries. These defendants
are the subject of, among other claims, the trustee's claim in count XXIII for substantive
consolidation with BFG.  Although those defendants have not yet been defaulted, I will assume
for purposes of this decision that BFG and the BFG subsidiaries (including defendant Blast
Fitness Acquisition, LLC) are consolidated.

4

compels us 'to draw on' our 'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

'"Moreover, *each* defendant's role in the [adverse action] must be sufficiently alleged to make him or her a plausible defendant. After all, we must determine whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" *Rodriguez-Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40-41 (1st Cir. 2012) (quoting *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 16 (1st Cir. 2011) (emphasis in original); *see also Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant.").

## B.  Trustee's Factual Allegations[8]

### 1.  BFG

On February 14, 2011, CapeCapital, acting through Mr. Dixon, formed BFG, a Massachusetts limited liability company.[9] ¶ 74. CapeCapital was the sole manager of BFG, and Mr. Dixon, in turn, was the sole manager and a member of CapeCapital. ¶ 3.  At its peak, BFG owned and operated over sixty fitness clubs bearing its name throughout the United States. (Intro., p. 2).  At all relevant times, BFG acted at the direction of CapeCapital and Mr. Dixon. ¶ 92.  BFG owned, entirely or partially, seventeen subsidiaries through which it operated its business.[10] ¶ 53. Fitness clubs at different locations were often operated through separate BFG

---

[8] Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the first amended complaint.

[9] Although not specifically pleaded in the complaint, there is no dispute that BFG is a Massachusetts limited liability company.

[10] Each of the seventeen BFG subsidiaries is a defendant here.  The subsidiaries are named in numerous counts of the complaint, including counts for fraudulent transfers, piercing the corporate veil/alter ego and substantive consolidation.  None of the BFG subsidiaries has filed a responsive pleading to the complaint.

subsidiaries, and those subsidiaries were often the actual tenants under the applicable leases for the premises. ¶¶ 251, 256. At all times relevant to the claims and causes of action alleged in the complaint, BFG was insolvent and insufficiently capitalized. ¶¶ 310-12.

In 2011 and 2012, BFG, Mr. Dixon and Steven Borghi, Mr. Dixon's business partner and a member of BFG, were mired in a dispute with Elizabeth Beninati, the widow of Mr. Borghi's previous business partner in the discount fitness club business. ¶¶ 71, 73, 76-79. Mr. Dixon, Mr. Borghi and BFG hired Mr. Dixon's longtime personal lawyer at Goodwin, John LeClaire, who is a defendant in this action, to represent them in negotiations with Ms. Beninati in April 2011. ¶ 80. Negotiations failed, and Ms. Beninati commenced a Massachusetts state court lawsuit against Mr. Dixon, Mr. Borghi and BFG on May 24, 2012, seeking millions of dollars in damages. ¶¶ 79, 376. Goodwin represented Mr. Dixon, BFG and Mr. Borghi in that litigation. ¶¶ 107, 376. In July 2014, the state court entered judgment against Messrs. Dixon and Borghi. ¶¶ 88, 315. Final judgment against them in excess of $4.5 million entered on January 9, 2015. ¶¶ 90, 317.

### 2. *Lexfit and Newfit*

In late 2012, while the Beninati litigation was pending, Mr. Dixon began transferring profitable BFG clubs to new entities in order to shield them from BFG's creditors such as Ms. Beninati. ¶¶ 82, 273, 308-309. Defendants Lexfit, LLC, a Massachusetts limited liability company, and Newfit, both managed by Mr. Dixon and/or CapeCapital, were two of these entities. ¶¶ 9, 10, 103, 273. Newfit was organized as a Delaware limited liability company after January 30, 2013 and before May of 2013. ¶¶ 180, 283.

### 3. *Lexfit and Newfit Transactions*

On December 6, 2012, Mr. Dixon, CapeCapital and another defendant transferred sixteen of BFG's more profitable fitness clubs to Lexfit for no or nominal consideration. ¶¶ 274, 276.

