**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| _____ ) | | |
| In re: ) | | Chapter 7 |
| ) | | Case No. 16-10236-MSH |
| BLAST FITNESS GROUP, LLC, ) | | |
| ) | | |
| Debtor ) | | |
| _____ ) | | |
| ) | | |
| GARY W. CRUICKSHANK, ) | | |
| CHAPTER 7 TRUSTEE OF THE ) | | |
| ESTATE OF BLAST FITNESS ) | | |
| GROUP, LLC, ) | | |
| ) | | |
| Plaintiff, ) | | Adversary Proceeding |
| ) | | No. 18-01011 |
| v. ) | | |
| ) | | |
| HAROLD R. DIXON *et al.*, ) | | |
| ) | | |
| Defendants. ) | | |
| _____ ) | | |

**MEMORANDUM OF DECISION ON MOTION TO DISMISS OF**
**DIXON FAMILY LIMITED PARTNERSHIP**

**I. <u>Introduction</u>**

In a thirty-count complaint,[1] Gary W. Cruickshank, the plaintiff and chapter 7 trustee of

the bankruptcy estate of Blast Fitness Group, LLC ("BFG"), seeks damages and injunctive relief

against forty named and dozens of unnamed defendants, including Dixon Family Limited

Partnership (the "Partnership"), a Delaware limited partnership whose general partner is

defendant, Harold R. Dixon, who also controlled BFG.  BFG filed a voluntary petition for relief

under Chapter 7 of the United States Bankruptcy Code[2] on January 26, 2016, at which time its

---

[1] As amended by a second amended complaint (ECF #339).
[2] All references to the Bankruptcy Code or the Code are to 11 U.S.C. § 101 *et seq.*

1

debts exceeded $16 million.  At the time of the bankruptcy filing, the Partnership owned 36% of

BFG.  This adversary proceeding was commenced two years after the petition date on January

26, 2018.

The Partnership has moved under Fed. R. Civ. P. 12(b)(6), per Fed. R. Bankr. P. 7012(b),

to dismiss[3] count I (constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B)),

count II (actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A)), count III

(constructive fraudulent transfer under the Massachusetts Fraudulent Transfer Act, Mass. Gen.

Laws ch. 109A ("MUFTA") § 5(a)(2)), count IV (constructive fraudulent transfer under MUFTA

§ 6(a)), count V (actual fraudulent transfer under MUFTA § 5(a)(1)), count VII ("turnover"

under Bankruptcy Code § 550),[4] count VIII (unjust enrichment), count X (statutory reach and

apply/Bankruptcy Code §§ 544 and 550 and Mass. Gen. Laws ch. 214, § 3(8)), count XI

(establishment of a resulting/constructive trust), count XVI (conspiracy), count XVII (aiding and

abetting), count XVIII (conversion and civil theft), count XIX (fraud), count XXIII (substantive

consolidation), count XXV (alter ego/piercing the corporate veil), XXIX (attorneys' fees), and

count XXX (costs).

At the outset, I note that the trustee does not contest dismissal of counts I, II, VIII, XVIII,

XXIII, XXIX, or XXX.  I will, therefore, grant the Partnership's motion to dismiss those counts.

---

[3] ECF #352.

[4] "Turnover" is a misnomer as the statute governs liability of transferees of avoided transfers.

## II. Procedural History

The trustee filed the original complaint on January 26, 2018, and thereafter filed the first amended complaint on April 4, 2018 (ECF #130). A number of defendants filed motions to dismiss the complaint, including Mr. Dixon, CapeCapital LLC ("CapeCapital"), a Massachusetts limited liability company managed by Mr. Dixon and which was the sole manager of BFG, the law firm of Goodwin Procter LLP ("Goodwin") and two of its attorneys (collectively, the "Goodwin Defendants"), CapeCapital Maryland Heights, LLC, CapeCapital West Hartford, LLC, CapeCapital Irving, LLC (collectively, the "Cape Real Estate Entities"), and Newfit, LLC ("Newfit").

The Goodwin Defendants' motions to dismiss were allowed in part and denied in part by my memorandum and order dated January 8, 2019. *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, Adv. Pro. No. 18-1011, 2019 WL 137109 (Bankr. D. Mass. Jan. 8, 2019) (*Blast I*). The motions to dismiss of Mr. Dixon, CapeCapital, and the Cape Real Estate Entities were allowed in part and denied in part pursuant to separate memoranda and orders dated April 30, 2019 (*Blast II*, *Blast III*, and *Blast IV*, respectively).[5] Also on that date, I allowed by separate memoranda and orders the motions to dismiss filed by Mr. Dixon's wife, Juliet Dixon, and Thomas F. Walsh and Michael J. Craffey, as trustees of certain Dixon-controlled trusts (the "Dixon trusts") (*Blast V-VII*, respectively). The motion to dismiss of Newfit was allowed in part and denied in part pursuant to my memorandum and order dated May 24, 2019. *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, 603 B.R. 654 (Bankr. D. Mass. 2019) (*Blast VIII*).