6

On January 30, 2013, Mr. Dixon, CapeCapital and another defendant transferred an additional eight of BFG's more profitable clubs to Newfit, which had not yet been created. ¶¶ 283-84, 289. BFG did not receive full consideration for these transfers. ¶ 285. Also on January 30, 2013, Lexfit transferred eight of the clubs received from BFG in the December 2012 transaction to Newfit for less than full consideration. ¶¶ 289, 291, 293.

On January 31, 2013, BFG assigned to Newfit all of its right, title and interest in a management agreement under which BFG managed three fitness clubs in Mashpee, West Roxbury and Needham, Massachusetts, which were owned by non-BFG entities.[11]  ¶¶ 350, 352. Under the management agreement, which BFG had the right to assign, BFG managed the three clubs in exchange for a management fee equal to 50% of gross revenue which was later increased to 75% with respect to the Mashpee and West Roxbury clubs. ¶¶ 350-354. The term of the management agreement ended in January 2018, and it provided for a $2 million fee payable to BFG if the club owners terminated the agreement. ¶ 351. BFG transferred the rights to receive the clubs' gross revenues to Newfit in exchange for $10 while BFG retained the obligation to manage the clubs. ¶ 355.

### 4. Newfit and BFG

There was overlap between Newfit and BFG with respect to management, assets and operations. Both entities shared the same manager, CapeCapital, which, in turn, was managed by Mr. Dixon, who controlled BFG. Defendant Thomas Moran, who was BFG's Director of Finance, held the same position with Newfit. ¶ 345. Newfit rented office space at the same Auburndale, Massachusetts location as BFG but paid a lower rent. ¶ 358. Newfit was

---

[11] The complaint does not name the counterparties to the management agreement.

represented by BFG's general counsel, Peter Fenn,[12] in several matters.  ¶¶ 12, 325.  Newfit is

also represented in this action by the same counsel representing Mr. Dixon, CapeCapital, the

Cape Real Estate Entities and other Dixon-related entities and family members.  On a date not

specified in the complaint, BFG transferred all of its intellectual property in the fitness operation

to Newfit without consideration.  ¶ 329.

On March 18, 2013, Mr. LeClaire emailed Mr. Dixon about the creation of Newfit and

related governance options, providing advice on how to "protect you better against things like

what Beninati is doing." ¶ 301.  In May 2013, after the creation of Newfit, Mr. LeClaire was

aware that cash of the specific fitness clubs and Newfit was treated as "fungible." ¶ 180. Bank

account records reflect multiple electronic transfers of funds between BFG and Newfit,

demonstrating commingling of funds. ¶ 348-49.  Goodwin advised Messrs. Dixon and Moran, in

the context of the Beninati litigation, to avoid any discussion of Newfit and to maintain that the

transfer of profitable clubs to a separate entity had "nothing to do" with the Beninati litigation

and shielding assets from creditors.  ¶ 180.

### 5.   *Landlords and Third Parties*

BFG could not pay its debts as they arose and it implemented a strategy, through Mr.

Dixon and CapeCapital, of shifting assets from one fitness club to another.  ¶¶ 255, 312. A large

number of BFG's creditors are landlords who leased space to wholly-owned entities of BFG.  ¶

248. The landlords relied on guaranties from BFG, third party guarantors, or other obligors under

the leases. ¶ 249.  BFG purchased fitness clubs from sellers, assumed the sellers' obligations

under existing leases and often breached its obligations to remove the sellers as obligors under

---

[12] Mr. Fenn is a named defendant in the complaint.  On October 5, 2018, the court approved a
settlement between Mr. Fenn and the trustee which provided for the dismissal of all claims
against Mr. Fenn in exchange for his payment of a settlement amount.

the leases.  ¶¶ 250, 359. When a club was shut down, the subsidiary, which was the actual tenant

under the lease, would stop making rent payments to the landlord. ¶ 256.  The landlord would

sue the tenant, only to find that the assets of the tenant had been transferred to another subsidiary

of BFG.  ¶ 257.  Landlords, guarantors, and obligors then pursued fraudulent transfer,

indemnification and other claims against BFG and others. ¶¶ 198, 232, 257, 359-60.