---

[5] *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, 603 B.R. 219 (Bankr. D. Mass. 2019) (*Blast II*), *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, 602 B.R. 208 (Bankr. D. Mass. 2019) (*Blast III*), and *Cruickshank v. Dixon (In re Blast Fitness Grp., LLC)*, Adv. Pro. No. 18-1011, 2019 WL 5898011 (Bankr. D. Mass. April 30, 2019) (*Blast IV*).

Following the issuance of the above memoranda and orders, the court conducted a status conference on August 21, 2019, and permitted the trustee to file a second amended complaint which he did on September 30, 2019 at ECF #339 (hereinafter the "complaint").  By separate memorandum and order dated February 5, 2020, I allowed the motion to dismiss filed by defendant CapeCapital Jewel, LLC (*Blast IX*).

A complete recitation of the trustee's factual allegations and my legal findings on certain of the trustee's claims are set forth in *Blast I-IV, VIII,* and *IX.*  I reiterate some here and supplement them based on additional factual allegations in the latest complaint as necessary to my determining the Partnership's motion to dismiss.

### III. <u>Motion to Dismiss</u>

*A.  Legal Standard*

In ruling on the motion to dismiss, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences in the trustee's favor.  *Langadinos v. American Airlines, Inc*., 199 F.3d 68, 69 (1st Cir. 2000).  A claim cannot be dismissed if the trustee has demonstrated a "plausible entitlement to relief." *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's obligation requires more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "The general allegations found inadequate in *Iqbal* were themselves 'factual' assertions but highly general and made without offering any detail."  *Pruell v. Caritas Christi*, 678 F.3d 10, 13 (1st Cir. 2012).

Inquiry into plausibility is a two-step process.  "First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded)

from allegations of fact (which must be credited)." *Rodriguez-Reyes v. Molina-Rodriguez*, 711

F.3d 49, 53 (1st Cir. 2013) (citing *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir.

2012)). "Second, the court must consider whether the winnowed residue of factual allegations

gives rise to a plausible claim to relief." *Id.* "Plausible, of course, means something more than

merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that

compels us 'to draw on' our 'judicial experience and common sense.'" *Schatz v. Republican

State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679).

'"Moreover, *each* defendant's role in the [adverse action] must be sufficiently alleged to make

him or her a plausible defendant. After all, we must determine whether, *as to each defendant*, a

plaintiff's pleadings are sufficient to state a claim on which relief can be granted.'" *Rodriguez-

Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40-41 (1st Cir. 2012) (quoting *Ocasio-Hernandez v.

Fortuno-Burset*, 640 F.3d 1, 16 (1st Cir. 2011) (alteration in original); *see also Penalbert-Rosa v.

Fortuno-Burset*, 631 F.3d 592, 594 (1st Cir. 2011) ("[S]ave under special conditions, an adequate

complaint must include not only a plausible claim but also a plausible defendant.").

## B.  Trustee's Factual Allegations[6]

### 1.  BFG

On February 14, 2011, CapeCapital, acting through Mr. Dixon, formed BFG, a

Massachusetts limited liability company.[7] ¶ 66. CapeCapital was the sole manager of BFG, and

Mr. Dixon, in turn, was the sole manager and a member of CapeCapital. ¶ 3.  At its peak, BFG

owned and operated over sixty fitness clubs bearing its name throughout the United States.

(Intro., p. 2).  At all relevant times, BFG acted at the direction of CapeCapital and Mr. Dixon,

---

[6] Factual allegations are cross-referenced to the relevant paragraphs (symbol ¶) of the complaint.
[7] Although not specifically pleaded in the complaint, there is no dispute that BFG is a
Massachusetts limited liability company.

who held himself out as CEO of BFG. ¶¶ 2, 98. BFG owned, entirely or partially, seventeen subsidiaries through which it operated its business.[8] ¶ 45. On an unspecified date, Mr. Dixon formed defendant Auburndale Fitness Group Investment LLC ("Auburndale Fitness"), a Massachusetts limited liability company of which he served as the sole manager.[9] ¶¶ 10, 67.

### 2. *The Partnership*

Mr. Dixon formed the Partnership on March 2, 2000. ¶ 90. According to the complaint, "he owned 100% of the [Partnership]" and held himself out as its general partner. *Id*. On the trustee's information and belief, Mr. Dixon formed the Partnership shortly after receiving a "massive fortune" from his employment at EMC Corp. and then used the Partnership for "purposes of asset protection, wealth management, and tax minimization." ¶ 91. Mr. Dixon acted as the sole agent of the Partnership, and all actions taken by him were done in furtherance of the Partnership's goals of asset protection and tax minimization. ¶ 92. On the trustee's information and belief, no partnership agreement was ever executed for the Partnership, it had no bona fide limited partners, it did not follow corporate formalities, was never properly capitalized, did not maintain capital account balance sheets, and was an alter ego of Mr. Dixon. ¶¶ 93-96. All of Mr. Dixon's actions and inactions as alleged throughout the complaint "were done on behalf of [the] Partnership and for the benefit of [the] Partnership[,]" and "all benefits alleged throughout this [complaint] that were conferred on Dixon were equally and simultaneously conferred on [the Partnership]." ¶ 97.