From 2014 to 2016, BFG was involved in numerous lawsuits commenced by landlords

and others for unpaid rents and other lease defaults. ¶¶ 186, 198-199, 231-33, 261. BFG could

not satisfy its debts to landlords due to its insolvency. ¶ 186.  On an unspecified date, Mr. Dixon

forwarded an email from another principal of BFG to Goodwin advising that "I have gotten

hammered today by many different vendors/contractors.  I have threatening messages on my

phone. . . ." ¶ 299.

### 6. *2015 Newfit Transactions*

At the end of March 2015, Blast Fitness Acquisition, LLC, a BFG subsidiary and

defendant in this action, transferred nine profitable health clubs worth between $7.6 (liquidation

value) and $15.9 million (internal valuation based on a multiple of projected EBITDA) to Newfit

in a cashless transaction, in exchange for which Newfit purported to retire $7 million of

antecedent debt owed to it by Blast Acquisition.  ¶ 319.  Mr. Fenn represented both BFG and

Newfit in the transaction. ¶ 212. The transfer was made to shield assets from creditors who had

already begun to sue BFG. ¶ 320.  On May 1, 2015, another cashless transfer from BFG to

Newfit was made transferring the assets of a fitness club in Schaumburg, Illinois, valued at

almost $600,000.  Mr. Fenn represented Newfit in the transaction.  ¶ 221.

After acquiring valuable clubs through Newfit, Mr. Dixon and another defendant then sold those clubs to Ed Eskandarian for a substantial markup, and Mr. Dixon continues to personally receive annual payments of $500,000 per year from Mr. Eskandarian. ¶ 331, 333.

## IV. Trustee's Claims Against Newfit

### A.   *Count VI- Turnover-Bankruptcy Code § 542(b)*

In count VI of the complaint, the trustee asserts that Newfit owes BFG a debt in an unspecified amount "that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b).  Newfit asserts it owes no debt to BFG within the meaning of Bankruptcy Code § 542(b).

#### *1. Applicable Law*

Bankruptcy Code § 542(b) provides:

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b).  Debts are "matured," "payable on demand," or "payable on order" if they are presently payable, "as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event."  *A.J. Calhoun v. Copeland Corp. (In re Gordons Transports, Inc.)*, 51 B.R. 633, 636 (Bankr. W.D. Tenn. 1985).  Bankruptcy Code § 542(b) explicitly references "property of the estate." Bankruptcy Code § 541(a)(1) defines "property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" 11 U.S.C. § 541(a)(1), and also includes "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, including Code § 550. 11 U.S.C. § 541(a)(3).

"A turnover action is not an action to recover damages for the taking of estate property but an action to recover possession of property belonging to the estate at the time of the filing. . . It invokes the court's most basic equitable powers to gather and manage property of the estate." *Braunstein v. McCabe*, 571 F.3d 108, 122 (1st Cir. 2009) (citing 5 Collier on Bankruptcy, ¶ 542.02) (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2009)).  Bankruptcy Code § 542(b) creates an action for turnover of matured debts owed to a bankruptcy estate.  "These may be, for example, debts owed for accounts receivable, for judgments already obtained or for monies previously held in trust or in escrow."  *Nat'l Enters., Inc. v. The Koger P'ship, Ltd. (In re Nat'l Enters., Inc.)*, 128 B.R. 956, 959 (E.D. Va. 1991).

### 2. Discussion

The trustee identifies in his opposition to the motion to dismiss the debts that should be turned over to him under Code § 542(b) as the $500,000 annual payments received by Mr. Dixon from Newfit's sale of fitness clubs to Mr. Eskandarian and the amounts Newfit allegedly deprived BFG from receiving under the assigned management agreement for the Mashpee, Needham and West Roxbury clubs.  With respect to the latter contention, the trustee asserts that BFG remained liable under the contract to perform management services and that to the extent any management or termination fees are owed under that agreement, they belong to BFG.