---

[8] Each of the seventeen BFG subsidiaries is a defendant here. The subsidiaries are named in numerous counts of the complaint, including counts for fraudulent transfers, piercing the corporate veil/alter ego, and substantive consolidation. None of the BFG subsidiaries has filed a responsive pleading to the complaint.

[9] That defendant's motion to dismiss was allowed by order dated December 9, 2019 (ECF #403).

### 3.  *Other Entities*

Mr. Dixon fully controlled the Partnership, Auburndale Fitness and CapeCapital, and he was largely indifferent to the allocation of his ownership interests across the entities, apart from what was expedient and minimized his tax liability and the reach of creditors. ¶ 105. Distinctions between those entities were ignored, and Mr. Dixon treated the ownership interests as fungible. *Id.*

### 4. *The Beninati Dispute*

In 2011 and 2012, BFG, Mr. Dixon and Steven Borghi, Mr. Dixon's business partner and a member of BFG, were mired in a dispute with Elizabeth Beninati, the widow of Mr. Borghi's previous business partner in the discount fitness club business. ¶¶ 63, 65, 68-71.  Ms. Beninati commenced a Massachusetts state court lawsuit against Mr. Dixon, Mr. Borghi and BFG on May 24, 2012, seeking millions of dollars in damages. ¶¶ 71, 385. Once Ms. Beninati filed the lawsuit, Mr. Dixon began exploring ways to transfer assets away from entities that had been sued and began creating new entities, such as Newfit, to remove assets from BFG.  ¶ 106. He began contemplating transfer of ownership of Auburndale Fitness's interest in BFG to the Partnership over time "to prevent [a] large tax event for partners." *Id.*

### 5. *The Bally Transaction*

In 2011, Goodwin performed services and drafted corporate and transactional documents for BFG in connection with BFG's acquisition and transfer of fitness clubs and the formation of various limited liability companies ancillary to those acquisitions and transfers. ¶¶ 110-111, 113-115.  In 2012, at the time the Beninati dispute was active, BFG was engaged in negotiations with Bally Total Fitness Inc. to purchase from it thirty-nine work-out clubs and certain real estate. ¶ 113. The Goodwin Defendants acted as counsel to BFG and its wholly-owned subsidiary, Blast

Fitness Acquisition, LLC ("Blast Acquisition"),[10] in that transaction, and in that capacity participated in drafting an asset purchase agreement dated April 10, 2012. ¶¶ 114, 118, 121. Under the terms of the asset purchase agreement, BFG was to acquire the work-out clubs and receive three pieces of commercial real estate from Bally located in Maryland Heights, Missouri, West Hartford, Connecticut and Irving, Texas which were to be "sold pursuant to the terms of a separate purchase agreement . . . for an aggregate purchase price of $1,000,000 to an entity identified by [BFG] prior to Closing." ¶¶ 54-55, 122, 126. Three of the thirty-nine work-out clubs proposed to be purchased by BFG (through Blast Acquisition) operated at these locations. ¶¶ 122, 126.

On or prior to April 12, 2012, Mr. Dixon planned to designate entities not owned by BFG to take title to the Bally real estate. ¶¶ 139-141. On April 25, 2012, he formed the Cape Real Estate Entities: CapeCapital Maryland Heights, LLC, a Missouri limited liability company; CapeCapital West Hartford, LLC, a Connecticut limited liability company; and CapeCapital Irving, LLC, a Texas limited liability company, all of which were managed by Mr. Dixon and effectively owned by him. ¶¶ 13-15, 54, 155, 162, 167, 174. None of these entities was owned by BFG. ¶¶ 54, 173-74. As stated above, each of the Cape Real Estate Entities are defendants in this adversary proceeding. *See Blast IV*.

To raise part of the cash needed to complete the Bally transaction, the members of BFG agreed to sell a preferred membership interest in BFG to the Partnership. ¶¶ 148-49. The Goodwin Defendants drafted and presented to BFG and its members a member consent dated April 27, 2012, which provided in part:

> WHEREAS, the Members and Managers [of BFG] are seeking to raise additional capital for the Company for purposes including, but not limited [sic], financing the

---

[10] Blast Acquisition, a defendant, is managed by Mr. Dixon. ¶ 24.

growth of the Company's business through the acquisition, from Balley [sic] Total Fitness Corporation, a Delaware corporation ("Bally") and certain of ts [sic] affiliates, of operating assets **and real property associated with additional health club facilities** (the "Bally Acquisition") **by a direct subsidiary of the Company.** (emphasis added).