The Eskandarian payments cannot form the basis of a claim against Newfit under Bankruptcy Code § 542(b) as the payments are alleged to have been made to Mr. Dixon, not Newfit, and I previously dismissed count VI against Mr. Dixon.  *See Blast II*.  To the extent, however, that on the bankruptcy filing date in 2016, any management or termination fees were owed to BFG under the management agreement in connection with the Mashpee, West Roxbury, and Needham clubs (which had a term ending in 2018), I find that such amount would have been

11

matured and fixed as of the bankruptcy filing date and not contingent or payable upon the

occurrence of a certain future act or event.  I find sufficient facts alleged in the complaint to

support a plausible claim for turnover of any such amount from Newfit, and thus I will enter an

order denying Newfit's motion to dismiss count VI.

## B.  *Count XVI- Conspiracy*

In count XVI, the trustee alleges that, beginning no later than 2012 and continuing at

least through BFG's bankruptcy filing date, Mr. Dixon and other count XVI defendants,

including Lexfit, Newfit, CapeCapital, the Cape Real Estate Entities, and others, formed a

"confederation" to siphon assets away from BFG, defraud BFG's creditors, and convert and steal

BFG's assets, damaging its creditors.  Newfit contends that the complaint provides no particulars

about its conspiracy claims that are applicable to it.

### 1. *Applicable Law*

In *Aetna Cas. Sur. Co. v. P & B Autobody*, the United States Court of Appeals for the

First Circuit, applying Massachusetts law, identified two types of civil conspiracy.  43 F.3d

1546, 1563-64 (1st Cir. 1994).  The first is a "very limited" "coercive type" of conspiracy where

"'[i]n order to state a claim of [this type of] civil conspiracy, plaintiff must allege that

defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would

not have had if they had been acting independently.'" *Id*. at 1563 (quoting *Jurgens v. Abraham*,

616 F. Supp. 1381, 1386 (D. Mass. 1985) and citing *Fleming v. Dane*, 304 Mass. 46 (1939)).

The second type of civil conspiracy, and the one upon which the trustee relies here, is "akin to a

theory of common law joint liability in tort" where the word "conspiracy" is used to denote

"vicarious liability" in tort for concerted action. *Id.* at 1564. The elements are (1) common design

or agreement between two or more people to commit a wrongful act and (2) proof of some

tortious act in furtherance of the agreement.  *Id*. (citing Restatement (Second) of Torts § 876 cmt.

b (Am. Law Inst. 1979)).  "Where two or more persons act in concert, each will be jointly and

severally liable for the tort." *Id*.   There is a three year statute of limitations for the tort of civil

conspiracy. *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977) (citing Mass. Gen. Laws

ch. 260, § 2A) (applying a prior version of the statute which provided for a two year limitations

period).[13]

The tort of aiding and abetting a breach of fiduciary duty requires that "(1) there must be

a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants

must have actively participated or substantially assisted in or encouraged the breach to such a

degree that they could not reasonably have been acting in good faith." *Baker v. Wilmer Cutler*

*Pickering Hale & Dorr LLP*, 91 Mass. App. Ct. 835, 847 (2017) (citing *Arcidi v. Nat'l Assn. of*

*Gov't Employees*, 447 Mass. 616, 623-624 (2006)).  In the context of a claim for conspiracy for

breach of fiduciary duty, "[t]he claim for civil conspiracy . . . similarly requires a showing that

the defendants (1) knew that the conduct . . . constituted a breach of fiduciary duty and (2)

substantially assisted in or encouraged that conduct." *Id*. at 847-48 (citing *Kurker v. Hill*, 44

Mass. App. Ct. 184, 189 (1998)) (footnote omitted).[14]

---

[13] The statute provides: "Except as otherwise provided, actions of tort, actions of contract to
recover for personal injuries, and actions of replevin, shall be commenced only within three
years next after the cause of action accrues."  Mass. Gen. Laws ch. 260, § 2A.  *See also*
Bankruptcy Code § 108, which provides, in part: "(a) If applicable nonbankruptcy law . . . fixes a
period within which the debtor may commence an action, and such period has not expired before
the date of the filing of the petition, the trustee may commence such action only before the later
of--
(1) the end of such period, including any suspension of such period occurring on or after the
commencement of the case; or
(2) two years after the order for relief."  11 U.S.C. § 108(a)(1) and (2).
[14] Newfit is a Delaware limited liability company.  "Massachusetts applies the internal affairs
doctrine, which 'recognizes that only one State should have the authority to regulate a
corporation's internal affairs-matters peculiar to the relationships among or between the

## 2. Discussion

Newfit contends that there is no indication in the complaint of any tort that was the subject of the conspiracy other than an alleged breach of fiduciary duty which would not be applicable to Newfit because it did not owe BFG a fiduciary duty.  The trustee maintains that Newfit assisted Mr. Dixon in breaching *his* fiduciary duties to BFG.