¶¶ 148-49, 151. This consent was presented to BFG's members at a time when Mr. Dixon and the Goodwin Defendants were already planning to transfer the Bally real estate to entities not owned by BFG. ¶ 150.  Members of BFG, including Mr. Borghi, relied on the member consent when they approved the admission of the Partnership as a member of BFG, approved the investment of $4 million by the Partnership, and allowed the Bally transaction to move forward. ¶ 152. They did so believing that BFG would receive the Bally real estate. *Id.*

Two days prior to Goodwin's presentment of the membership consent, on April 25, 2012, Mr. Sullivan, a Goodwin attorney and a defendant in this adversary proceeding, emailed Mr. Dixon asking for clarity regarding how much money Mr. Dixon was contributing and investing in BFG to provide funding for the Bally transaction. ¶ 145. On the same day, Mr. Dixon replied: "i am putting in 4 mill outside the 1 mill for realestate" [sic]. *Id.* Mr. Sullivan responded:

> Ok, but $1.25 of that is coming in via Steve (from your loan), correct? I want to make sure that the total new money coming into the Blast entity is $4M, not $5.25. The $1M for real estate is totally separate, correct (ie – Blast is NOT the buyer of the owned RE, Dixon Family LP is, correct)?"

In turn, Mr. Dixon responded: "Correct. 4 mill total." ¶¶ 145-46.

### 6. *Subsequent Transfers*

The Bally transaction closed on April 30, 2012,[11] and on or by that date, Bally had sold the Bally real estate, worth over $4 million, to the Cape Real Estate Entities, for approximately $1 million. ¶¶ 54, 156, 163, 168. Two of the parcels were transferred to Cape Real Estate Entities before the member consent was executed. ¶¶ 156, 163. Mr. Dixon used BFG funds to subsidize the purchase of the Bally real estate. ¶¶ 55, 156, 163, 168. Following the Cape Real Estate Entities' acquisition of the Bally real estate, CapeCapital and Mr. Dixon directed BFG and/or its subsidiaries to enter into leases with the Cape Real Estate Entities and to make "potentially over-market" lease payments to them for the BFG clubs operating at the three Dixon-controlled properties at a time when BFG was insolvent. ¶¶ 55, 176, 196-98.

At the direction of Mr. Dixon, the Cape Real Estate Entities sold the properties to third parties in separate transactions on December 31, 2013, June 26, 2014, and December 31, 2014, ¶¶ 158, 161, 164, 169, 170, for prices significantly in excess of their purchase prices, with the proceeds then being distributed *by the Cape Real Estate Entities to Mr. Dixon or to other unknown third parties, named in the complaint as John Doe defendants*. ¶¶ 158, 159, 164, 165, 169-170 (emphasis added). The Cape Real Estate Entities breached their lease agreements with BFG and/or its subsidiaries by terminating these leases prematurely to facilitate the sale of the Bally real estate, and CapeCapital and Mr. Dixon directed the closing of the clubs at those locations for that purpose. ¶¶ 160, 166, 171, 199.

---

[11] This fact was not pleaded by the trustee but is not disputed.

## IV. Trustee's Claims Against the Partnership

### A. Counts III, IV, and V-Fraudulent Transfers

#### 1. Generally

Counts III, IV, and V of the complaint, thoroughly discussed in *Blast II-IV*, allege fraudulent transfers involving the Partnership, based upon the Bally real estate transfers, pursuant to MUFTA §§ 5(a)(2), 6(a) and 5(a)(1), respectively, and Bankruptcy Code §§ 544(b) and 550. The trustee asserts that the Partnership held, directly or indirectly, BFG's fraudulently transferred assets and received resultant proceeds from their sale.

#### 2. The Trustee's Position

In *Blast II*, I denied Mr. Dixon's motion to dismiss counts III and IV against him with respect to the Bally real estate transfers, finding that the trustee had sufficiently pleaded that Mr. Dixon controlled the Cape Real Estate Entities which took title to the properties and that he was a party "for whose benefit [the] transfer was made" under MUFTA § 9(b)(1) and Bankruptcy Code § 550(a)(1). I also found that the trustee sufficiently pleaded that Mr. Dixon was a subsequent transferee of the proceeds from the Cape Real Estate Entities' sale of the Bally real estate. *Blast II*, 603 B.R. at 236. I also denied Mr. Dixon's motion to dismiss count V against him, finding that the trustee had sufficiently pleaded the existence of a number of so-called "badges of fraud" under MUFTA § 5(b) in connection with his involvement in the Bally real estate transfers to the Cape Real Estate Entities which he controlled and effectively owned. *Id*. at 240-41. Similarly, in *Blast IV*, I denied the Cape Real Estate Entities' motion to dismiss counts III, IV, and V against them with respect to the Bally real estate transfers. *Blast IV*, 2019 WL 5898011, at *3. The trustee asserts that I should make a similar ruling here with respect to the fraudulent transfer claims against the Partnership because Mr. Dixon was acting as its general

partner in connection with the transfers, and the Partnership is therefore a party for whose benefit the Bally real estate transfers were made.  Stated another way, the trustee contends he has adequately pleaded that BFG transferred the right to purchase the Bally real estate to the Partnership which, in turn, then assigned that right to the Cape Real Estate Entities while the Partnership simultaneously retained an interest in the real estate.