There are numerous specific allegations in the complaint to support a plausible claim that CapeCapital and Mr. Dixon knowingly engaged in a plan under which they breached their fiduciary duties to BFG and its members and that they, along with Newfit in connection with the Newfit transfers effected within the statute of limitations period in 2013 and 2015, each knew of the breaches of fiduciary duties and substantially assisted the other in that conduct for Mr. Dixon's benefit and not in good faith.  Indeed, a primary grievance of the complaint is that Mr. Dixon created entities such as Newfit in a coordinated effort to divert company assets from creditors to recover his investment in BFG and otherwise enrich himself.  Accordingly, I will enter an order denying Newfit's motion to dismiss count XVI.

## C.  Count XVII-Aiding and Abetting

In count XVII, the trustee asserts that certain defendants, including CapeCapital and Mr. Dixon, owed the members of BFG the fiduciary duty of care, loyalty and good faith, they

---

corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands.'" *Mariasch v. Gillette Co.*, 521 F.3d 68, 71–72 (1st Cir. 2008) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)).  "The state with authority over a corporation's internal affairs is the state of incorporation."  *Id.* (citing *Harrison v. NetCentric Corp.*, 433 Mass. 465, 470 (Mass. 2001)).  Newfit has not asserted in the motion to dismiss that any counts of the complaint should be considered matters pertaining to its internal affairs, and it has relied primarily on Massachusetts and First Circuit law in its brief.  I will, therefore, not address Delaware law with respect to the counts it seeks to dismiss.  *See Scott v. NG U.S. 1, Inc.*, 450 Mass. 760, 766 n.13 (2008).

breached those duties when they defrauded BFG's members and converted BFG's funds and

assets, and Newfit aided and abetted such breaches.  Newfit contends it did not owe a fiduciary

duty to BFG. For the reasons stated above with respect to count XVI, Newfit's motion to dismiss

count XVII will be denied.

### D.  Counts XX and XXI – Intentional and Tortious Interference with Contractual Advantage

With respect to counts XX and XXI, the trustee asserts that Newfit's assumption of the

benefits of BFG's management agreement for the Mashpee, West Roxbury and Needham clubs,

which left BFG responsible to perform the contract's obligations while receiving none of its

benefits, constituted tortious interference with a contractual advantage.

#### 1.  Applicable Law

To prevail in an action for intentional interference with contractual relations, a plaintiff

must establish that "(1) he had a contract with a third party; (2) the defendant knowingly induced

the third party to break that contract; (3) the defendant's interference, in addition to being

intentional, was improper in motive or means; and (4) the plaintiff was harmed by the

defendant's actions." *G.S. Enters., Inc. v. Falmouth Marine, Inc*., 410 Mass. 262, 272 (1991)

(citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812-817 (1990)); *see also Psy-

Ed Corp. v. Klein*, 459 Mass. 697, 715 (2011) (setting forth the same standard for "tortious

interference with contract" and citing *G.S. Enters., Inc.,* 410 Mass. at 272).  "A claim for

intentional interference with contractual relations is one sounding in tort." *Pure Distribs., Inc. v.

Baker,* 285 F.3d 150, 154–55 (1st Cir. 2002) (citing *United Truck Leasing Corp*., 406 Mass. at

812).