Specifically, the trustee asserts that Mr. Dixon orchestrated a scheme for the Partnership, as the true owner of the Cape Real Estate Entities, to take hidden ownership of the Bally real estate.  In support of this contention, the trustee relies on the April 25, 2012 email exchange between Messrs. Sullivan and Dixon.  He claims that the email exchange demonstrates that the Partnership was the true buyer of the Bally real estate which rightfully belonged to BFG and that Mr. Dixon was acting as the general partner for the Partnership when he engaged in the Bally real estate diversion. Based on principles of agency, the trustee maintains, the Partnership is therefore liable for Mr. Dixon's actions, including the presentation of the 2012 membership consent.  He asserts that the Partnership is an indispensable defendant in this adversary proceeding because it is an "inextricable pillar" of Mr. Dixon's fraudulent scheme and "indispensable to the trustee's effort to unwind the fraud in this case."

### 3. Discussion

While I have previously found the complaint sufficient in its fraudulent transfer claim allegations against Mr. Dixon and the Cape Real Estate Entities regarding the Bally real estate transfers, I cannot conclude that the complaint's allegations, or the reasonable inferences to be drawn from them, support plausible fraudulent transfer claims against the Partnership. Rather, the trustee's arguments are largely based on speculation and conjecture and impermissibly stretch the content of the complaint. Moreover, I do not find the Partnership to be

"indispensable" to the trustee's fraudulent transfer claims based on the Bally real estate transfers as those claims have been preserved against Mr. Dixon and the Cape Real Estate Entities, and the trustee can achieve only one recovery of the value of the Bally real estate transfers if successful in this action. S*ee* MUFTA § 9(b); 11 U.S.C. § 550(a), (d).

There are insufficient direct or specific allegations in the complaint to support the trustee's contention that BFG transferred its right to receive the Bally properties to the Partnership, that the Partnership was the surreptitious owner of the properties (or the owner of the Cape Real Estate Entities), that it was the eventual recipient of sale proceeds, or that it was the party for whose benefit such transfers were made. Rather, the trustee relies on a strained and attenuated construction of the April 25, 2012 email exchange between Messrs. Sullivan and Dixon to create the inference that the Partnership was the true transferee of the properties and the later proceeds. He describes the email exchange as "the qualitative bedrock upon which all other allegations stand."

In the email exchange, Mr. Sullivan asked Mr. Dixon for clarity about how much money Mr. Dixon was contributing and investing into BFG, and Mr. Dixon replied: "i am putting in 4 mill outside the 1 mill for the realestate [sic]." Mr. Sullivan responded with three questions: 1) whether a portion of the funding was coming from a loan; 2) whether the total amount of new money coming into BFG was $4 million or $5.25 million; and 3) whether BFG or the Partnership would be the buyer of the Bally real estate, and Mr. Dixon responded: "Correct. $4 mill total." The trustee argues that this response affirms that the Partnership was the transferee of BFG's rights to the real estate. To infer that the Partnership was the true buyer and transferee of the Bally real estate, the owner of the Cape Real Estate Entities, and the eventual recipient of sale proceeds would be unreasonable as Mr. Dixon's reply email squarely addressed only the second

13

of Mr. Sullivan's inquiries, i.e., the total amount to be invested.  Moreover, such inferences are

undermined by the complaint's competing and specific allegations that the *Cape Real Estate*

*Entities* took title to the properties, thereafter leased them to BFG at above-market rates, sold

them for substantial profit, and then distributed the sale proceeds to Mr. Dixon or unknown third

parties named in the complaint as John Doe defendants.  The complaint does not allege that the

proceeds were distributed to the Partnership.  The trustee engages in conjecture when he asserts

in his opposition to the motion to dismiss that "[i]t is more than plausible that [Mr.] Dixon would

have put [the real estate] sales proceeds back into the [Partnership] so that he could offset these

ill-gotten gains from the Bally Real Estate with his losses from other business ventures."

The trustee argues that the Partnership should be tied to Mr. Dixon's alleged malfeasance

because he was acting as its general partner when he engaged in the alleged real estate swindle.

Under the Delaware Revised Uniform Limited Partnership Act, "Except as provided in this

chapter or in the partnership agreement, a general partner of a limited partnership has the rights

and powers and is subject to the restrictions of a partner in a partnership that is governed by the

Delaware Uniform Partnership Law . . ." Del. Code Ann. tit. 6, § 17–403(a).   Under the

Delaware Revised Uniform Partnership Act, a partnership is liable for, and bound by, the acts

and omissions of its partners acting within the course of partnership business. *See* Del. Code

Ann. tit. 6, § 15–305(a) ("A partnership is liable for loss or injury caused to a person, or for a

penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a

partner acting in the ordinary course of business of the partnership or with authority of the

partnership."); *see also Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51, 63 (D.

Mass. 2004) (applying Delaware law). Relying on these legal underpinnings, the trustee

maintains that the Partnership must be a fraudulent transfer defendant because the complaint ties the Partnership to Mr. Dixon's alleged malfeasance.