### 2. Discussion

From the facts alleged in the complaint, I cannot plausibly conclude that Newfit

knowingly induced BFG or a third party to breach the management agreement.  The complaint

alleges that BFG exercised its assignment rights under the contract by transferring the right to

receive management fees to Newfit while BFG maintained the burdens and liabilities of the

agreement for little or no consideration.  There are no allegations that the management

agreement was breached as a result of Newfit's involvement or interference, and the claims are

more in the nature of fraudulent transfer and/or aiding and abetting breach of fiduciary duty

claims which are asserted in other counts of the complaint. Accordingly, I will enter an order

allowing Newfit's motion to dismiss counts XX and XXI.

### E. Count XXIII-Substantive Consolidation

In count XXIII, the trustee asserts that the assets and liabilities of BFG and the count

XXIII defendants are intertwined and that inequity and harm would result to creditors if BFG

were able to shed its liabilities while maintaining its assets through those defendants.  He

requests that the defendants' assets and liabilities be substantively consolidated into BFG's

bankruptcy estate.   Newfit notes disagreement among courts as to whether a debtor and non-

debtor entity can be substantively consolidated. *See, e.g.*, *Helena Chem. Co. v. Circle Land and

Cattle Corp. (In re Circle Land and Cattle Corp.)*, 213 B.R. 870, 876 (Bankr. D. Kan. 1997)

("There is doubt, however, whether the bankruptcy court has either subject matter or personal

jurisdiction over a non-debtor.").  Newfit maintains that even where recognized, substantive

consolidation should be used sparingly, citing *In re Owens Corning*, 419 F.3d 195, 208–09 (3d

Cir. 2005) (footnotes omitted) (citing *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In

re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988)), as amended (Aug. 23,

2005), as amended (Sept. 2, 2005), as amended (Oct. 12, 2005), as amended (Nov. 1, 2007)

("Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy

in certain circumstances. No court has held that substantive consolidation is not authorized,

though there appears nearly unanimous consensus that it is a remedy to be used 'sparingly.'").

### 1. *Applicable Law*

Substantive consolidation "has been long recognized . . . [as] a valid exercise of the

courts' equitable powers under § 105." *Gray v. O'Neill Props. Grp., L.P. (In re Dehon, Inc.)*,

No. 02–41045, 2004 WL 2181669, at *3 (Bankr. D. Mass. Sept. 24, 2004); *see also* 11 U.S.C. §

105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."). "Bankruptcy courts may substantively consolidate two or

more related entities and thereby pool their assets. Substantive consolidation 'treats separate

legal entities as if they were merged into a single survivor left with all the cumulative assets and

liabilities.'" *Logistics Info. Sys., Inc. v. Braunstein (In re Logistics Info. Sys., Inc.)*, 432 B.R. 1,

10 (D. Mass. 2010) (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health

Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)).

In *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, the First Circuit stated:

> Consolidation is permitted only if it is first established that the related debtors'
> assets and liabilities are so intertwined that it would be impossible, or financially
> prohibitive, to disentangle their affairs. . . The trustee may request consolidation
> to conserve for creditors the monies which otherwise would be expended in
> prolonged efforts to disentangle the related debtors' affairs. . . Nevertheless, the
> bankruptcy court must balance the potential benefits of consolidation against any
> potential harm to interested parties.

954 F.2d 1, 11 n.15 (1st Cir. 1992) (internal citations omitted). The court added that because

"[substantive] consolidation can cause disproportionate prejudice among claimants required to

*share* the debtors' pooled assets, the party requesting substantive consolidation must satisfy the

bankruptcy court that, on balance, consolidation will foster a net benefit among all holders of

unsecured claims." *Id*. at 12 (footnote omitted) (emphasis in original); *see also Lassman v.*

*Cameron Construction LLC (In re Cameron Construction & Roofing Co., Inc.*), 565 B.R. 1

(Bankr. D. Mass. 2016) (noting that while substantive consolidation of two or more debtors'

estates is widely accepted, a court, in an appropriate case, may also order the substantive

consolidation of a debtor and non-debtor).