I cannot conclude that every alleged bad action taken by Mr. Dixon in connection with the fraudulent transfers should be attributed to the Partnership or that it was the party for whose benefit the transfers were made simply because Mr. Dixon was its general partner. The complaint lacks specific allegations that Mr. Dixon was acting within the ordinary course of the Partnership's business or with its authority in connection with the fraudulent transfers. On the contrary, the allegations in the complaint point to Mr. Dixon's actions taken on behalf of *other* entities he owned and controlled, namely the Cape Real Estate Entities, which actually took title to the properties and later sold them. The trustee's conclusion, stated in his opposition to the motion to dismiss, that the Partnership and Mr. Dixon presented a fraudulent membership consent to the members of BFG "intending all the while for [the Partnership] to purchase the Bally Real Estate" is not supported by the complaint's allegations, is insufficient to cast the Partnership as the direct or indirect recipient of a fraudulent transfer, and is conjecture. Although the allegations concerning Mr. Dixon's presentment of the allegedly fraudulent member consent are insufficient to infer that the Partnership was the recipient of a fraudulent transfer, they may form the basis for other plausible claims against the Partnership as discussed below.

In short, I am bound to accept the complaint's *well pleaded* allegations as true. I cannot look beyond those allegations to infer that every act of malfeasance by Mr. Dixon can be attributed in equal measure to the Partnership based on conclusory allegations that all of his actions were taken for the benefit of the Partnership. This would, for example, impermissibly cast a net over any entity which held Mr. Dixon's numerous assets including the Dixon trusts

which have already been dismissed as defendants in this adversary proceeding. *See Blast II*, 603 B.R. at 238.

The trustee commenced this adversary proceeding more than two years ago, has amended the original complaint twice and has had access to BFG's books and records since 2016.  He has had ample time and opportunity to supplement his allegations against the Partnership with concrete allegations about its status as a direct or indirect transferee of BFG's assets or their proceeds.  He has not provided sufficient allegations to support plausible claims against the Partnership under the actual or constructive fraudulent transfer provisions of MUFTA §§ 5(a)(1), (2) and 6(a).   Thus, I will enter an order granting the Partnership's motion to dismiss counts III, IV, and V.

### B.  Count VII-Bankruptcy Code § 550

Count VII is brought under Bankruptcy Code § 550 to effectuate any judgment the trustee might recover under the fraudulent transfer counts. Dismissal of counts I, II, III, IV, and V against the Partnership necessitates dismissal of count VII. I will enter an order allowing the Partnership's motion to dismiss count VII.

### C.  Count X-Statutory Reach and Apply-Code §§ 544, 550; Mass. Gen. Laws ch. 214, § 3(8)

In count X, the trustee asserts claims under Bankruptcy Code §§ 544 and 550 and under Mass. Gen. Laws ch. 214, § 3(8) to reach and apply the assets formerly held by BFG that are now owned, controlled, or in the possession of the Partnership as a result of the alleged actual fraudulent transfers.  Dismissal of count V against the Partnership necessitates dismissal of count X against it.  Accordingly, I will enter an order allowing the Partnership's motion to dismiss count X.

### D.  *Count XVI-Conspiracy*[12]

#### 1. *Applicable Law*

As discussed in *Blast II* and *III*, the type of civil conspiracy relied upon by the trustee

here, is "akin to a theory of common law joint liability in tort" where the word "conspiracy" is

"used to denote vicarious liability in tort for 'concerted action.'" *Aetna Cas. Sur. Co. v. P & B*

*Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994).   The elements are (1) common design or

agreement between two or more people to commit a wrongful act and (2) proof of some tortious

act in furtherance of the agreement.  *Id*. (citing Restatement (Second) of Torts § 876 cmt. b

(1977)).  "Where two or more persons act in concert, each will be jointly and severally liable for

the tort." *Id*.   There is a three-year statute of limitations for the tort of civil conspiracy. *Kadar*

*Corp. v. Milbury*, 549 F.2d 230, 234 & n.3 (1st Cir. 1977) (citing Mass. Gen. Laws ch. 260, §

2A) (applying a prior version of the statute which provided for a two-year limitations period).[13]

*See also Pagliuca v. City of Boston*, 35 Mass. App. Ct. 820, 823 (1994).

---

[12] The Partnership is a Delaware limited partnership.  "Massachusetts applies the internal affairs doctrine, which 'recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands.'" *Mariasch v. The Gillette Co*., 521 F.3d 68, 71–72 (1st Cir. 2008) (quoting *Edgar v. MITE Corp*., 457 U.S. 624, 645 (1982)).  "The state with authority over a corporation's internal affairs is the state of incorporation."  *Id*. at 72. (citing *Harrison v. NetCentric Corp.*, 433 Mass. 465, 470 (Mass. 2001)).  The Partnership has not asserted in the motion to dismiss that any counts of the complaint should be considered matters pertaining to its internal affairs, and it has relied primarily on Massachusetts and First Circuit law in its briefs other than with respect agency law.  I will, therefore, not address Delaware law with respect to the remaining counts it seeks to dismiss.