### 2. Discussion

As stated in *Blast IV*, I see no bar to substantive consolidation of a debtor and a non-

debtor under appropriate circumstances, where, such as here, a complaint alleges with

particularity a scheme among a principal and numerous entities he formed and controlled for the

purpose of acquiring, diverting and transferring valuable assets and profit opportunities from a

debtor to avoid the reach its creditors. *See Gray v. O'Neill Props. Grp., L.P.*, 2004 WL 2181669,

at *3 ("Large corporations, such as the Debtor, often use multi-tiered corporate structures, and

substantive consolidation has been used to reach the assets and liabilities of a non-debtor

subsidiary corporation.").  I find sufficient allegations in the complaint to plausibly support the

conclusion that the assets and liabilities of BFG and Newfit were intertwined and that avoiding

(already) protracted efforts to disentangle their affairs would be a net benefit to the estate.  The

complaint alleges with specificity that Newfit was organized in 2013 as a vehicle created by Mr.

Dixon for the sole purpose of acquiring BFG assets (even prior to its legal existence) through a

series of fraudulent transfers with BFG from 2013 through 2015 while BFG was being pursued

by Ms. Beninati and then by landlords and other third parties over lease defaults.  I find the

trustee has alleged sufficient facts at this stage of the proceedings to support a plausible claim for

substantive consolidation of Newfit and BFG.  I will enter an order denying Newfit's motion to

dismiss count XXIII.

## F.  Count XXV-Alter Ego/Piercing the Corporate Veil

In count XXV, the trustee asserts that defendants including Mr. Dixon, CapeCapital,

Newfit, Lexfit, the BFG subsidiaries, the Cape Real Estate Entities and others each exercised

pervasive control over BFG (and each other) and engaged in confused intermingling of business

activity, assets and management. He seeks an order piercing the corporate veils separating those

defendants and BFG and an order finding them liable as "alter egos" and thus liable for BFG's

debts.

### 1.  Applicable Law

In Massachusetts, corporations and their shareholders are generally deemed to be distinct

legal entities. *See Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 657 (1993). Under unusual

circumstances, however, a court may disregard the separateness of entities, particularly to defeat

fraud or remedy an injury. *See id*. These efforts are often characterized as veil piercing or

establishing alter ego status.  "The doctrines of veil piercing . . . and alter ego are interrelated and

litigants often use the terms interchangeably.  Indeed, a party may seek to pierce a corporate veil

under an alter ego theory which is equitable in nature." *Butler v. Candlewood Road Partners,*

*LLC (In re Raymond)*, 529 B.R. 455, 471 (Bankr. D. Mass. 2015) (citing *Weiss v. Lockwood*, 499

B.R. 392, 394 (D. Mass. 2013) (citing *Miranda v. Gonzalez (In re Gonzalez)*, No. 02–05485–

BKT, Adv. P. No. 09–150, 2010 WL 3395677, at *2 (Bankr. D.P.R. Aug. 23, 2013) (footnote

omitted)).  "Nevertheless, veil piercing and alter ego can be distinguished." *The Patriot Grp.,*

*LLC v. Fustolo (In re Fustolo)*, 597 B.R. 1, 47 (Bankr. D. Mass. 2019) (citing *U.S. Trustee v.*

*Zhang (In re Zhang)*, 463 B.R. 66, 81 (Bankr. S.D. Ohio 2012)). '"The former asks a court to

hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity

and therefore liability is direct.'" *Id.* (citing *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th

Cir. 2005) (footnote omitted)).

In *My Bread Baking Co. v. Cumberland Farms, Inc.*, the Massachusetts Supreme Judicial

Court ("SJC") considered "[t]he circumstances in which one corporation, or a person controlling

it, may become liable for the acts or torts of an affiliate or a subsidiary under common control . .

. ." 353 Mass. 614, 618-19 (1968).  It explained that it is appropriate to depart from the general

principle of corporate separateness in two situations:

> (a) when there is active and direct participation by the representatives of one
> corporation, apparently exercising some form of pervasive control, in the
> activities of another and there is some fraudulent or injurious consequence of the
> intercorporate relationship, or (b) when there is a confused intermingling of
> activity of two or more corporations engaged in a common enterprise with
> substantial disregard of the separate nature of the corporate entities, or serious
> ambiguity about the manner and capacity in which the various corporations and
> their respective representatives are acting. In such circumstances, in imposing
> liability upon one or more of a group of 'closely identified' corporations a court
> 'need not consider with nicety which of them' ought to be held liable for the act
> of one corporation 'for which the plaintiff deserves payment.'