[13] The statute provides: "Except as otherwise provided, actions of tort, actions of contract to recover for personal injuries, and actions of replevin, shall be commenced only within three years next after the cause of action accrues."  Mass. Gen. Laws ch. 260, § 2A.  *See also* Bankruptcy Code § 108, which provides, in relevant part: "(a) If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--

## 2. *Discussion*

The trustee asserts that the Partnership shared the common design to fraudulently transfer the Bally real estate and breach Mr. Dixon's and CapeCapital's fiduciary duties to BFG. According to the trustee, the scheme entailed Mr. Dixon and the Partnership fraudulently enticing other members of BFG into admitting the Partnership as a preferred member of BFG by representing, through the April 27, 2012 member consent, that the real estate would be purchased "by a direct subsidiary of the company" while Mr. Dixon and the Partnership planned to have the Partnership purchase the real estate instead and, in fact, had already transferred two of the parcels to entities not owned by BFG.

Allegations that the Partnership and Mr. Dixon shared a common plan to fraudulently transfer the Bally real estate to the Partnership are insufficient to support a claim for conspiracy for the same reasons stated above with respect to the fraudulent transfer claims. To the extent the trustee relies on the presentment in April of 2012 of the allegedly fraudulent membership consent as a basis for the conspiracy claim, the statute of limitations precludes any such reliance.  My rulings in *Blast II*, *III*, and *IV* preserved the trustee's conspiracy claims against Mr. Dixon, CapeCapital, and the Cape Real Estate Entities related to the Bally real estate transfers because their alleged actions in connection therewith actively continued through December 31, 2014, when the last of the three properties was sold.  The same cannot be said for any alleged acts of the Partnership in connection with the 2012 membership consent.  I will enter an order allowing the Partnership's motion to dismiss count XVI.

---

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief."  11 U.S.C. § 108(a)(1), (2).

### E.  Counts XVII (Aiding and Abetting) and XIX (Fraud)

The trustee maintains that he has sufficiently pleaded claims against the Partnership for

aiding and abetting breaches of fiduciary duties and fraud.  The trustee is vague about the basis

of the aiding and abetting claim other than to assert that there is not much distinction between a

civil conspiracy claim and aiding and abetting when fiduciary duties are involved and that the

claim is properly asserted "to the extent that [the Partnership] aided and abetted breaches of

fiduciary duty that were owed to [BFG]." The fraud claim is based on Mr. Dixon's alleged

misrepresentations concerning the Bally real estate which, the trustee asserts, Mr. Dixon made as

the general partner of the Partnership.

### 1.   Count XVII-Aiding and Abetting

The tort of aiding and abetting a breach of fiduciary duty requires that "(1) there must be

a breach of fiduciary duty; (2) the defendants must know of the breach; and (3) the defendants

must have actively participated or substantially assisted in or encouraged the breach to such a

degree that they could not reasonably have been acting in good faith." *Baker v. Wilmer Cutler

Pickering Hale and Dorr LLP*, 91 Mass. App. Ct. 835, 847 (2017) (citing *Arcidi v. Nat'l Assn. of

Gov't Employees, Inc.,* 447 Mass. 616, 623-624 (2006)). *See also Demoulas v. Demoulas Super

Markets, Inc*., 424 Mass. 501, 517 (1997) ("[T]ort actions must be commenced within three years

after the cause of action accrues. G.L. c. 260, § 2A.  A shareholder derivative action for breach

of fiduciary duty through diversion of corporate opportunities and self-dealing sounds in tort.").

There are insufficient direct allegations in the complaint that the Partnership actively

participated in or substantially assisted or encouraged Mr. Dixon to breach his fiduciary duties to

BFG in connection with the alleged real estate diversion to the Cape Real Estate Entities.

Reliance on the presentment by Mr. Dixon on the Partnership's behalf in 2012 of the allegedly

fraudulent membership consent is barred by the statute of limitations. The complaint is replete with allegations that Mr. Dixon, CapeCapital, and the Cape Real Estate Entities knowingly engaged in and aided breaches of fiduciary duties owed to BFG with respect to the initial transfers, the breached lease agreements, and the subsequent sales of the real estate, but those allegations are not made with respect to the Partnership. For these reasons, I will enter an order allowing the Partnership's motion to dismiss count XVII.

### 2. *Count XIX-Fraud*

"Under Massachusetts law, [a determination of] fraud requires that the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 357 (1st Cir. 2013) (citing *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 458 (2002)).  The Partnership asserts that the complaint fails to allege that it made any representation, let alone one that was false, material, or reasonably relied upon by BFG.  As discussed in *Blast II*, 603 B.R. at 244, failure to disclose material information may give rise to liability under common law fraud where a defendant was under a duty to disclose the information.  *See Milton v. Van Dorn Co.*, 961 F.2d 965, 968 n.4 (1st Cir. 1992) (citing *Royal Bus. Grp., Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991); *Nei v. Burley*, 388 Mass. 307, 310-311 (1983)).

As I ruled in *Blast II*, the complaint sufficiently alleges that Mr. Dixon knew that neither BFG nor its subsidiaries would acquire the Bally real estate at the time he caused the member consent to be presented to BFG's members and that the members relied on it when they approved the admission of the Partnership as a member of BFG, resulting in harm to BFG.  *Blast II*, 603 B.R. at 244; *see also Blast I*.  As the CEO of BFG and the agent of its manager, CapeCapital, Mr.