*Id.* (internal citation omitted).[15]

"The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare

situations, to ignore corporate formalities, where such disregard is necessary to provide a

meaningful remedy for injuries and to avoid injustice."  *Attorney General v. M.C.K., Inc.*, 432

Mass. 546, 555 (2000).  In *M.C.K*, the SJC listed the factors to be considered when courts engage

in an analysis of the *My Bread* principles:

---

[15] *See Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 36 (Bankr.
D. Mass. 2011) ( "Although the standards for piercing the corporate veil are articulated most
frequently with respect to corporations, this Court concludes that the same principles would
apply for alter ego liability to attach to members of limited liability companies.").

> The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id.* at 555 n.19 (citing *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria set forth in *My Bread*); *Evans v. Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 733 (1991)); *see also Birbara v. Locke*, 99 F.3d 1233, 1240 (1st Cir. 1996) ("*My Bread* sets the standard for deciding when to pierce the corporate veil under Massachusetts law; *Pepsi-Cola* elucidates some factors that may be considered when engaging in a *My Bread* analysis."). "Massachusetts courts employ the alter ego doctrine to determine whether a principal of a corporation is its alter ego using the *My Bread Baking Co.* factors." *In re Fustolo*, 597 B.R. at 50.

Since its ruling in *My Bread*, the SJC has observed that under Massachusetts law, the corporate veil will only be pierced in rare situations. *See, e.g.*, *Spaneas v. Travelers Indem. Co.*, 423 Mass. 352, 354 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form.") (citing *My Bread*, 353 Mass. at 620).

## 2. *Discussion*

With respect to count XXV, I find the trustee has alleged sufficient facts supporting "fraudulent or injurious consequence of the intercorporate relationship" and "confused intermingling" as a basis for corporate disregard of Newfit under *My Bread*, having specifically pleaded a number of the factors set forth in *M.C.K.* The gravamen of the complaint against Mr. Dixon and Newfit is the gross inequity and injury to BFG's creditors resulting from alleged fraudulent and improper use of numerous entities Mr. Dixon controlled, including Newfit, to

misappropriate and divert BFG's assets beyond creditors' reach while BFG was insolvent.  The

trustee has sufficiently supported his claims with specific allegations concerning Mr. Dixon's

pervasive control over Newfit (and its control over BFG), which was managed by him and

CapeCapital, of which he was the sole manager and a member.  Further, the trustee has

sufficiently alleged that Mr. Dixon formed and/or used Newfit and other entities to promote

fraudulent transactions in a common enterprise which benefited him and his affiliates. Lastly, he

has included numerous allegations regarding intermingling of business activity and assets among

BFG and Newfit.  Both entities shared the same manager, office space, counsel, and director of

finance, and Newfit's assets such as profitable fitness clubs, intellectual property, and rights

under the management agreement were all acquired from BFG and its subsidiaries.  While

mindful that veil piercing will be permitted in only rare situations, I find at the Rule 12(b)(6)

stage, with all reasonable inferences drawn in the trustee's favor, the allegations are sufficient to

support a plausible claim for veil piercing and/or alter ego determination against Newfit and the

numerous Dixon-controlled entities. I will enter an order denying Newfit's motion to dismiss

count XXV.

## V. **Conclusion**

Based on the foregoing, an order shall enter granting Newfit's motion to dismiss with respect to counts XIX, XX, XXI, XXIV, and XXIX of the trustee's amended complaint and denying the motion with respect to counts VI, XVI, XVII, XXIII, and XXV.


Dated: May 24, 2019                    By the Court,

                                       Melvin. S. Hoffman
                                       United States Bankruptcy Judge

Counsel Appearing: Ilyas J. Rona, Esq.
                   Milligan Rona Duran & King LLC
                   Boston, MA
                           for the plaintiff, Gary W. Cruickshank,
                           Trustee of the Estate of Blast Fitness
                           Group, LLC

                   Joseph S.U. Bodoff, Esq.
                   Rubin & Rudman LLP
                   Boston, MA
                       for the defendant, Newfit LLC