Dixon had a duty to disclose truthful information about the planned disposition of the real estate. *Blast II*, 603 B.R. at 244. I also find it reasonable to infer from the complaint's allegations that Mr. Dixon was acting as the agent of the Partnership when he presented the consent.  Securing the members' consent was coextensive with Mr. Dixon's actions in causing the Partnership to invest in BFG and would have been a prerequisite to the admission of the Partnership as a member.  Accordingly, I believe a reasonable inference can be drawn that Mr. Dixon was acting within the course of the Partnership's business and within his authority as its general partner when he presented the membership consent to the members of BFG. I will enter an order denying the Partnership's motion to dismiss count XIX.

### F.  Count XXV-Alter Ego/Piercing the Corporate Veil

In count XXV, discussed at length in *Blast II*, *III*, and *VIII*, the trustee also asserts alter ego claims against the Partnership based on its lack of separateness from Mr. Dixon.  In support, he relies on allegations in the complaint that Mr. Dixon owned 100% of the interests in and was the general partner of the Partnership, Mr. Dixon used the Partnership for asset protection and tax minimization, the Partnership had no partnership agreement or bona fide limited partners, and that it followed no formalities. As stated in *Blast II, III, and VIII*, a gravamen of the complaint is the claim of gross inequity and injury to BFG's creditors resulting from alleged fraudulent and improper use of numerous entities Mr. Dixon controlled (and which also controlled BFG) to misappropriate and divert BFG's assets beyond creditors' reach while BFG was insolvent. While the trustee has sufficiently pleaded allegations of active participation in or pervasive control over the activities of BFG by Mr. Dixon and CapeCapital, the Cape Real Estate Entities, and Newfit, which he controlled, constituting fraud and resulting in injury, the bulk of the allegations against the Partnership in that regard contain no details of similar involvement

21

and are conclusory. That is the case notwithstanding Mr. Dixon's presentment of the allegedly

fraudulent membership consent.  While a lone common law fraud claim against the Partnership

may survive the motion to dismiss, allegations based only on the membership consent are not

enough to support a veil piecing claim which, as discussed in *Blast II* and *III*, is permitted only in

rare instances.  *Blast II*, 603 B.R. at 246-47.

The allegations in the complaint that the Partnership had no separateness from Mr. Dixon

because he owned 100% of its interests and because he used it as a vehicle for asset protection

and tax minimization are overly broad as many wholly owned business enterprises serve similar

purposes. Additionally, the allegations that the Partnership followed no organizational or

operational formalities are conclusory and, in some instances, contradicted by other allegations.

On the one hand, the trustee alleges that the Partnership was "never properly capitalized" and

elsewhere alleges that the Partnership was formed for the purpose of wealth management after

Mr. Dixon received a "massive fortune." In another instance, the trustee alleges that the

Partnership had no bona fide limited partners and elsewhere alleges that Mr. Dixon sought to

prevent adverse tax events for partners. Although the trustee has sufficiently supported his claims

for piercing the corporate veil/alter ego, for purposes of a motion to dismiss, with specific

allegations against Mr. Dixon, CapeCapital, the Cape Real Estate Entities, and Newfit, he has not

provided enough with respect to the Partnership. I will enter an order allowing the Partnership's

motion to dismiss count XXV.

### G.  *Count XI-Establishment of a Resulting/Constructive Trust*

In Massachusetts, "[a] constructive trust is a flexible tool of equity designed to prevent

unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential

relationship, mistake, or 'other circumstances' in which a recipient's acquisition of legal title to

property amounts to unjust enrichment." *Maffei v. Roman Catholic Archbishop of Boston*, 449 Mass. 235, 246 (2007) (citing *Fortin v. Roman Catholic Bishop of Worcester*, 416 Mass. 781, 789 (1994)). The trustee asserts that as long as he has claims against the Partnership, it is appropriate that the remedy of constructive trust be available in the event equity so requires. For the reasons stated above, I find that the complaint's allegations are not sufficient to support claims that the Partnership directly or indirectly received the misappropriated rights to purchase the Bally real estate, the real estate itself, or the resulting sale proceeds.  Thus, I cannot infer that the Partnership acquired legal title to any property or proceeds on which to impress a constructive trust. Accordingly, I will enter an order allowing the Partnership's motion to dismiss count XI.

## V. <u>Conclusion</u>

Based on the foregoing, an order shall enter granting the Partnership's motion to dismiss with respect to counts I, II, III, IV, V, VII, VIII, X, XI, XVI, XVII, XVIII, XXIII, XXV, XXIX, and XXX of the trustee's complaint and denying the motion with respect to count XIX.


Dated: April 27, 2020                                    By the Court,


                                                        Melvin. S. Hoffman
                                                        United States Bankruptcy Judge

Counsel Appearing:    Ilyas J. Rona, Esq.
                      Milligan Rona Duran & King LLC
                      Boston, MA
                      for the plaintiff, Gary W. Cruickshank,
                      Trustee of the Estate of Blast Fitness
                      Group, LLC

                      Joseph S.U. Bodoff, Esq.
                      Rubin & Rudman LLP
                      Boston, MA
                      for the defendant, Dixon Family Limited Partnership